# CASES ARGUED AND DECIDED

## IN THE

# SUPREME COURT OF MISSISSIPPI,

### AT THE

# OCTOBER TERM, 1907.

---

## J. L. JORDAN *v.* B. B. BOBBITT ET AL.

### [45 South., 311.]

1. LIMITATIONS. *Probate sales. Purchase of land. One year limitation. Remainderman. Code 1871, § 2173.*

   The limitation of one year from the sale in favor of purchasers of land sold by any administrator, executor or guardian by virtue of the order of any probate court, when the sale is in good faith and the purchase money paid (Code 1871, § 2173), will bar recovery by a remainderman who fails to bring suit against a purchaser in possession within one year after the termination of the particular estate, although when the sale was made and for many years thereafter he had no right to sue by reason of the existence of that estate.

2. SAME. *Bad Faith.*

   Bad faith is not imputable to the making of a sale by an administrator to pay debts under decree duly entered merely because it appears by the record that the debts of the estate were barred.

FROM the circuit court of Leake county.

HON. JAMES R. BYRD, Judge.

91 Miss.—1

This was an action of ejectment brought by the appellees, Bobbitt and others, and against the appellant, Jordan, to recover the land in controversy. The facts of the case are fully set out in the several opinions delivered by the members of the court.

*McMillon & Howard,* for appellant.

This case is one in which there is a great mass of record evidence, and the court should have continued the case for the term in order to have given time to have introduced the testimony regularly and to have heard and understood the same, instead of rushing it through on Saturday night, the last day of the term.

Dower was never assigned to the widow of A. I. Bobbitt, deceased. Code 1857, p. 469, art. 173, requires the petition for dower to be filed in the county of the residence of the deceased last before his death, and that it particularly specify the lands out of which dower is to be assigned. The petition in the case at bar fails to show that it is filed in the county of the residence of the deceased, while it is held in *Caillaret* v. *Bernard,* 7 Smedes & M., 316, that this statute must be strictly complied with to give the court jurisdiction to act.

The writ of dower: Under Code 1857, p. 469, art. 173, the writ must issue to the sheriff directing him to summon three discreet freeholders as commissioners, not connected with the party by consanguinity or affinity and entirely disinterested, who shall allot and set off by metes and bounds to the said widow her dower in the lands of her deceased husband. The return on the writ in the case at bar fails to show that the writ was executed as required by law, both on the part of the sheriff and the commissioners. The sheriff's return fails to show that the commissioners summoned were discreet freeholders, and that they were not related to the party and entirely disinterested. The return of the commissioners fails to show that they set off the dower of the widow by metes and bounds, as was required

by law.   *Gill* v. *Jones,* 57 Miss., 367.   The writ of dower
should specify the land out of which the dower should be al-
lotted; otherwise the commissioners would be at sea.. They
would not know what lands to take into consideration, as is
shown by the report in this case; the report showing that they
set apart lands that were not in the petition.

Unassigned dower is a mere right or chose in action, and no
estate ever vests in the widow to any particular lands until
the law has been fully complied with in setting off her dower,
and she has been put in possession by the sheriff after dower
has been legally set off by the commissioners.   When the land
has been set off according to law, it becomes the duty of the
sheriff, under and by virtue of the writ of dower, to put the
widow in possession of the lands set out, "which possession
shall vest in her such estate as she may be entitled to under this
act," says Code 1857, p. 470, art. 173.   Until she is thus put
into possession, no title ever vests in her, but she stands as
before, only holding a right of dower, which is held, in *Ligon* v.
*Spencer,* 58 Miss., 37, a mere right or chose in action.   When
the sheriff and commissioners have fully complied with the law,
they shall make their report to the court, which shall be re-
corded.   Code 1857, p. 470, art. 173.

Should the court hold that W. B. Mann and those holding
under him could not hold adversely against the heirs of A. I.
Bobbitt under the deed executed to him by Mary E. Middleton
and Henry A. Middleton dated December 6, 1867, the appellee
having shown no title in A. I. Bobbitt, then, dower having
never been assigned to Mary E. Middleton, the widow of A. I.
Bobbitt, deceased, W. B. Mann only acquired under said deed
an equitable one-third interest in the lands embraced in said
deed — an interest which he could have only enforced through
a court of equity.   *McKenzie* v. *Donald,* 61 Miss., 452, 455.
In the case of *Morton* v. *Carroll,* 68 Miss., 699, 9 South., 896,
the lands were sold, and the widow shared in the proceeds.
It is held in the case of *Rule* v. *Broach,* 58 Miss., 552, that, the

vendee having acquired only an equitable interest in the un-assigned dower interest in the lands, he could not defend by his deed an action of ejectment brought by the heirs. This being the law, W. B. Mann, nor those holding under him, could not have defended against an action of ejectment by the heirs of A. I. Bobbitt, deceased, until they had lost their right of action by failing to bring suit within 10 years after they became of age. Having the right to bring an action of eject-ment, and failing to exercise such right for more than ten years after they became of age, and W. B. Mann and those holding under him having held the lands in peaceable and adverse pos-session for more than ten years after they became of age, they had been long since barred at the time they brought this suit.

It is further held in the case of *Rule* v. *Broach,* 58 Miss., 552, that the purchaser of the lands of a decedent from the widow, whose dower has not been allotted, acquires no title as against the heirs, because. of the rule in this state that the right of dower is not assignable (see the facts in this case). See *Ligon* v. *Spencer,* 58 Miss., 37, for definition of unas-signed dower.

Dower having not been assigned, the right was lost to the widow in ten years after she abandoned the premises. She abandoned the premises in 1867. Therefore her right of dower was barred in 1877, at which time the heirs of A. I. Bobbitt had the right of ejectment against any one then in possession, and, they having failed to exercise this right for the period of ten years after they arrived at their majority, they had long since lost their right of action against W. B. Mann and those claiming under him, at the time they brought this suit. *Westbrook* v. *Hawkins,* 59 Miss., 499.

It was error for the court to admit the testimony of Lucy Miller, one of the plaintiffs in the court below, to prove the death and the date of the death of Mary E. Middleton, when she admitted that she had not seen Mary E. Middleton for fourteen years, and only testified to what purported to be the

statements of Henry A. Middleton, the surviving husband of Mary E. Middleton. This character of testimony is only admissible to prove pedigree, and then only when the party making the statements is dead. The testimony of Mrs. Miller shows in this case that Henry A. Middleton was living, and that the daughter of Mary E. Middleton was living and both residing within the jurisdiction of the court in which she was testifying. She also shows that one of the plaintiffs in the court below, B. B. Bobbitt, was residing at the time she was testifying in Franklin county, Miss., the county in which Mary E. Middleton is claimed to have died. 1 Greenleaf on Evidence (16th ed.), p. 197, § 114b; Gillett on Indirect & Collateral Evidence, p. 198, § 143; 16 Cyc., p. 1231, § 3 (primary evidence unattainable); 7 A. & E. Enc. Law (1st ed.), p. 73, art. 31; *Fulkerson v. Holmes,* 117 U. S., 397, 6 Sup. Ct., 780, 29 L. Ed. 915 (1886).

In ejectment defendant's possession of the land will be presumed to be rightful until plaintiff shows title. Plaintiff's bill of particulars must show title from the government down, and where such bill of particulars fails to show title peremptory instruction is proper. *Goforth et al. v. Stingley et al.,* 79 Miss., 398, 30 South., 690. In this case the appellee fails to show title in A. I. Bobbitt, by their bill of particulars, and also by their evidence.

It is claimed by counsel for appellees that the estate of A. I. Bobbitt was never declared insolvent for the reason that the administrator did not file, with his petition for the estate to be declared insolvent, a schedule of the assets and liabilities of the estate, and for the further reason that the heirs did not have notice of this petition before the probate court. This contention is certainly erroneous, as the record now pending before the court shows that the administrator complied strictly with the law then in force. The estate was declared insolvent under Code 1857, p. 448, art. 98, which did not require that the minors, without guardian, should be served with notice.

Yet they were all served with notice. Lucy Bobbitt and Dick Bobbitt, were served personally, and all the heirs were served by publication upon an order of the probate court, as will appear from pages 155 and 156 of the record in this case, as provided under Code 1857, p. 429, art. 22, and proof of said publication made, as will appear from pages 159 and 160 of this record. In all proceedings in the probate court affecting the right or interest of an infant, it was necessary under the Code of 1857 that his guardian be summoned, if he had one, and if his guardian was adversely interested, or failed to appear, then that a guardian *ad litem* be appointed for him. It was not required in any case that the infant should be summoned, but it was required that he have a guardian in court to represent him. Neither was it necessary for the record to show that he had neither father nor mother nor guardian under Code 1871, §.1148. *Burrus* v. *Burrus,* 56 Miss., 92; *Bailey* v. *Fitzgerald,* 56 Miss., 579. This rule as to notice to minors applies the same to sales of land as to insolvency proceedings, as will be seen from *Railway Co.* v. *Blythe,* 69 Miss., 939, 950, 11 South., 111, wherein the rule is expressed in this language: "In this State it is a well-settled rule that notice to minors in proceedings in the chancery court for the sale of land derived from their ancestors is unnecessary."

The following cases, at first glance, appear to be in conflict with the above rule; but when noticed it will be seen that they are not cases for the sale of minors' lands derived from ancestors, but are cases coming under another section or article of the respective Codes (Code 1871, § 704, and Code 1857, p. 489, art. 64), and have no application to sales of minors' lands which they have derived from ancestors: *Erwin* v. *Carson,* 54 Miss., 282; *Moody* v. *McDuff,* 58 Miss., 701; *Gibson* v. *Currier,* 83 Miss., 235, 35 South., 315, 102 Am. St. Rep., 442.

Where the petition for the sale of lands was filed by the guardian, it was unnecessary to summon the guardian, and the final decree for sale of the lands in this cause was made upon

the petition of R. Reid, administrator *d. b. n.*, and who was at the same time guardian for all the heirs who were then minors. *Gregory* v. *Orr,* 61 Miss., 307.

It is claimed by the appellees that the order for the sale of these lands to pay debts filed by John A. Hanson, administrator, is void for the reason that the petition is not accompanied by an account of the personal property and the debts due by the estate. This cannot be true for the reason that the petition shows that there is no personal property to report, and that the estate has been previously decreed to be solvent, and that it is still insolvent. Had the estate never been declared insolvent, then this contention might be true; but a schedule of the debts and liabilities having been previously presented, and the estate decreed to be insolvent, it was not necessary to again file a schedule of the indebtedness. They further claim that the sale is void for the reason that the heirs had no notice of the sale or the petition for the order for sale. This position is certainly erroneous for the reason that the record in this case shows that R. Reid, who was then guardian for all the minors, was served with summons (which was all that was required under § 1148 of the Code of 1871, as previously shown in this brief), and in addition to this there was publication of notice to all parties in interest made in accordance to an error of the chancery court under § 1013 of the Code of 1871.

The proper notice was given of the sale, and the lands were regularly sold, the money paid to the administrator, R. Reid, deeds made to the purchasers, and the sale reported to the court; but by some oversight or neglect on the part of the court the sale appears to have never been confirmed by the court. This defect, however, is cured by the fact that the purchaser at the administrator's sale paid the money and was delivered possession, and, even more, the administrator executed his deed of conveyance to him. It is held, in the case of *Johnson* v. *Cooper,* 56 Miss., 608, that where executors or administrators, under order of the chancery court, sell land, receive the

purchase money, and deliver possession to the purchaser, and he holds possession for many years, and makes improvements on the land, it must be held that the sale has been confirmed by the acts of the parties.   The parties to the sale are the executor or administrator and purchaser; the devisees not being parties thereto, though they were parties to the proceedings which resulted in the order of sale.

It is contended by the appellees that the debts against the estate of A. I. Bobbitt were barred by statute of limitation at the time the land was sold and therefore the sale is void.   This contention cannot be true for the reason that the statute of limitation was suspended in 1861 and 1862 and never began to run again until the 2d day of April, 1867.   George's Digest, p. 497, par. 193, and for the further reason that the six months' notice to creditors, required under Code 1857, p. 449, art. 101, was never given, and for the reason that a failure to probate claims after the estate was declared insolvent did not, under Code 1857, p. 450, art. 101, bar nonprobated claims as to any surplus that might remain after paying off the probated claims. Also, for the further reasons that part of the claims were judgments, and quite a number of the claims due at the time the estate was declared insolvent were claims that did not mature until after the death of A. I. Bobbitt.   In the case of *Sivley* v. *Summers,* we find the court holding thus:   Under Code 1871, § 2155, continued in force from Code of 1857, the claim of R. S. Drone evidenced by the promissory note of the testator, due and payable June 1, 1865, was not barred because it matured after the death of the testator and maker, and therefore was not a cause of action against him, and, according to repeated decisions, is not affected by the statute cited.   In the case of *Matthews* v. *Matthews,* 66 Miss., 239, 6 South., 201, it is intimated all the way through, and we think sound law, that the petition of the administrator for the sale of land to pay debts is such an action for the collection of the debts as will stop the statute of limitation from running against credit-

ors. The case of *Nutt* v. *Brandon,* 85 Miss., 705, 38 South. Rep., 104, does not overrule or even affect the two cases just cited. *Sivley* v. *Summers,* 57 Miss., 712, and *Matthews* v. *Matthews,* 66 Miss., 239, 243, 6 South., 201. The opinion in both these cases was delivered by Judge Campbell, and the opinion in the case of *Nutt* v. *Brandon,* just cited, was delivered in exact accordance with the argument of Campbell before the court. In this argument, he does not fix the time at less than ten years, but, upon the contrary, says that the claims had run for more than ten years. The case of *Nutt v. Brandon* has no bearing on the case at bar, as it was a case wherein the court was called upon to say whether or not claims which had been running for 30 years or more, without any effort to collect them, were good against the estate at that time, and if they could be collected by law. In the case at bar, the claims have already been collected, the land sold, and the heirs given legal notice of the petition to sell. The heirs had their days in court, and, having failed to respond to the petition for sale and to protest against the decree for sale in any way, the decree for sale was a valid judgment against them, and, though it had been an invalid judgment against them for the reason that the debts were barred, they cannot now attack that judgment collaterally. *Hendricks* v. *Pugh,* 57 Miss., 157; *Cocks* v. *Crosby,* 57 Miss., 183; *McLemore* v. *Railroad,* 58 Miss., 514; *Rigby and Wife* v. *Lefevry et al.,* 58 Miss., 639; *Sadler v. Trustees Prairie Lodge,* 59 Miss., 572; *Temples* v. *Cain,* 60 Miss., 478, 484. Where the decree ordering sale recites that it appeared to the satisfaction of the court that summons had been issued and duly served on all persons interested in said suit, this is sufficient to sustain the jurisdiction of the court as to the objection for want of service on the heirs of the estate as against a collateral attack. *Shannon* v. *Summers,* 86 Miss., 619, 627, 39 South., 345. The saving clause to minors in Code 1871, § 1265, does not apply to decrees and sales of the property of deceased persons and the sales of lands by guardians under order of the chancery

court. *Mayo* v. *Clancy,* 57 Miss., 674; *McLemore* v. *Railroad Co.,* 58 Miss., 527.     Examine § 1265 of the Code of 1871. The case of *Sweatman* v. *Dean,* 86 Miss., 641, 38 South., 231, reaffirms the doctrine set out in *Cocks* v. *Simmons,* 57 Miss., 183, as to collateral attacks on final decrees.    See last of page 646 and top of page 647 of 86 Miss., p. 232 of 38 South. In the case of *Sivley* v. *Summers,* 57 Miss., 712, 716, the decree had been set aside at a former hearing of the court, but not at all for the reason that the debts were barred, but was set aside on other grounds, and the parties allowed to plead the statute after the sale had been set aside.

W. B. Mann, having bought these lands in good faith at the administrator's sale, and having paid the money, received a deed, and, having gone into possession thereof, we could admit that the sale was void, which we do not, and then the appellees are barred of their right of action under § 2173 of the Code of 1871.    In the case of *Morgan* v. *Hazlehurst Lodge,* 53 Miss., 665, and at page 697 of said case, we find this language used in construing the above-mentioned section:  " Code 1871, § 2173, was enacted to cure an evil of purchasers who bought lands at such sales in good faith and paid their money for them, which were almost without exception void or voidable, years afterwards losing their lands."   In the same case, at page 297 in the opinion, that " § 2173 of the Code of 1871 curative, has its origin in that policy, and should receive that construction that will accomplish the end."    Same case, page 683:   " Though the sale be void, he is under color of title, and the statute does no more than protect and perfect his imperfect right after the expiration of one year from the time the right to bring the suit arose."

In the case of *Hall* v. *Wells,* 54 Miss., 289, after discussing the evil intended to be covered, Judge Campbell says, at page 297 in the opinion, that " section 2173 of the Code of 1871 applies to all sales of the class mentioned which are invalid, no

matter on what ground; every sale which is included in the evil intended to be remedied is embraced."

In the case of *Summers* v. *Brady,* 56 Miss., 10, it was held, at page 17 of this opinion, that, though the purchase money was not in good faith and was void, § 2173 of the Code of 1871 would protect an innocent vendee who had purchased after the bar had become complete, as far as can be discovered by the record. "It could never have been intended to limit the benefit of the statute as to require remote purchasers to prosecute inquiries into the hidden interest of the administrator in the purchase. This we think the true and only safe rule to carry into effect the purpose of the statute and to give that verity to the titles which is to the best interest of all people." It is also held in this case that "all parties are supposed to have notice of the judicial seizure of the property in making the sale, and they are required to assert their right within one year thereafter, and the Legislature saw fit to make no exceptions in favor of minors and married woman."

While a contrary rule has been established by the court as to subsequent purchasers by the case of *Gibson* v. *Currier,* 83 Miss., 234, 35 South., 315, 102 Am. St. Rep., 442, and *Shannon* v. *Summers,* 86 Miss., 619, 38 South., 345, there was a dissenting opinion in both these cases. In the case of *Gibson* v. *Currier,* 83 Miss., 234, 35 South., 315, 102 Am. St. Rep., 442, Judge CALHON delivered a very able dissenting opinion, basing it on the case of *Summers* v. *Brady,* 56 Miss., 10, and the case of *Shannon* v. *Summers,* 86 Miss., 619, 38 South., 345, Judge TRULY rendered a dissenting opinion, holding that the true construction of § 2173, Code 1871, had been announced in the case of *Summers* v. *Brady,* 56 Miss., 10. Thus we see that, had it not been for the fact that Judge CALHOUN was off the bench on account of his health at the time of the case of *Shannon* v. *Summers,* 86 Miss., 619, 38 South., 345, was decided, it would have been held in that case that

the true construction had been announced in the case of *Summers* v. *Brady,* as we see that both Judge Calhoun and Judge Truly were of the same opinion on this question.

In the case at bar, however, there is no question of bad faith on the part of W. B. Mann in the purchase at the sale of R. Reid, administrator, *d. b. n.,* and the records show that the proceedings were regular, and the money paid by him to the administrator, and a deed executed to him, and that at said sale there were other lands purchased by other parties, and that Mann purchased other lands than that alleged to be dower lands, and he paid a better price for the lands purchased by him than most, if not all, the other purchasers at said sale. It is held, in the case of *Shannon* v. *Summers,* 86 Miss., 619, 38 South., 345, that the statute protecting sales made in good faith and the money paid applies even where the sale is made in violation of the Constitution. What could be worse than an infringement upon the Constitution?

It is contended by counsel for appellee in the trial before the circuit court, and so held by that court, that they had two years after the death of Mary E. Middleton in which to bring this action, and that their right of action was governed by § 2760 of the Code of 1892, and not by § 2173 of the Code of 1871. The falsity of this contention and holding is so prominent that we consider it hardly necessary to mention it here, but will say that the sale was made, as the record shows, under the Code of 1871, and by examination of that statute we find that it applies to all sales of the class mentioned heretofore or hereafter made, while the same provision was brought forward in Code 1880, § 2693, extending the time to two years, and again brought forward in Code 1892, § 2760; but in the Codes of 1880 and 1892 the provision only applied to sales that were thereafter made, which provisions could not affect the provisions of the Code of 1871 and sales made under that Code. In the case of *Jeffries* v. *Dowdle,* 61 Miss., 504, the

petition was filed by the guardian to sell the lands on the 5th day of October, 1869, and the defendant there relied upon § 2173 of the Code of 1871, and was sustained. The suit was brought by the heirs of Tate on the 15th day of August, 1883, being long after the Code of 1880 went into effect. In the opinion delivered in this case, we find the court especially holding: " That if there was an order of sale by the probate court, and the sale was in the honest purpose to execute the order and the purchaser bought in the honest effort to obtain title and paid the purchase money, the fact that the guardian may have desired the sale to be made that he might get and use the money did not affect the good faith of the sale, if there was no collusion between him and the purchaser, and it is not intimated that there was, in the record." The sale was upheld in this case as to all the lands sold by the guardian, under the order of the court, when in fact the alleged guardian was not guardian for the party as a lunatic, but was only guardian for him while a minor. The same principles are followed and reaffirmed in *Gibson* v. *Currier,* 83 Miss., 235, 35 South., 315, 102 Am. St. Rep., 442, and *Shannon* v. *Summers,* 86 Miss., 619, 38 South., 345.

It may be argued by appellees that the fact that W. B. Mann purchased at the administrator's sale, and was at the same time holding a deed from Mary E. Middleton and Henry A. Middleton to the lands involved in this suit, would indicate bad faith upon his part. This could not be true. It was the natural thing for him to do, and the thing that any other sane man would have done. W. B. Mann bought forty acres at that sale, which was not embraced in the deed from the Middletons to him, and, as stated before, he paid a better price for the lands that he bought than most, if not all, other parties buying at that sale. From the report of sale, as appears in the record, it will be seen that at that sale the purchasers, the land purchased, and the prices paid were as follows:

W. B. Mann S. W. ¼ of N. W. ¼, section 13, township 10, range 7 .............................. $ 52 00

W. B. Mann E. ½ of S. W. ¼ and S. E. ¼ of N. W. ¼, section 12, township 10, range 7, and N. W. ¼ of N. W. ¼, section 13, township 10, range 7, less 7 acres in said S. E. ¼ of N. W. ¼ ............. 155 00

Mariah T. Mann " N. E. S. ¼," section 11, township 10, range 7, 160 acres, for .................... 158 00

W. M. Cotten S. W. ¼ of S. E. ¼, section 13, township 10, range 7, 40 acres, for ................. 12 50

J. L. Plunkett E. ½ of S. W. ¼, section 13, township 10, range 7, 80 acres, for ..................... 40 00

$417 50

In the case of *Wood* v. *Bott and Wife,* 56 Miss., 128, it was held that the widow, after dower was assigned, could buy the lands without any taint of fraud.

In the case of *Woodstock Iron Co.* v. *Fullenwider,* 87 Ala., 584, 6 South., 197, 13 Am. St. Rep., 73, it is held that heirs are estopped to deny the validity of a chancery sale of any character after the lapse of twenty years.

The reversionary interest in these lands was liable to creditors and subject to be sold to pay the debts.     *Wood* v. *Bott,* 56 Miss., 128; *Shannon* v. *Summers,* 86 Miss., 619, 38 South., 345; *Morton* v. *McCandles,* 68 Miss., 812, 10 South., 72; *Bridgefourth* v. *Maxwell,* 42 Miss., 743; 14 Cyc., p. 925; *Acker* v. *Trueland,* 56 Miss., 30; *Morton* v. *Carroll,* 68 Miss., 699, 9 South., 896; *Hazlip* v. *Nunnery* (Miss.), 29 South., 821.

*Mayes & Longstreet,* on the same side.

This case has been so fully briefed for the appellant and for the appellees that we shall not tax the time of the court by any attempt to go over the whole field of controversy and reply in

detail to the various counter propositions submitted with so much ability by counsel for the appellees in their brief. We add, however, the suggestion that the record does not show that the debts were barred; the administrator may have proceeded, and probably did proceed, under *Byrd* v. *Wells,* 40 Miss., 711, decided in 1866–67. We shall make a short reply, confining ourselves to what seems to us the determinative question in the case.

Even if it should be conceded for the argument (a concession which we do not make absolutely, but only for this argument) that the judicial sale made by the chancery court was absolutely void, the whole matter was closed out by operation of § 2173 of the Code of 1871. If it be granted that this section did not begin to run, as to its bar, until the widow died, yet still it is clear from this record, and it is not denied, that she died more than a year before this suit was instituted. Section 2173 was not repealed by Code 1880, § 2693, nor by the corresponding section of the Code of 1892 (§ 2760). Both the latter sections are different in the respect that neither one of them applies to any sale made before their respective dates. Neither applied to a sale made before 1880. Each has reference only to sales " hereafter " made. The full and true rule is simple and just. The Codes of 1880, 1892, and 1906, have been respectively so framed as that on this point the statute of limitations contained in each Code governs the right of parties in respect to judicial sales made under such Code.

The argument made by counsel for appellees in their brief, to the effect that § 4 of the Code of 1880 (§ 2693), and Code 1892, § 2760, did not keep alive the rights of appellant in this case, and the citation of *Wilkerson* v. *Hudson,* 71 Miss., 130, 13 South., 866, to support that view, is a boomerang. The very reason why in that case it was held that § 4 of the Code of 1880 and 1892 did not apply to the statute of limitations involved in that case was because the Code of 1880 did contain a statute of limitations which, by

its terms, was applicable. But in the case at bar neither the Code of 1880 nor the Code of 1892 does contain any such statute. As pointed out above, the corresponding statutes in those two Codes are by their very terms limited to sales which were made after those statutes in those Codes became operative. In neither Code is there any statute which by its terms, or by any possible construction, is applicable to a sale made prior to the year 1880. Therefore the right in this case falls squarely within the language of § 4 of the Code of 1880, and the provision of such § 4 as to it is not overridden or set aside by the fact that there is a specific provision elsewhere in such Code applicable to the case, for there is none.

We submit, further, that this particular statute is more than a mere statute of limitations. It is a statutory rule of property, and is and was an essential feature of the contract of each purchaser who buys at a judicial sale. By the law it is fixed, and such purchaser knows, that if he act in good faith his title is conclusively made good after the lapse of the statutory period. By the purchase he buys a title conditional for one or two years on the regularity of the court proceedings, but certain afterwards, and to repeal this statute would degrade the title so purchased by him by attaching to it the element of uncertainty for possibly a lifetime. Therefore, by the act of repeal, the Legislature would put the purchaser in the attitude that he has a very different contract from that which he made at the time of his purchase.

We submit that the principle of *Moody* v. *Hoskins,* 64 Miss., 468, 1 South., 622, covers. However that may be, *Wilkerson* v. *Hudson* is a direct authority for our contention. There it was decided that one who purchased a tax title under the Code of 1880 was entitled to bring an action of unlawful detainer after one year, as provided in that Code, and did not have to wait two years, as provided in the Code of 1892; and in holding that he was entitled to sue in one year under the Code of 1880, because of § 4 of the Code of 1892, this

court said, generally, that: " This view accords with the expressed purpose of the Code of 1892, as of all former Codes, to affect or disturb former transactions as little as possible. The various statues of limitation are, by express provision, to apply to and govern rights of action accrued under them, except where a bar has accrued under the provisions of the Code, and the purpose is shown to make the Code prospective, except as to proceedings which relate to forms and remedies, and not to time."

Whether § 4 kept alive § 2173 of the Code of 1871 as to this transaction or not is a question not to be settled by considering the meaning of the words " any right accruing or accrued," as counsel have attempted to do. The section is of broader application than that. It provides also that no " act done " shall be affected; and most certainly this purchase in 1873 was an " act done " under Code of 1871, and the express provision is that the new Code should not " affect " it. It seems idle to say that the contention of counsel herein is not for anything that would " affect " it, for if the contention were allowed the direct effect would be to nullify the act of purchase.

It is also insisted that, inasmuch as the plaintiffs were remaindermen, and could not sue the purchaser at once because he was a life tenant, and the plaintiffs were not entitled to immediate possession, the cause of action did not accrue to them at the same time, but only at the widow's death; and, inasmuch as the statute provides on its face that actions must be brought within one year from the date of sale, therefore the statute does not apply to such a case. But the argument overlooks the express and practically contemporaneous construction of the statute, on this point, in *Morgan* v. *Hazlehurst Lodge,* 53 Miss., 665. It was there held that, notwithstanding the phrasing of the statute, it did not begin to run until there was a claimant in possession who could be sued; but also it was held that the statute would run whenever that came to be the case. Page

682 of 53 Miss. If the contentions of counsel in this case were allowed, the effect of their construction would be to destroy the statute in every case in which there was outstanding an estate either in curtesy or dower, or a term of years, and under the Code of 1871 all existed. The salutary aim of the provision, as fully set forth in the cases of *Hazlehurst Lodge, supra,* and *Hall* v. *Wells,* 54 Miss., 289, would be defeated. Of course, the statute must now be construed as it would then have been construed in a similar case. Bill in equity did lie at once under § 975, Code 1871 (§ 500, Code 1892; § 1833, Code 1380). See *Carlisle* v. *Tindall,* 49 Miss., 229; *Fox* v. *Coon,* 64 Miss., 465, 1 South., 629.

It is further contended by the appellee that the burden of proof which rested upon the appellant to show that the sale was in good faith, and the money paid, has not been met.

First. As to the payment of the money: The record in this case contains a report made to the court by the administrator in which his receipt of the money is expressly acknowledged to the court (Tr., p. 204). So far as the payment of the money is concerned, we submit that this is all the proof of payment which we are required to make. It was not the duty of the purchaser, after paying the money to the administrator, to see to its proper application. That is not the language of the statute. The obligation on him is to show that the money was paid, and not to show that the administrator properly disposed of it or accounted for it. In addition to this, the administrator's deed expressly acknowledged receipt of the money. See Tr., p. 208.

Second. The burden of proof of showing that the sale was in good faith is easily met. In fact, it is met simply by showing that the sale occurred under a decree of the court, and by showing that the money was paid. The law presumes that the purchaser's purchase was made in good faith. It is a disputable presumption, it is true, but still it is a presumption. There is a *prima facie* case. This court has frequently held that fraud

is not to be assumed, and only so long ago as Monday, the 11th of March, the Chief Justice of this court delivered an opinion to the same effect overruling the finding of a chancellor on the facts. ,

Counsel for the appellees tried to make out a showing of bad faith as against the administrator, by rehearsing in their briefs the various irregularities and defects of the record, from which irregularities and defects they argue that the administrator must have proceeded in bad faith. The answer to this proposition is twofold:

In the first place, it is not a question of the administrator's good faith or bad faith, but it is a question of the good faith of the purchaser. This is shown by the whole current of decisions on this statute. In each of the cases in which sales have been avoided under this statute on the ground of bad faith, it is because the facts of the case affirmatively show that something had been done which was censurable and improper, about the sale, in which the purchaser had participated as well as the administrator.

In the second place, you cannot argue bad faith under this statute merely from the fact that the proceedings leading up to the sale were irregular, and that the things which ought to have been done under the various statutes were not done. If this could be done, and such a line of argument were proof of bad faith, then the statute would be nullified. The very object of it was to prevent these questions of irregularities and defective proceedings from being gone into for the purpose of vitiating the sale, after the lapse of one year. To allow these same questions, then, to be gone into for the purpose of showing bad faith, is obviously illogical and in contravention of the purpose of the statute. So far from relieving the situation intended to be relieved, it would leave it just where it was before, with the difference that the sale would be set aside, not because of the original defects thereof, but because those original defects showed bad faith in the sale. In other words, the title,

so far as its security was concerned, would be put back into the very same hole it was taken out of.

We had not expected to file any further brief in this case, and we have really very little to add to the briefs already on file in behalf of the appellant. However, in deference to the suggestion of the court that we do so, we have prepared, and we submit the following:

First. On the question as to whether the statute of limitations applicable to this case is § 2173 of the Code of 1871, or is § 2760 of the Code of 1892, we have to say that this question seems to be settled in favor of the application of the former section, not only by the general argument which is submitted in our prior brief, but also by precedent of this court. In the case of *Jeffries* v. *Dowdle,* opinion by Judge CAMPBELL, decided at the April term, 1884, and reported in 61 Miss., 504, that section was applied as being the one which constituted the bar in a case exactly like this. A guardian sale had been made under the Code of 1871. Suit was brought to vacate that sale in August, 1883, but the court held that the suit was barred by the one-year statute of 1871. Just as in the case at bar we claim should be done, the statute that was applied was that which was in force, not when the suit was brought, but when the sale was made. In that case, too, the court will observe that the question of good faith of the sale was submitted to the jury by instructions of the court, and the court did not undertake to decide that point as it is now claimed here that his honor below must have done in this case.

Secondly. The able attorney for the appellee in his oral argument did not undertake to show why this suit could not have been brought in equity as soon as the deed of 1873 was executed, in accordance with the clear principle of *Fox* v. *Coon,* 64 Miss., 465, 1 South., 629. The Chief Justice suggested from the bench that perhaps an equity suit did not lie, and perhaps the statute did not attach for the reason that the statute in turn was made applicable, and applicable only, to

actions for the possession of property. But this is an error. The language of the statute is not so limited. The statute runs as follows: " Nor shall any action be brought to recover land or other property, hereinafter sold by order of a chancery court, where the sale is in good faith, and the purchase money paid, unless brought within one year after such sale." The statute does not say that no action shall be brought to recover possession, and therefore there is no suggestion in the statute, by the employment of so narrow a term, that the prohibition of the statute is confined to possessory actions alone. The language of the statute is broad. It provides that no action shall be brought to recover the property, and we submit that a bill in chancery to vacate and set aside an adverse and hostile claim to a reversion is an action to recover property. The reversionary estate is just as much property as the present possession of the property is property. The term is broad. It includes all forms of title.

In this connection, it is to be observed that the very next section in the Code of 1871, to-wit, § 2174, provides that: " Whenever there is a concurrent jurisdiction in the courts of common law and in the courts of equity of any cause of action the provisions of this chapter limiting a time for the commencement of a suit for such cause of action in a court of common law shall apply to all suits to be brought for the same cause in a court of chancery."

Let it be noted that the case of *Richardson* v. *Brooks,* 52 Miss., 118, was a bill in equity, the prayer of which was for a cancellation of deeds, that defendants be declared trustees for complainants, that an account be had as to *mesne* profits, and for possession of the lands. Amongst other defenses, § 2173 of the Code was relied on, and in its decision the court recognized that this section was a proper defense, if only the fact had been that the purchase had been made in good faith. The court did not at all suggest that this section applied only to possessory actions at law, but recognized that it would apply

to a bill in equity to remove clouds. Judge CAMPBELL was on the bench and took part in this decision, and no doubt this case, and other similar cases decided about that time, constituted the reason why, in the enactment of the corresponding section in the Code of 1880, the change was made so that the new law provided that the suit should begin to run from the time when the purchaser took possession. The very change in the provision of the statute in this particular indicates that it was not considered to be the law before.

In *Summers* v. *Brady,* 56 Miss., 10, this court said, in speaking of this section of the Code of 1871, that: "The proceedings for such sales are in the nature of *in rem* proceedings. All parties are supposed to have notice of the judicial seizure of the property in making a sale. They are required to assert their rights within one year thereafter, and the Legislature saw fit to make no exception in favor of minors and married women." This decision was made in 1878, and was probably the immediate provocation to the change in the form of the statute when it was enacted anew in the Code of 1880, whereby it was provided that the statute should begin to run on the taking of actual possession, meaning thereby that the constructive seizure of the property by the making of a judicial sale should not thereafter operate to start the statute of limitations.

Third. In connection with the subject of good faith, we have, in *Jeffries* v. *Dowdle,* 61 Miss., 504, by Judge CAMPBELL, a statement of what constitutes good faith within the meaning of the statute. He says: "It devolves on him who invokes the bar of that statute to show the conditions which make it applicable, viz., that the sale was made in good faith, to execute an order of sale made by the probate court, and that the purchase money was paid. If there was an order of sale by the probate court, and the sale was made in the honest purpose to execute the order, and the purchaser bought in the honest effort to obtain title, and paid the purchase money, the fact that the

guardian may have desired the sale to be made that he might get and use the money did not affect the good faith of the sale, if there was no collusion between him and the purchaser, and it is not intimated that there was in this case." It will be observed that Judge CAMPBELL did not say that the negative must be proven, that there was no collusion.

The fact that the money was paid is shown by the administrator's deed, and his report to the court, which has not been assailed by the parties in interest here as containing untrue recitals or statements.

It is further to be noted that this record shows, or at least it fails to show the contrary, and it is the record in the administration matter, that during this long period of more than 30 years the administrator has never been challenged by any of these parties on the ground either that he falsely acknowledged the receipt of money which he had never obtained, or that he had not properly distributed money which he did obtain. No complaint has ever been made.

We submit, further that, while the purchaser must show good faith, he makes that showing by the record, showing that the sale was made in the usual manner under an order of the court, reported to the court, the acknowledgment of the purchase money from him made in the report by the administrator and thereby the fund on the face of the record at last brought subject to the order of the court, all of which is supplemented by the presumption of law of the good faith of the purchaser. This presumption of law has positive evidential value. The purchaser has a right to rely on that presumption as evidence of his good faith until counter evidence is adduced to overturn it.

It is not an answer to the foregoing proposition to say that further affirmative proof outside of the presumption is laid upon the purchaser by the terms of the statute. The statute contains no such terms. The language of the statute is " where the sale is in good faith." It does not say anything more on

this head, nor does it in express terms provide that the purchaser must make other and further showing of good faith to establish his *prima facie* case than the legal presumption.

It seems clear that this statute, phrased as it is, does not impose upon the purchaser the obligation to show good faith in any other wise, or to any greater extent, than § 1825 of the Code of 1892 imposed on the proponent of a will the burden of showing the sanity of the testator and his freedom from undue influence. And yet in *Sheehan* v. *Kearney,* 82 Miss., 688, at page 700, 21 South., 41, at page 45, 35 L. R. A. 102, this court says as follows: "Now, when the proponent of a will offers the will and the record of its probate, a presumption is thereby raised that the alleged testator had testamentary capacity, and this presumption satisfies the burden of proof in that respect, and the contestant must fail unless he overcomes this by proof on his part." And again, on the same page, the court says: "But the burden in both respects is satisfied by the introduction of the will and the record of the probated will, and the contestants must then offer proof to overcome the *prima facie* case thus made in both respects."

As stated above, the burden of proof laid on the purchaser by the statute is no more clearly laid upon him, and laid upon him in no different degree than is the burden of proof laid upon the proponent of the will by this statute. In the one case, this court has expressly declared that that burden may be met *prima facie* by the presumption, and we submit that it can be made just as well by an equally settled and equally valuable presumption in the former case. Neither presumption is conclusive, each is disputable, and one ranks no higher in the law as a presumption and has no more evidential value than the other. Each makes out the *prima facie* case.

*O. A. Luckett, J. B. Sullivan,* and *May, Flowers & Whitfield,* for appellees.

A. I. Bobbitt died October 3, 1861. He owned the eighty

acres in controversy at the time of his death.   He left a widow,
Mary E. Bobbitt, who, about three years later, married H. A.
Midldeton.   He also left five children, these four plaintiffs,
appellees here, and Alfonso Bobbitt, who died young without
heirs.   About twelve days after the death of A. I. Bobbitt, his
widow was appointed administratrix, and John A. Hansom was
appointed administrator of his estate.   Hanson served continu-
ously until March, 1873.   In 1864, Bobbitt's widow, Mary E.
Middleton, petitioned the probate court of Leake county for
an allotment of her dower.   Her petition was granted, and in
July of that year the final order was made by the probate judge,
Jas. W. Wilder, approving the report of the commissioners and
setting apart the dower of the widow, which included the lands
in controversy here.   On December 6, 1867, Mrs. Middleton
and her husband conveyed the dower land to W. B. Mann.   In
1867, John A. Hanson, administrator, presented his petition
to the probate court asking that the estate of A. I. Bobbitt
be declared insolvent, and that he be authorized to sell the real
property belonging to the said estate for the payment of debts.
This petition presented to the court did not embrace the dower
lands.   The final order directing the sale of the lands was
made October 14, 1867.   Under this order the lands were never
sold.   Nothing more was done until the year 1871, nearly ten
years after the death of A. I. Bobbitt, when Hanson, admin-
istrator, presented his petition to the chancery court reminding
the court that the probate court of the county had previously
declared the estate of A. I. Bobbitt insolvent, and asking the
sale of the realty to pay the debts.   He asked that he be author-
ized to sell all the land including the dower.   It seems that
nothing was done further than to file the petition.   In October,
1872, eleven years after the death of Bobbitt, another petition
was presented to the chancery court of Leake county suggesting
that the probate court of that county had at its October, 1867,
term, five years previously, declared the estate of Bobbitt in-
solvent, and asking the court for authority to sell all the land,

including the dower land, and including this here in controversy, for the payment of the debts. At the February, 1873, term of the chancery court, a decree *pro confesso* was entered against all the defendants and heirs of A. I. Bobbitt. An undated decree in the chancery court directing the sale of the property was entered. It seems to have been entered at the February term of the court in 1873. Still the land was not sold. At the August, 1873, term of the chancery court, Raymond Reid suggested to the court that John A. Hanson was dead, and asked to be appointed administrator. On August 6, 1873, an order was entered authorizing and directing Raymond Reid, administrator, to sell the lands. At the February, 1874, term of the chancery court, Reid filed his report of sale showing that he had sold all the lands, and that the lands here in controversy were sold to W. B. Mann. His deed is dated November 3, 1873. This sale was never confirmed. Mary E. Middleton died in June, 1904. This suit was filed December 19, 1905, by the heirs of A. I. Bobbitt, to recover the dower lands, claiming that it had reverted to them as the heirs of A. I. Bobbitt. J. L. Jordan claims the reversion through the sale made by the administrator in 1873.

We deem the question raised as to the competency of certain testimony offered as of no importance. Mrs. Miller testified positively that Mrs. Middleton was dead, and that she died in 1904; that she lived within three or four miles of Mrs. Middleton's daughter, Mrs. French, and within a few hours' drive of Mrs. Middleton; that she talked with Mrs. French about the death of their mother; that she had seen and talked with Mr. Middleton himself about it; that Middleton had married again. The family understood that Mrs. Middleton was dead. Immediately after her death, the heirs took up the matter and began a correspondence with certain lawyers, which correspondence resulted in this litigation. This last fact was brought out on cross-examination. The defendant offered a declaration in a former suit, which gave the date the action

accrued as August, 1903. The only difference between the parties at the trial seems to have been whether the death occurred in 1903 or 1904, and under our theory of the case it makes no difference in which year she died.

Counsel for appellant say, first, that a continuance of the cause should have been granted. There is an application for a continuance copied in this record and marked filed May 24, 1906. It does not appear, however, that this application was presented to the court. No evidence was offered in support of it, and there is no order either sustaining or overruling it. Of course, no point can be made here upon the action of the court below unless this court should be advised whether the trial court really acted, and, if so, what that action was. We have no way of knowing whether the trial judge had his attention called in any way to this application.

(1) Counsel then say that no dower was ever allotted to the widow of A. I. Bobbitt. They say that the petition should show specifically the lands out of which the dower is to be allotted. The petition presented to the court by Mary E. Middleton May 9, 1864 (R. p. 33), does particularly describe the land left by A. I. Bobbitt. The descriptions contained in the said petition embrace the lands which were set apart as the widow's dower, and which are involved in this controversy. It is then said that the petition does not show that the deceased usually resided in Leake county immediately before his death. The petition does, however, state that the lands are in Leake county, and that the surviving members of his family were at the time in Leake county. It is in evidence that as a matter of fact A. I. Bobbitt did live on this land at the time of his death, and this was his home. Besides, the order of the court (R. p. 34) granting the petition for dower, and directing the sheriff to summon commissioners, adjudicates this question, and finds as a matter of fact that this was land upon which A. I. Bobbitt in his lifetime was accustomed to dwell next before his death. *Shannon* v. *Summers,* 86 Miss., 619,

627, 38 South., 345. It is then said that the return on the writ issued fails to show that the commissioners summoned were discreet freeholders, and that they were not related to the party and entirely disinterested. The writ did, however, require the sheriff " to summon three or five discreet free-holders of your county connected to the parties neither by con-sanguinity or affinity and disinterested." R. p. .218. It is also said that the return of the commissioners does not show that the dower was described by metes and bounds. It is, however, described, as it is in the petition, as being certain parts of certain sections, township, and range. R. p. 219. It is objected, too, that the writ should specify the land. But § 173, p. 469, Code 1857, does not require this. The allot-ment of dower was regularly approved and confirmed by the court.

Besides, the deeds through which appellant claims the land were received by persons who recognize the allotment of dower to Mary E. Middleton. On page 206 of the record is a deed to W. B. Mann, which embraces the dower land only, and is signed by Mary E. Middleton and husband alone. W. B. Mann would not have accepted this deed when there were four or five minor heirs of A. I. Bobbitt living if this dower had not been allotted. The deed warrants the title as against the claims of all persons claiming through the grantors. The deed made by Raymond Reid, administrator, to W. B. Mann embracing this same land and dated November 3, 1873, only conveys " the reversion of the dower in said lands." R. p. 209. This appellant is depending upon this deed to W. B. Mann for his interest in the reversion and upon the deed by Mary E. Middleton and her husband for the life estate. The petition presented to the chancery court at the January term, 1871, asks for the sale of the dower land, and describes it as " land set apart to the widow, now Mary E. Middleton, as her dower interest in the realty of her deceased husband." R. p. 180.

The widow was entitled to her dower as a matter of course.

She had an equitable estate before the dower was assigned. The proceedings by which dower is allotted will not be criticised with the same strictness with which proceedings to sell land to pay debts are examined. " Dower, being intended for the sustenance of the wife and the nurture and education of the younger children, is much favored by the law." *Hinds et al.* v. *Pugh,* 48 Miss. 268, 275.

In fact, our court has made a distinction between proceedings in the probate court for the sale of realty of an intestate, and proceedings for the allotment of dower. Section 18 of article 4 of the Constitution of 1832 expressly vested in courts of probate jurisdiction of dower matters. The authority vested in such courts to sell real estate to pay the debts of an intestate was not given by the Constitution, but by the laws. " No jurisdiction is granted, by the Constitution, to the probate court, over the realty of an intestate decedent. The power of the court over realty is derived from legislative grant, and this grant is the donation of a special and limited jurisdiction, which can only be exercised in strict accordance with the limitations and conditions prescribed by the Legislature "— citing authorities. George's Dig, p. 615, § 46a.

This appellant and his grantors claim the interest of these appellees in this land now solely by virtue of the sale of the reversion after the dower estate under a decree of the chancery court. They cannot now be heard to say that there had really been no dower allotted.

(2) Almost every criticism that can be made of any proceedings may be made of these which resulted at last in the sale and conveyance of this land. Four different applications were made to the probate and chancery courts together for the sale of this land. Bobbitt died on October 3, 1861. The administrators were appointed twelve days later. The record shows that they had control of this estate from that time on. The first application to the probate court asking that the estate be declared insolvent was made in June, 1867, nearly six

years after the administration was begun. It is true the Civil
War was then in progress, and all kinds of business were dis-
concerted, yet the petition presented to the court fails to show
how the war interfered with the administration of the estate.
Hanson states to the court in his petition (R. p. 145) " that
in the year 1861 he was appointed and qualified as adminis-
trator of said estate, which consisted of lands and tenements,
slaves, and other personal property. Most of the personalty,
however, was slave property, and that under the order of
your honorable court this administrator proceeded to administer
said estate, believing said estate to be perfectly solvent and
fully able to pay all legal claims against the intestate, but
owing to the war which followed and the emancipation of the
slave property it became necessary to sell some of the real
estate to pay debts, which was done, and the proceeds applied
to the liquidation of certain debts, all of which has been duly
reported to your honorable court." This petition on its face
shows maladministration of the estate. It shows that the estate
was not at first considered insolvent, and that, if it was then
(1867) insolvent, it had been rendered so by the long delay
and bad management of the administrators. Article 98, p.
448, Code 1857, required that every administrator " shall take
all proper steps, speedily to ascertain whether the estate be
solvent or insolvent, and if it be ascertained that the estate,
both real and personal, will be insufficient to pay the debts
of the deceased, the executor or administrator shall exhibit to
the probate court, under oath, a just and true account of all
the personal estate, and assets of every description or kind,
and also a true list or account of the lands, tenements, or
hereditaments of the deceased, and shall also exhibit to the
court at the same time a schedule of all the debts due from
the deceased, and if it shall appear to the court that the estate
is insolvent, it shall make an order for the sale of all the
property." The purpose of the statute was to require the
administrator to ascertain the condition of the estate at the

time of the death of the intestate, and, as nearly as this could be done, enable the court to determine the question of solvency or insolvency as of the date it was turned over to the administrator. In the case at bar, the administrator had sold some of the land, had permitted the personal property to be lost, had paid a great many debts, and had waited six years to present his petition to the court asking that the estate be declared insolvent.

In *Parker, Adm'r,* v. *Whiting,* 6 How., 352, 360, the court was considering a case where a decree of the probate court declaring the estate insolvent was made upon a petition presented more than eighteen months after letters of administration and publication of notice to creditors. In that case it was said: "It is therefore often impossible for an administrator to ascertain the true condition of an estate until the expiration of the time allowed for presenting claims. Hence we cannot say that the administrator is absolutely required to make his report sooner. At the expiration of that time, however, an administrator is bound in general to know the condition of an estate, and ought not in ordinary cases afterwards to be permitted to say that it was insolvent. Such a report at a later period is, to say the least of it, a very suspicious circumstance." The syllabus in that case would indicate that the court refused to hear any evidence tending to impeach the decree of the probate court collaterally. But the opinion itself shows that the decision is not antagonistic to our contention here.

"It is the duty of an administrator to be prompt in reporting an estate insolvent, if in fact it be so. As a general rule, this must be done before he pays any debt, for he cannot prefer creditors, and each of them has a lien on the assets in proportion to his claim. Yet, if an administrator is coerced to make payments, he should be excused upon a showing to that effect. At the expiration of the period for the presentation of claims, he should know the condition of the estate." George's Dig. p. 620, § 73.

In *Bramblet, Adm'r,* v. *Webb et al.,* 11 Smede. & M., 438, where an administrator had delayed filing his insolvency petition for four years, and the probate judge had refused to grant it, this court said that there was no error. It was said: "The petitioner, from his own showing, has violated the law. He must have known the condition of the estate at a much earlier period, and yet he was four years in bringing forward his report." And the court further said commenting upon *Parker* v. *Whiting, supra:* " The statute requires that the report of insolvency shall be made ' as soon as may be.' This must be done, too, before the payment of any debts."

In the case at bar, the first petition was presented by the administrator about six years after administration was granted, after the administrator had paid many debts, and after all the personal property had lost its value. The petitioner did not undertake to tell the court why he had for so long a time delayed this report. His petition does offer an explanation of the insufficiency of the assets June 10, 1867, to pay the debts, but the explanation condemns the administrator. No explanation is offered of his failure to administer the estate and utilize the personal property before it lost its value. He does offer Exhibit A to show the debts due by the estate, not under oath (R. p. 147); and he files his Exhibit B, not under oath (R. p. 149), showing the debts due to the estate. Why these claims had not been adjusted in some way between October 15, 1861, when letters were issued to him, and June 10, 1867, when he presented his first petition, he does not offer to show.

But on this showing the court declared the estate insolvent. The petition referring to the exhibits and the order of the court show precisely upon what the court acted. There is no contention from any source that any part of the records had been lost, or that the probate judge had anything before him which is not shown here. But this adjudication by the probate judge shown by his order on pages 163 and 164 of the record

is void on its face, because it is not made to appear by the petition who are the interested parties. No heirs of A. I. Bobbitt are named in the petition on page 145 of the record. Not only should the petition show the parties, but, if there were minors at the time, the petition should have shown whether they had a guardian and whether this guardian was a resident or nonresident of this state. Article 98, p. 449, Code 1857, provides in cases of this kind: " If any of the distributees or devisees be infants, the process shall be served upon their guardian, and if no guardian has been appointed, the court shall appoint a guardian *ad litem,* who shall attend to the interests of the infants." And in article 32, p. 431, of the same Code, it is provided: " No judgment or decree shall be binding on, or shall conclude, a minor having a guardian resident in this state, unless the guardian of such minor shall be first served with process to appear and defend the interests of the minor; and if the guardian be a nonresident of the state, the mode of bringing in nonresident parties shall be observed, and if any guardian shall fail to appear after service of notice or publication, or if the guardian should be personally interested, or if there be no guardian, the court shall appoint a guardian *ad litem,* to protect the interests of the minor, and its judgments shall then be conclusive on such minor." This court held, in *Billups* v. *Brander,* 56 Miss., 496, that " a guardian must be cited, or it must in some way be affirmatively made to appear that there is none, or that he is interested in the matter." The petition in that case alleged that it was not known whether there was a guardian or not, and the court said that allegation was not sufficient. It is true in that case the court was dealing with an appeal, and expressly confines its decision to that case, yet if the parties were not in court, and it should be made to appear from the records themselves that the persons interested were not summoned as required by law, the adjudication would necessarily be void.

As above stated, the petition filed in 1867 did not show who

the parties interested were. It did not give the names of the
minors, and, of course, did not state whether there was a
guardian. Citations issued for Dick (M. A. C.) Bobbitt and
for Lucy Bobbitt; the writs themselves describing these persons
as being minors. Lucy Bobbitt was at the time in Jackson
county, and Dick Bobbitt in Madison. These writs were served
on these minors June 19 and July 2, 1867. At the June,
1867, term, the court entered an order in which it appears
that the court found that the widow of Bobbitt, deceased, and
her husband, and Alfonzo, and B. B. Bobbitt, resided in Frank-
lin county; that Dick Bobbitt resided in Madison county; and
that the residence of Uriah and Lucy Bobbitt was unknown.
It was ordered at that time that the " petition stand continued,
and that citation issue against the said Mary E. Middleton
and Henry Middleton, her husband, and Alfonzo Bobbitt and
Breckenridge Bobbitt, and be directed to the sheriff of Franklin
county, returnable at the next term of this court, and a like
citation issue against the said Dick Bobbitt, and be directed
to the sheriff of Madison county, citing them to appear at
said term, . . . and that the said Uriah and Lucy Bobbitt
be cited by posting notices " and by publication in the Forest
Register. R. p. 155. At the July term, it was found that
the publication of notices theretofore made were defective, and
that the citations of Franklin county had not been returned,
and the cause was then continued till the September term,
with an order for new process. Citation then issued and was
served on Lucy Bobbitt in Jackson county; one on Dick Bobbitt
in Madison county, and citation was published for all the rest
of the interested parties beginning with August 3d and ending
with August 31st. Nothing more was done till the October
term, when the court ordered a guardian *ad litem* to be
appointed for all the minor heirs of A. I. Bobbitt. At the
same term a decree *pro confesso* was entered against Mary E.
Middleton and H. A. Middleton upon the publication made
in the Forest Register. At the same term, " upon the petition,

and Exhibits A and B therewith filed by said administrator, for said estate to be declared insolvent by the court, and for the sale of the remaining real estate of said decedent, or intestate, to pay the debts yet due of said estate, and also upon citations returned executed and proof of publication filed against the heirs and distributees at law of said estate, and a decree *pro confesso* as to the adult heirs and distributees at law of said estate filed by Joseph D. Eads, their guardian *ad litem,*" the court rendered its final decree adjudging the estate insolvent, and directing the sale of the real estate described in the petition to pay the debts.

It will be observed that it nowhere appears in this record whether these minors had a guardian. We are willing to admit that if the decree showed this fact, or if the records anywhere, of that proceeding, showed this fact absolutely essential to the adjudication of the questions presented by this petition, it might be sufficient. But we are unable to tell whether these minors had a guardian at that time, and, if they had one, whether he was a resident of this state or not. This is necessarily fatal. The proceeding is void therefore on its face.

The court will also observe that Mary E. Middleton, H. A. Middleton, her husband, and Alfonzo Bobbitt, and B. B. (or Breckenridge) Bobbitt were known to be living at that time in Franklin county, Miss. This information is found in the order entered at the June term of the court, R. p. 155. At the July term it was ordered that " alias citation issue against all the heirs, and distributees at law of said estate, whose places of abode are known, returnable to said September term, and that an alias publication of citation against Uriah Bobbitt be made in the Forest Register." On the same day it seems that the citations issued for Lucy and Dick Bobbitt, and publication was made at the same time for all of the heirs, including Mary E. Middleton and her husband. These people lived in Franklin county, as was known at that time. It appears, too, from

the testimony of Lucy Miller on pages 134 and 135, that Mrs. Middleton, the mother of the witness, lived on this land about two years after she was married to Middleton, and that she (Mrs. Middleton) then moved to Ocean Springs and lived there awhile. Then she moved to Rankin county, and from there she moved to Franklin county, where she lived until her death.

Article 22, p. 429, Code 1857, is as follows: " Whenever it shall be made to appear to the satisfaction of the court, that any non-resident of this state, or absent party, has an interest in the estate of a deceased person, . . . and if it shall be necessary to make such non-resident or absentee, a party to the proceedings in court, or when the parties in interest are unknown, an order may be made appointing some day of a succeeding term, for the appearance of such nonresident, or absent, or unknown party; a notice of which order shall be published in some newspaper in the state, best calculated, in the opinion of the court, to apprise the party, once a week for four consecutive weeks, or longer, if the court should deem it necessary; and on due proof that publication has been made according to the order, it shall be as good and effectual in law, as if the proper process had been served personally." But in the case at bar it appears that the residence of all the parties except U. R. Bobbitt was known. No publication was ordered by the court except for U. R. Bobbitt. R. p. 156. On the other hand, the court ordered citation issued for the rest of them and publication for U. R. Bobbitt. Instead of this, without any order of court, and without any showing that the residence of these other parties was unknown, without any showing that any one of them was a nonresident, but with the information written into the order of the court that the place of residence of all of them was known except that of U. R. Bobbitt, the clerk at once made his publication.

In *Burrus* v. *Burrus,* 56 Miss., 92, a divided court held, finally it seems, that the provisions of the Code of 1857 relating to probate courts are complete in themselves, and that these

provisions alone must be consulted in passing upon the validity of process for infants or of the service of such process in these courts. It had previously been held that such process in these courts should be made to conform to the general law concerning process for infants. *Mullins* v. *Sparks,* Adm'r, 43 Miss., 129; *Winston* v. *McLendon,* Adm'r, 43 Miss., 254; *Erwin* v. *Carson,* 54 Miss., 282. But in *Burrus* v. *Burrus, supra,* the court through CAMPBELL, J., and SIMRALL, C. J., held that the probate court provisions are complete in themselves; that there was no necessity for service of process upon infants in these courts; that the law did not require service upon the father or mother of the infant; that the only requirement was that process should be served upon the guardian if the infant had a guardian in this state, and if he did not have a guardian in this state, but did have a nonresident guardian, publication should be made for such nonresident. The difference between the general provisions relating to process upon infants and the probate provisions was that, under the general provisions, the infant must himself be served with process, and also his father, mother, or guardian; but under the probate provisions it was not necessary to serve any process at all upon the infants themselves nor upon their father or mother, but only upon their guardian. In the case of *Erwin* v. *Carson, supra,* the court held, through CAMPBELL, J., that the chancery court had no authority to appoint a guardian *ad litem* for an infant unless the record showed that he had no mother, father, or guardian. "Until the process is executed on the father, mother, or guardian, or it is made to appear that the infant has none in this state, the court cannot legally appoint a guardian *ad litem* for such infant, for service on the father, mother, or guardian, if any in this state, is part of the required service on the infant." This is good law for the case at bar, if we only strike out the words "mother" and "father." As far as it relates to what the record should show as to the guardian of the infant, it is the law of this case. In the chancery court,

or in the circuit court, the records were required to show that the infant had no father, mother, or guardian before the court could appoint a guardian *ad litem;* in the probate courts, the records were required to show that there was no guardian before the guardian *ad litem* could be appointed.

Counsel insist that " neither was it necessary for the record to show that he had neither father nor mother nor guardian under Code 1871, § 1148. *Burrus* v. *Burrus,* 56 Miss., 92; *Bailey* v. *Fitzgerald,* 56 Miss., 579." But counsel drop this contention with very brief treatment. They perceive at once the weakness of this position. They try to find some support for the position, but they find none. The two cases cited from 56 Miss. do not furnish them any support. In *Burrus* v. *Burrus,* the petition itself accounted for the guardian of the infants; he (the guardian) being one of the petitioners. He was in court. There was, of course, no necessity of serving process on him when he was already in court, and asking for the very thing which the representative of the infant should have been given notice to resist. A guardian *ad litem* was appointed on this showing.

And in *Bailey* v. *Fitzgerald* the guardian was in court. The decree collaterally attacked in that case was one finally discharging the guardian. There no guardian *ad litem* was appointed. The court said: " When minors were interested in and proper parties to such proceedings, the summons must have been directed to and served on their guardian, and where the guardian failed to appear, or was interested, the court must have appointed a guardian *ad litem.*" And the court further said in that case that the minor was not properly before the court, although process was served on her. " The decree was void. The thirty-second section of the probate court law (Code 1857, p. 431) declares that no decree shall be binding or shall conclude a minor, unless the guardian is a party, if there be one, ' and, if there be no guardian, or if the· guardian be personally interested, ; . . the court shall

appoint a guardian *ad litem,* . . . and its judgment then shall be conclusive on such minor.' " The probate court could in no case appoint a guardian *ad litem* if the infant had a guardian not in court, not served with process, and not interested personally. These facts must of necessity have appeared of record in order to justify the appointment of a guardian *ad litem.*

In the case at bar, the infants were not in court, and the adults were not in court. It was an *ex parte* proceeding altogether, and the decree was rendered upon a petition which did not even show the parties, and upon process which did not legally bring any parties in court, and upon Exhibits A and B required by law to be under oath, but which were not in fact sworn. The decree rendered in 1867 and appearing on page 163 of the record is absolutely void for all purposes. In fact, this decree was treated by the parties as being a nullity. The chancery judge so considered it, although he was not consistent in his treatment of it. The administrator regarded it as irregular and void, and did not therefore proceed to sell the land. The second petition presented in January, 1871, to the chancery court recites the fact that, at some term of the probate court, the estate of A. I. Bobbitt was declared insolvent, and then proceeds: " But for the want of notice to the heirs as required by law, the said order and decree for the sale of the land was defective. Hence most, if not all, of said lands remain unsold and the property of said estate." It will be observed that, when this final decree of the court adjudging the state insolvent was entered, not a single one of the persons in interest, was present in court. There was *pro confesso* against the adults, and a guardian *ad litem* was present representing the minor heirs. We wish the court also to keep in mind the fact that the petition upon which this adjudication was made did not ask for the sale of the lands here in controversy, or for the sale of any part of the dower.

While the insolvency proceedings instituted by the adminis-

trator in the probate court in 1867 were irregular, and the decree adjudging the estate insolvent was and is void on its face, and was so considered by the administrator at the time, as shown by his second petition filed in 1871, yet the parties thereto acted as though the said 1867 decree were regular and valid as far as it adjudged the estate to be insolvent, but void in so far as it ordered the sale of the land. The subsequent petitions were presented to the court, and more regular service of process ordered only for the purpose of obtaining a valid order to sell the land. There was no purpose in these said subsequent proceedings to have the estate declared insolvent. The petitioners would only say that " the estate was heretofore declared insolvent, but we want an order to sell the land." They did not sell the land under the 1867 decree, but obtained new orders for this purpose. But these new orders were based upon the 1867 decree of insolvency. It is too plain for argument that the court and counsel overlooked the fact that, if the 1867 decree was not sufficient to authorize the sale of the land because the parties were not legally in court, it was not good as an adjudication of insolvency. They relied upon it in the 70's in effecting a sale of the lands. They did not, however, consider it a good decree in itself to authorize the sale of the lands. The 1867 decree directed that the lands be sold. It also adjudged the estate to be insolvent. It was treated as void in so far as it directed the sale of the lands. It was treated as good in so far as it adjudged the estate to be insolvent.

Now the most important thing the court had to do in these insolvency proceedings in the probate court was to determine whether the estate was insolvent. It followed as a matter of course that the lands would have to be sold if the estate was insolvent. At the very time this most important question was adjudicated by the court, the parties were not legally before the court. At the time the court acted, upon the unsworn Exhibits A and B filed with the petition in 1867, these minors

were not legally in court, nor represented, nor was any party in interest before the court. When the subsequent petitions were filed in the 70's in the chancery court, no showing whatever was made as to the then condition of the estate, but the petitioner in each case would only assure the court that the estate was still insolvent. See Record, pp. 180, 183.

The statutes authorizing probate courts to sell lands in administration proceedings must be strictly followed. *Martin* v. *Williams,* 42 Miss., 210, 97 Am. Dec., 456. In this case the court relies upon former decisions. In *Laughman* v. *Thompson,* 6 Smed. & M., 259, this court said, where a collateral attack was made upon a probate court decree authorizing a sale by an administrator: " A sale by order of the probate court of the real estate of a decedent, must be made in strict compliance with the law, by issuing citation, and advertising, or it will be void, and the records of the proceedings may be offered to show that the rules of law in those respects have not been strictly observed. *Smith* v. *Denson,* Adm'r, 2 Smed. & M., 326. It must appear from the records of the probate court, in cases of the sale of lands by an administrator under its order, that legal notice has been given to the heirs at law or a legal reason in excuse of the want of such notice, or both the order and the sale are void. *Gwin et al.* v. *McCarroll,* 1 Smed. & M., 351; *Campbell* v. *Brown et ux.,* 6 How., 106. In the case at bar, the record offered to be introduced does not show whether citation was issued and served or not, nor whether there were any heirs or creditors of the estate, or whether they voluntarily appeared. In the absence of the record, this court would be bound to presume that the probate court acted correctly; but if, upon inspection of the record, no citation appears to have issued, no appearance to have been made by the parties, and no evidence of the nonexistence of such parties, this court would be compelled to pronounce an order and sale under such circumstances to be void. Such a record must show, affirmatively, everything necessary to give the court

jurisdiction over the subject-matter." George's Digest, p. 616, par. 46b, and authorities.

In the case at bar, we have the entire record which the probate and chancery courts had before them. Nothing has been lost. There was no showing made that the infants had no guardian. If they had one, it was not shown that he was interested. If they had one, it does not appear whether he lived in this state. There was no legal process for Mary E. Middleton and her husband, although they were shown to reside in Franklin county, and there was no order of court that publication be made for them. The decree adjudging the estate insolvent and ordering the sale in 1867 was void if any necessary party was not summoned before the court. *Mundy* v. *Calvert et al.,* 40 Miss., 181; *Martin* v. *Williams,* 42 Miss., 210, 220; *Jones* v. *Matthews* (Miss.) 4 South., 547; *Gibson* v. *Currier,* 83 Miss., 234, 250, 35 South., 315, 102 Am. St. Rep., 442.

(3) While it appears in this record that the administrator Hanson had no legal excuse for delaying his proceedings to sell the land to pay the debts of the estate for six years, this court will be surprised to find that, even after the institution of the proceedings in 1867, nothing decisive was even then done. We have already shown that the 1867 proceedings were void; that they were considered by the administrator himself defective, as shown by the 1871 petition found on page 180 of the record. The administrator filed his first petition in 1867, six years after the death of his intestate, and then nothing more was done until four years later, and then there was another delay of two years. The land was actually sold twelve years after the death of A. I. Bobbitt. It was certainly an extreme case where a probate court could have been authorized to make a sale at such a late day. The statute requires that such things shall be speedily done. We have already seen that our court has said that a delay of two or three years is a very suspicious circumstance. Here, however, we have

a delay of twelve years. And no excuse is offered for this long delay, except that in the 1867 petition the administrator says the war had been in progress, and the slaves had thereby been lost. In this petition he offers no explanation of his delay, but only the cause of the insufficiency of the personalty. In his 1871 and 1872 petitions he offers no excuse whatever for the delay of four or five years immediately preceding. He only calls the court's attention to the fact that the 1867 proceedings were defective because of want of proper process on the parties. We submit that this fact alone is sufficient to show the invalidity of all these proceedings which resulted in the sale of the land here in controversy. Having all the record before us, we see that the probate and chancery courts had no jurisdiction of the parties and of the subject-matter. As heretofore suggested, the chancery court was simply informed that there was a decree of the probate court declaring the estate insolvent in 1867, and proceeded upon the theory that it was good as an adjudication of insolvency, although it was admitted that there was defective process.

But the court will now observe that, when the 1871 petition (R. p. 180) was filed, there was then a guardian for the minors. Citation issued and was served on Raymond Reid, guardian, requiring him to appear at the May, 1871, term. But at that time nothing was done. But in October, 1872, nearly eighteen months after return day of the citation on Raymond Reid, guardian, another petition was presented to the chancery court, which made no mention of the pervious petition, and is not based in any respect upon the petition filed theretofore in 1871. It does refer to the decree of insolvency rendered by the probate court in 1867. It prays process for the guardian, and contains the allegation that some of the heirs are nonresidents of the state. There was no other process, however, for Raymond Reid, guardian, though his name is in the petition as the resident guardian residing in Leake county. Affidavit is then filed to the effect that U. R. Bobbitt is in

the state of Texas, and that the widow and her husband and two of the heirs are in Franklin county, and Lucy and Dick Bobbitt somewhere in Mississippi. Then there is an order of the court finding that all the defendants are nonresidents of the state, and ordering that they appear at the November, 1872, term of the court. There was no showing made to the court that all the defendants were nonresidents. The affidavit filed was that one was a nonresident, two resided somewhere in Mississippi, and the rest in Franklin county, excepting the guardian of the minors, who was in Leake county. Section 1158 of the Code of 1871 provided that: " If any of the distributees or devisees be infants, the process shall be served upon their guardians, and if no guardian has been appointed, the court shall appoint a guardian *ad litem,* who shall attend to the interests of the infants." Here the infants had a guardian in the county, and no process was served on them. They also had a mother living in this state, and no process was served on her.

We have already seen that the chancery court had no authority to appoint a guardian *ad litem* unless it was made to appear that there was no legal guardian, or that he was interested. The final decree appearing on page 193 of the record was rendered upon a petition affirmatively showing four of the interested parties to be residents of Franklin county, two of them residents of Mississippi whose post office was unknown, one a nonresident, and all the minors having a guardian in Leake county, and upon publication made for all the defendants and *pro confesso* against the adults and answer of a guardian *ad litem* for the infants. In March, 1873, John A. Hanson died, and Raymond Reid was then appointed administrator. He presented his petition to the court then asking that he be authorized to proceed to sell the land, and the court ordered him to proceed. He made his bond and advertised the land for sale in the Carthagenian and made his report to the chancellor at the February term, 1874. It appears, however, that

he made a deed on November 3, 1873, to W. D. Mann, con-veying, among other lands, the reversion of the dower in the lands here in controversy. His sale was never confirmed by the court, as is admitted by counsel, but they say that it has been confirmed by the acts of the parties. There may be cases where the acts of the parties might amount to confirmation, but the doctrine can have no application here.

We insist, therefore, that, in the first place, there was never any adjudication of insolvency by the probate court, and, in the second place, that there was never any valid decree of the chancery court ordering the sale of the land, even though the 1867 insolvency decree should be found valid.

(4) But while we think we have already conclusively shown that the judgment of the lower court is correct, since the estate was never legally declared insolvent, and the land never legally sold, yet we think there is another fact about the probate and chancery court proceedings which is by itself sufficient and conclusive. It affirmatively appears that, at the time the land was sold to pay the debts, they were all necessarily barred by the statute of limitations. The court below found this to be a fact from the proofs before him, and it is assumed by all the parties hereto that nothing has been lost from the probate and chancery court records, and that everything which the probate and chancery judges had before them this court has before it now.

We insist that it is true that, at the time the land was sold, all the debts against the estate were barred by the statute of limitations without any regard to the general statutes of lim-itation in force at the time; the statute which would be useful here being the same in the Codes of 1857 and 1871. All statutes of limitation were suspended during the war; the period ending with April 2, 1867. If we add to this the nine months within which the administrator could not be sued, this brings us to November 2, 1867. But this land was not sold until November, 1873, six years after the statute of limitations

began to run after the war. The petition upon which the
decree of sale was rendered was not filed until September 16,
1872, and the decree itself was not entered until some time
after that; the exact date of the decree not appearing from
the record. The final direction to Raymond Reid, adminis-
trator *d. b. n.,* was made in the decree of the court entered at
the August term, 1873, nearly six years after the statutes of
limitation had begun again to run.

Section 2155, Code 1871 (art. 11, p. 400, Code 1857),
reads as follows: " No action or *scire facias* shall be brought
against any executor or administrator, upon any judgment or
other cause of action, against his testator or intestate, but
within four years after the qualification of such executor or
administrator." Every claim against this estate on which suit
had not been instituted against the administrator on November
2, 1871, was barred. This is true whether the insolvency pro-
ceedings of 1867 were valid or void. *Nutt* v. *Brandon,* 85
Miss., 702, 38 South., 104; *Sivley* v. *Summers,* 57 Miss., 712,
729.

Now it is not contended here that there had been any suits
against the administrator. If there were any judgments at
all, they were judgments against the deceased himself. These
would be barred by the four years' statute of limitations just
the same as open accounts against the estate. That this is
conclusive of this controversy we think is too plain for argu-
ment. We know that the general rule is that decrees or judg-
ments of courts cannot be collaterally attacked. If they are
void on their face, the rule does not apply. The chancery
court had no power to authorize a sale of this property to pay
debts all of which were barred by the statute of limitations.
It is the duty of the administrator to plead the statute of
limitations. An administrator could not legally ask for the
sale of lands to pay stale claims. If the records show this
fact, no justification of the sale can be made.

In *Nutt* v. *Brandon,* the court did not undertake to say

what statute of limitations would apply in cases of this kind, because the time had been so long as to exceed the limit fixed by any and all statutes. The court did there expressly decide, however, that under the Codes of 1857 and 1871 the statutes did run even after an estate was declared insolvent, since there was no prohibition to sue the executor or administrator.

(5) Counsel for appellant say, however, that admitting the invalidity of the probate and chancery court proceedings at the end of which W. B. Mann got a deed to the reversionary interest in the dower land, still these appellees cannot recover the land because of § 2173 of the Code of 1871. The suit was filed about eighteen months after the death of the widow, Mrs. Middleton. They say that appellees are barred by the one-year limitation fixed by said § 2173.

These appellees could never have brought a suit to " recover " this land until after the death of Mrs. Middleton. Appellant had his deed to her life interest, whether the court proceedings were good or bad. He owned the entire dower estate. The appellees had no right of entry until the property should revert; that is, until June, 1904. The said section of the 1871 Code says: " Nor shall any action be brought to recover land or other property." We had no action to recover the land until the land reverted. Could any court hold that we were barred before our right of action accrued? Up to June, 1904, appellant did not hold the land through a sale " by order of a chancery court." He held by virtue of the conveyance by Mary E. Middleton and H. A. Middleton found on page 206 of the record. He did not begin to hold by virtue of the chancery sale until June, 1904. We say it needs no citation of authorities to support our proposition that § 2173, or any other statute of limitations, will not be so enforced by any court as to create a bar to an action before the right of action has accrued. But see *Gindrat* v. *Railway Co.,* 96 Ala., 162, 11 South., 372, 19 L. R. A., 839, where all the authorities are collected in a note. The general rule is there

said to be " that, as between the owner of the life estate and the remainderman or reversioner, adverse possession cannot exist." See, also, last paragraph of opinion in *Hoskins* v. *Ames,* 78 Miss., 986, 29 South., 828.

We understand counsel for appellant, however, as conceding that time will be counted from the date of the death of Mrs. Middleton, whichever statute of limitations may be applied. The question then becomes: Can § 2173, Code 1871, bar the right of these reversioners to recover the land in their suit instituted in 1905 ? The admission that the time will not be counted from the date of the sale would seem to amount to the admission that said § 2173 cannot be applied at all. It does not fix a limit to be counted from anything except from the date of sale. It precludes every person interested after one year from the date of sale; that is, in every case where the statute can be invoked at all.

It would not be, and has not been, contended that any statute of limitations can be invoked in this case which measures the time from the date of the sale. It is obvious that injustice would be done, and that no Legislature ever intended such a use of a statute of limitations. The heirs of Bobbitt had no right and no right of action during the continuance of the life estate of Mrs. Middleton. The possibility of any such right ever accruing to them was wholly dependent upon their surviving their mother, Mrs. Middleton. If she should outlive them, they would never have any right. At her death it accrued to them, the right of entry, the right of action. Up to this time they had no sort of vested right. They certainly had no right to enter upon or to bring an action to " recover the land." We are not insisting that § 2760, Code 1892, applies; but we are insisting that § 2173, Code 1871, does not apply. In the first. place, as we have already shown, it was not made for this kind of a case and cannot be used. It only limits the time within which actions may be brought when such actions accrue on the date of the sale.

But, in the second place, we say the said § 2173 cannot apply because it had been repealed, and because this action accrued in 1904, and must be governed by the laws then in force. We must look in the Code of 1892 or among the laws in force in June, 1904, to find a statute of limitations to control in this case. There is but one that could be invoked, and that is § 2730, Code 1892, which says: " A person may not make an entry or commence an action to recover land but within ten years next after the time at which the right to make the entry or to bring the action shall have first accrued to some person through whom he claims; or, if the right shall not have accrued to any person through whom he claims, then within ten years next after the time at which the right to make the entry or bring the action shall have first accrued to the person making or bringing the same." This is the one in force at the time the suit was brought, and is the only one that could be pleaded to defeat the action of these appellees.

It might be said that § 4 of the Codes of 1880 and 1892 kept alive § 2173 on the theory that this was an " accruing right or an " accruing " action. But this court said, in *Wilkerson* v. *Hudson,* 71 Miss., 130, 134, 13 South., 866; " The ' right accruing or accrued ' mentioned in § 4 of the Code is not a right of action as affected by the statutes of limitations, because an accruing right with reference to them would, when accrued, be subject to the statute in force when it became complete, and such is provided for in § 2759 of the Code in express terms." If § 4 of these Codes should seem at first glance to cover a case like this at bar, the appearance vanishes when it is read in connection with § 2759, Code 1892, and § 2692, Code 1880. Under that section of the Code of 1892, every action accruing thereafter is governed by that chapter. The said section provides that the chapter of which it is a part " shall not apply to any actions commenced nor to any cases where the right of entry shall have accrued " before the time the chapter went into

91 Miss.—4

effect. This provision can only mean to conform to the general rule on the subject, and apply the provisions of that chapter to all actions where the right of action or the right of entry accrued after the date the chapter went into effect. There is but one provision of said chapter that could apply to the case at bar, and that is the said § 2730.

The right to plead § 2173, Code 1871, was not vested in the purchaser by his contract with the administrator so as to be protected by constitutional provisions prohibiting the improvement of contracts. 19 A. & E. E. of L. (2d ed.) p. 167. These appellants cannot therefore complain of the repeal of the statute before all actions were barred by it. There is even difference among the authorities as to whether a statute of limitations may be repealed so as to take away the right to plead a bar which has already attached. *Id.* p. 170.

(6) But, as we have already said, every criticism that can be made of any chancery sale may be made of the one under which this appellant claims title to this land. We insist that § 2173, Code 1871, cannot be invoked or § 2760, Code 1892, because it has not been made to appear that the sale was in good faith, and that the purchase money was paid.

The statute provides a hard rule at best, and our court has emphasized the two conditions upon which the statute may be invoked, namely, that the sale was made in good faith, and that the purchase money was paid. These conditions must be shown to exist before any defendant can invoke the bar of this statute. The statute was made to protect no one who is not entitled to such protection, and the burden is upon him to show that he is entitled to such protection. When he sets up this statute to defeat an action against him by the heirs to recover the land, he assumes the burden of proving that the sale was made in good faith, and that the purchase money was paid. *Jeffries* v. *Dowdle,* 61 Miss., 504; *Shannon* v. *Summers,* 86 Miss., 619, 629, 38 South., 345. This appellant failed in

his attempt to show that the sale was made in good faith, and that the purchase money was paid.

If the plaintiffs in the court below had made no attack upon the good faith of the administrator in making the sale in the chancery court proceedings, the burden would have been upon the defendant anyway to show that it was in good faith. But we have shown that there were all kinds of suspicious circumstances about that sale. It was a void sale. It was made more than twelve years after the death of A. I. Bobbitt. It was made without proper notice upon any of the parties interested. It was made to pay stale claims clearly barred by the statute of limitations. Our court has heretofore said that the administrator should institute such proceedings speedily, and that to wait as long as three years creates suspicion. But here we have an administrator, the man who was appointed twelve days after the death of his intestate, waiting twelve years to sell the land. It appears that he waited six years after he was convinced that the estate was insolvent. He had permitted the slaves to lose their value, when, as far as the records show, he might have sold them while they were valuable. *Green* v. *Thompson,* 84 Va., 376, 5 S. E., 507, These circumstances create suspicion and are sufficient to support the circuit judge's finding that as far as the records show the sale was not made in good faith, and that the statute could not therefore be invoked. Certainly, if the burden were not placed upon the party depending upon the sale by the statute itself, this proof would be sufficient to require the defendant in any case to show that the sale was made in good faith. The defendant not only failed to meet the burden, but the proof for the plaintiff independently of the statute, places upon the administrator the charge of bad faith.

Nor did the defendant show that the purchase money was paid. There is a deed executed by him to W. B. Mann, who had previously purchased the dower from Mrs. Middleton and her husband, and there is a report of the sale to the chancellor,

but the sale was never confirmed. We have only these two documents, both signed by the administrator; one being a receipt by him, which he could have contradicted, and the other a report of sale, which, as far as the record shows, was never called to the attention of the court. We find no credit upon any claim against the estate to show that any money received for the lands was used in the payment of debts. If the money had been paid and accounted for to the court, it would have been easy to show it, because, as the court will recall, there is no suggestion from any source that any part of the record of these old proceedings has been lost. Nothing is in the record to suggest that the money was ever paid, except the deed executed by the administrator, and his report to the court, which was never acted upon. Nothing more, it appears, was ever heard of this money. See *Clay* v. *Field*, 115 U. S., 260, 6 Sup. Ct., 36, 29 L. Ed., 375, in which the Supreme Court of the United States discusses this statute of ours. This failure to account for the money, and the silence of the records with respect to it, not only defeat the defendant's right to plead the statute on the ground that the purchase money is not shown to have been paid, but these facts disprove the existence of the other condition that the sale was made in good faith. The court will understand that these questions of fact were passed upon by the trial judge, and that he decided from these facts that there is no showing by the defendant that the purchase money was paid, and, also, that there is no showing that the sale in 1873 was made in good faith.

As further evidence that the sale was in bad faith, and that no purchase money was paid, we call the court's attention to the fact that no steps had been taken by any of the creditors during that twelve years to enforce their claims by suits. Every creditor had doubtless forgotten his claim during that twelve years. No publication was made for creditors as required by article 101, p. 449, Code 1857, to be made when an estate

was reported insolvent. It appears that nobody except the administrator had any interest in anything that was done.

There was no proper process, no publication for creditors under said article 101, no valid claims to pay, no confirmation of sale, no accounting for the money, and no payment of debts. Yet these farcical proceedings were entertained by the court in clear violation of the law which required the administrator to report the condition of the estate speedily. He was performing 12 years after his appointment.

The circuit judge decided that the claims were all barred at the time the petition to sell the land was presented under which the lands were sold; that there was no process for the parties in interest as required by law; that the right of action to these appellees did not accrue until June, 1904; that § 2173, Code 1871, does not apply; that, if it does apply, the appellant failed to show that the purchase money was paid; and that the sale was made in good faith. It is respectfully submitted that his judgment should be affirmed. Every vital question decided is a question of fact, and there was evidence to support the finding of the circuit judge.

There was a general finding by the circuit judge in favor of these appellees. It does not appear upon what the general conclusion was based, nor by what course of reasoning it was reached. But we take it this court will not examine this record for the purpose of finding something upon which to reverse it, but will uphold the judgment of the trial court, if possible. If any view of this record can be taken that will uphold the general finding of the trial judge, such view will be adopted here. If the appellant expected to rely upon any specific finding of the court below as constituting error, he should have made the record to show it. The burden is upon the appellant to point out error, and, if such error does not appear from the record, it will not be considered.

It is possible that the circuit judge decided this case on the question of law, and it is possible that he decided it on one of

two questions of fact. If he decided it upon the question of law possibly involved upon the face of this record, and decided it incorrectly, and such question had been specifically presented by the record, the judgment would be reversed. But if it appears that there are questions of fact upon which he could have decided it, and upon such questions have disposed of the case, then the court will adopt that finding, if possible, thereby to uphold the judgment. If there are questions of law and questions of fact, and a determination of the questions of fact in such a way as to support the judgment would dispense with the consideration of the questions of law, certainly this court will not unnecessarily go into a consideration of the law questions.

In this case, as far as the record here shows, the circuit judge reached his decision by finding that § 2173 does not apply to any case of the sale of a reversionary interest, or that § 2173 has been repealed, or that § 2173 could be invoked in a case of the sale of a reversionary interest, and that it has not been repealed, but that the defendants invoking the aid of this statute did not meet the burden of proof that the sale was made in good faith and the purchase money paid. The first two of these are questions of law. The last is a question of fact. If the circuit judge decided on the facts that the purchase money had not been paid, or that the sale was not made in good faith, then it was not necessary for him to go into the law questions above stated. Counsel say in their original brief that the circuit judge did decide that the two years' statute appearing in subsequent Codes applies. This statement of counsel for appellant will warrant us in saying to the court that the circuit judge decided the case on the facts, as he informs us himself. But it matters not what we say about this, nor what counsel for appellant say about it. We know the record must speak for itself. And if it appears that there is evidence in the record to support the finding of fact that the defendants did not show that the purchase money

was paid, and that the sale was made in good faith, we most respectfully submit that the judgment of the trial court will be affirmed.    Such a view will uphold the judgment of the trial court, and we assume that this court will uphold it, if possible. To do otherwise would be to search the record for grounds upon which to reverse, rather than to indulge every presumption of its correctness and affirm, if possible.

If this statute had never been enacted, heirs could have brought suits to attack chancery sales to pay debts of decedents, and could have recovered by showing that the sale was not made in good faith, and that the purchase money was not paid. The right to do this depends upon no statute.    No sale of land could bind heirs if it was fraudulent, and if the purchase money was not paid.    Void sales could always be attacked and set aside.    It needed no statute to create this right and remedy. And this statute (§ 2173) recognized the existence of the right and remedy.    The said section placed a limitation upon the right of heirs to bring the suit, and in consideration of such reduction of the right of the heirs the said statute at the same time placed certain burdens upon the purchaser of the land.    The purchaser of the land was given some unusual protection by the statute, but at the same time he had to yield something.    The suit must be brought within one year by the heir; but the purchaser must keep himself in readiness to prove that the sale was made in good faith, and that the purchase money was paid.    There was both giving and receiving on the part of the purchaser.    He must be able to show that the sale was made in good faith, and that the purchase money was paid; but he had to keep up his equipment of facts and proof. In order to avail himself of the one-year statute, he must be able to show that the sale was made in good faith, and that the purchase money was paid.    These two facts only would constitute a complete defense after one year.

While sales could, in the absence of any statute, have been set aside because they were not made in good faith, and the

purchase money was not paid, these were not the only grounds upon which they could be set aside. As a general rule, a person is not bound by any proceeding to which he was not a party. In the absence of this statute, a failure to summon any necessary party would render the proceedings invalid as to him. This ground of attack was taken away by the said statute in every case where the sale is made in good faith and the purchase money paid, unless the suit was brought in one year after the sale. Such sales could, in the absence of the statute, be attacked on the ground that they were unconstitutional. But even that ground was not sufficient after one year, under this statute, where the sale was made in good faith, and the purchase money paid. In other words, the said statute took away every ground of attack upon chancery sales after one year, provided the sale was made in good faith and the purchase money paid. But while all the other grounds of attack were destroyed, in effect, by the said statute, and while this much was done to help the purchaser at chancery sales, something was required of the purchaser himself. In order to get the protection of the statute, he assumed the burden of proving the existence of the facts and conditions which entitled him to its protection. Unless he could show the existence of these conditions, the sale at which he purchased was open to all the attacks which could have been made within the one year. After one year he was prepared to protect himself against attacks on all the other grounds, provided he kept himself prepared to show the good faith of the transaction and the payment of the purchase money.

The idea to which we are trying to give prominence here is that, in order to avail himself of this statute, the purchaser must prove as facts of his case, and as part of his case, and as the only condition upon which he may invoke the protection of this statute, that the purchase money was paid, and that the sale was made in good faith. These facts are not to be presumed. Simply because the record may show that a sale was

made, it is not to be presumed that the sale was made in good faith. We are assuming there was a sale to begin with, and as to this sale (as evidenced by the deed in the case at bar, if evidenced at all) the defendant assumed the burden of proving it to have been made in good faith and the purchase money paid. The plaintiff does not have to prove these facts, nor the negative of these facts. Nor does the record prove itself.

The issues in this case were made up in the following manner:

(1) The plaintiffs filed their suit in ejectment claiming that they were entitled to this land, and that it was unlawfully withheld from them by the defendant. The defendant pleaded the general issue, and the trial was begun.

(2) Plaintiffs proved that they were the heirs of A. I. Bobbitt, and therefore the owners of the reversionary interest in this land; a life estate having been carved out of it.

(3) The defendant then says: " You are barred by § 2173 of the Code of 1871."

(4) The response of the plaintiffs to this is: " You cannot invoke the protection of § 2173 unless you show that the sale was made in good faith, and the purchase money paid."

(5) And then the defendant says: "'I will prove that the sale was made in good faith, and the purchase money paid." And he proceeds to prove these facts.

To prove that the sale was made in good faith, the defendant offers the record of the proceedings in which the sale was made. These proceedings show that there was never a valid decree of insolvency; that the final order for the sale of the land was made about 12 years after the death of the intestate; that the law required that such proceedings be instituted speedily or as soon as practicable after the administration of an estate began; that the parties were not properly before the court when the order of sale was taken; that all the debts which the land was sold to pay were at the time barred by the statute of limitations; that a sale was made, but was never reported to, nor confirmed

by, the court.  This is the proof, and the only proof, of good faith.  The circuit judge held that this did not meet the burden of proving good faith.  Can this court say that the circuit judge had no evidence before him upon which to base such decision?  In other words, this evidence, the circuit judge held, did not show good faith.  Will this court say that it conclusively shows that the sale was made in good faith?  Was his finding clearly wrong?  Is there no testimony or evidence to support this finding?  If this record proved anything about the character of this transaction, it tended to prove that the sale was not made in good faith.  And here we wish to impress it upon the court that this is the evidence offered, not to show bad faith in the transaction, but for the purpose of showing good faith.  It might be that, if the plaintiffs had assumed the burden of showing bad faith, and had offered these records for that purpose, the burden being on them, this evidence would not have been sufficient, at least it would not have been conclusive; but if the burden had been on the plaintiffs to show bad faith, and the circuit judge had decided on this evidence that bad faith was shown, we submit that this court would not have disturbed his findings.  But the case is much stronger in favor of our contention when it is kept in mind that these records were offered for the purpose of showing the character of the transaction from the defendant's standpoint; that is, were offered for the purpose of showing good faith.  If there is anything which these records do not show it is good faith.  And yet, in order to reverse the judgment of the lower court, this court will have to hold that these same facts conclusively show that the transaction was in good faith.  This court will have to hold that these facts do not even tend to show bad faith, but that they conclusively show the opposite.

And then the defendant undertakes to show that the purchase money was paid.  All he offers is a deed made out of time and before any sort of report was pretended to have been made, and what purports to be a report of sale filed in the papers.

But the report is not sworn to as required by § 1151 of the Code of 1871, and it was never presented to the chancellor. It does not appear that it was ever called to the attention of the court that this report had been filed. It does not appear that he ever charged himself with this money. It is not made to appear on any of his accounts. It is not made to appear that he paid any debts with it. In fact, no trace of this money is found. If the defendant proposes to stand on the records, he should at least show good records. The proof of the payment of this money would have been the accounts of the administrator made to the court. If he had presented his report to the chancellor, and it had been confirmed, the proposition would be an entirely different one. The condition of this file of papers shows that the transaction had not yet been completed; that the proceedings were held in abeyance for something else to be done. While a deed was made, it was not made as required by law. If the purchase money was paid at all, it was evidently a personal and private matter between W. B. Mann and Raymond Reid. As administrator, Reid did not account for the money, and it does not appear that it was ever paid into court. He could not get a confirmation of the decree until he did pay it into court, and hence no confirmation was ever obtained.

On both these propositions the defendant relies solely upon the records, and the records are irregular, showing void proceedings leading up to the sale and imperfect and void proceedings subsequent to the pretended sale. And we repeat that the situation would be different if the plaintiffs had assumed the burden of proving the bad faith of the transaction and the failure to pay the purchase money. It may possibly be that, if the burden had been on them to establish these defaults, and the circuit judge had found upon this testimony that they had not established it, his finding possibly would not have been disturbed. But his finding upon the facts in this case must be held to be final, unless this court should say that the defendants

prove conclusively as a matter of law that the sale was made in good faith, and that the purchase money was paid. And we say, too, that the proposition would be a different one if, in order to meet the burden resting upon the defendant to show that he was entitled to the protection of this statute, he had introduced records which were irregular and valid on their face. Even in that case we submit they would not have been sufficient, but the defendant would have been in a much better attitude before this court.

We will briefly discuss, in order, the questions submitted by the court in its order on remanding the cause.

" Is § 2173 of the Code of 1871 applicable at all as against reversioners or those holding in remainder ? "

(1) This statute is one of the hardest ever made a part of our laws. The period within which rights might be barred is short. It has been held to cure all defects in the cases to which it applied. There is no saving in favor of persons under disability. An infant's property could be sold under this statute; he being incapacitated to protect his own rights, and no one appearing to represent him. Yet he was barred at the end of one year. In other words, his property could be taken away from him without due process of law under any sort of defective and void proceedings. Yet it was all plastered over, and every defect cured, by the expiration of one year. Such a hard statute as this will certainly not be applied to any case not clearly within its terms.

(2) The statute fixes one year to be measured only from the date of sale. There is no warrant in it for the computation of the period of limitation from any date, except the date of sale. It could therefore have been intended to affect no case wherein the right of action did not accrue on the date of sale. It has never been contended in any case, and counsel make no such contention in this case, that a statute of limitations can begin to run before the right of action accrues. And when § 2173 provides that actions to recover lands sold at chan-

cery sales to pay debts shall be commenced within one year from the date of the sale, it must be presumed to refer to such actions which accrued on that date. This would cover a majority of the instances. The purpose to quiet titles could not be accomplished by any statute which did not limit the time within which to sue to be computed from the date of sale. It would not have any influence in quieting titles if it provided that a suit which could not be brought for twenty years should be begun within one year after the right to bring it accrued.

(3) The holding of this court in *Morgan* v. *Hazlehurst Lodge,* 53 Miss., 665, does not oppose, but upholds, this view. The time within which the suit could be brought in that case was measured from the date of the sale. It was not actually brought within one year from the date of the sale, but the right to sue had existed all the while. The failure to sue was owing to the absence of some one to bring the suit against. The right existed, but the enjoyment of it was deferred by the act of the defendant himself. It was the same right which would have been barred at the end of one year from the date of sale if it had been possible for the plaintiff to enforce his right. This holding of our court is supported by the Wisconsin case of *Jones* v. *Billstein,* 28 Wis., 221. But neither of these cases is authority for the contention of appellant in the case at bar. The only case we have been able to find which is an exact parallel with the one at bar is the Arkansas decision to which we have already cited the court.

" Can § 2173 apply in any case where the sale was made to pay debts all of which were barred by the statute of limitations ? "

(1) At the time this sale was made there were no debts against the estate. They were all barred. The estate was in exactly the same category it would have been in if there had never been any debts. The chancery court has no power, under any circumstances, to sell the lands of a deceased to pay debts, if there are in fact no debts to be paid. Certainly, a proceeding

which could not under any circumstances be valid cannot be made valid by the lapse of a period of time.

(2) It is impossible to conceive of a case where a sale to pay barred claims could be made in good faith. The statute can never be invoked in a case where the sale was made to pay debts barred by the statute of limitations, since the sale was necessarily not in good faith, and since no presumption of correctness can be indulged, and since the proceedings could not possibly be validated.

" Is the evidence in this case sufficient to show that the purchase money was paid ? "

Whoever invokes this statute takes it upon himself to show that the sale was made in good faith, and that the purchase money was paid. The defendant below, the appellant here, invoked this statute and assumed the burden. He undertook to prove that the purchase money had been paid. The question is not, Does the evidence show that the purchase money was not paid ? but, Does the evidence show that it was paid ? The plaintiffs had to make no proof of the failure to pay the purchase money.

(3) There is a deed signed by the administrator which acknowledges the receipt of the money, and this deed was recorded. This is not sufficient. In a suit against the administrator himself to require him to account for the money which he received as shown by this deed, the deed itself would not be conclusive, but would be open to contradiction by him. This is conclusively settled by the supreme court of the United States in *Clay* v. *Field,* 115 U. S., 260, 6 Sup. Ct., 36, 29 L. Ed., 375. Then we have what purports to be a report of sale. But it is not sworn to as required by the statute. See § 1151, Code 1871. It was never presented to the court. There was no order confirming the sale. There was an order (page 202, Record) granting further time to the administrator to make his report. The fact that it was not reported, as required by law, weakens the value of the deed itself as proof.

(4) The best proof that could be offered, and the only sufficient proof, would be the report sworn to, the order approving the sale, and the accounts of the administrator showing that he handled the money. None of these things appear. No debts were paid with the money. The administrator did not account to the court for it. In fact, no trace whatever is found of this money.

(5) A reasonable explanation is that the money was not paid, and therefore the report of sale was never made, and asked to be passed upon; that it was delayed for the purpose of collecting the money, and it was never collected. This must be true, or the payment of the purchase price was an arrangement between the purchaser and the administrator himself, and was unlawful and never brought to light.

(6) We have no showing whatever that this purchase money was paid, and the circumstances tend to prove the contrary, and we ask the court here to bear in mind that it is not pretended that any records have been lost. The appellant undertook to show that the money had been paid, and he, of course, produced all the records found in the file of the estate matter. It seems to us to be conclusive of the failure to pay the purchase money that no trace of the money is found. If he had received it, he must have charged himself with it, or in some manner accounted for it. If the sale was made in good faith to pay debts, it seems that he would have paid some of the debts. If he had reported to the court that he received the money, the court would certainly have required him to account for it. It cannot be said that W. B. Mann took possession of the property under this sale, because he already had possession, having had a deed six years before from the owner of the life estate. Mann did not change his condition on the strength of this sale.

The court will permit us to add that this statute (§ 2173 of the Code) could not be invoked in this case, because there never was any sale. The confirmation of the sale is as necessary as knocking the land off to the bidder. There really was

no sale to set the statute in motion, if it ever could have been invoked in this case.   2-Tiffany on the Modern Law of Real Property, § 462; 18 Cyc., pp. 787, 788.   " Sales of the realty of a decedent are in most jurisdictions subject to the approval of the court, as in the case of judicial sales generally, and therefore in the absence of confirmation the title of the heirs is not divested; the title of the vendee before confirmation being a mere equity.   A bidder at a sale is not a purchaser and is not entitled to have possession until confirmation, and he is under no legal obligation to pay the amount bid until the sale has been confirmed.   Confirmation must be shown.   It will not be presumed."

" Confirmation is the formal expression of the judicial sanction of the sale, and is therefore necessary for its completion. Before confirmation the sale is not in a technical and legal sense a sale.   The accepted bidder is merely a preferred proposer, and to divest the former owner's title and render valid the deed to the purchaser the sale must be confirmed."   24 Cyc., p. 33.

" Giving to these considerations their proper influence in their application to proceedings in the probate courts, we can have no difficulty in maintaining the conclusion which the court has so often reached, that a sale of real estate, under a decree of that court, like a sale under a decree of a court of chancery, does not operate to divest the title of the heirs or devises until reported and confirmed by the court."   *Learned* v. *Mathews,* 40 Miss., 210, 228.

We have just received a copy of the supplemental brief filed by counsel for appellant.   We have the utmost respect for the able counsel who appeared before the court in this case and great confidence in his ability.   If there is reason or authority to support any position which he may take, he will produce it. His argument in this case has served to confirm our confidence in the soundness of our contentions and to make our confidence absolute.   We are sure he has exhausted reason and authority,

and yet he has proposed no argument in support of his position which is anything more than plausible. We desire to answer the arguments in his supplemental brief in the order in which he presents them.

(1) He says that the question as to whether § 2173 of the Code of 1871 or § 2760, Code 1892, applies is settled by *Jeffries* v. *Dowdle,* 61 Miss., 504.

(a) There is no contention in this case that § 2760 applies. Our contention is that § 2173 does not apply, but that the general statute of limitations in force at the time the cause of action accrued does apply.

(b) In *Jeffries* v. *Dowdle,* the statute in force at the time the cause of action accrued was applied; the principle for which we are here contending being recognized. We have never contended that the statute of limitations in force " when the suit was brought " is to be regarded. We are only insisting upon the general principle that the statute in force when the cause of action accrued controls.

Counsel says that in the *Jeffries* case the court submitted to the jury the question of good faith, and " did not undertake to decide that point as it is now claimed here that his honor below must have done in this case," showing that he has not examined this case far enough to find out that it was submitted to " his honor below " by agreement of counsel; a jury being waived.

(2) It is suggested that a suit in equity could have been brought, in view of the decision in *Fox* v. *Coon,* 64 Miss., 465, 1 South., 629.

(a) In *Fox* v. *Coon* there was no chancery sale.

(b) In that case there was no suit to recover the land.

(c) The bill was filed in that case upon the theory that one of the heirs and reversioners, Robert T. Fox, acquired the land at a tax sale as trustee for his co-tenants. The court held that he did not hold the life estate as trustee, but that he did so hold the fee. The bill was retained in so far as it was necessary to

remove the clouds from the title of the reversioners, and no further.

(d) There was no statute of limitations involved.

Counsel then says that § 2174, Code 1871, makes the same statute apply to equity claims as to law actions. But that section applies the same statute of limitations to equity and law actions " brought for the same cause." No suit could have been brought in law or equity to " recover the land " until the right to enter the land accrued. We are willing to admit that, if we could in 1905 have brought a suit in chancery " to recover the land," we would have been faced by the same statutes of limitation. Counsel, showing again that he has given little consideration to his arguments in this case, ignores the construction given the act in *Morgan* v. *Hazlehurst Lodge,* a case upon which he stoutly relies for other purposes. There the court said: "The language of the section is ' no action shall be brought to recover property heretofore sold,' etc. Technically, ' action ' has a more restricted meaning than ' suit,' and refers to suits in courts of common law, while the latter term includes judicial proceedings in both courts of law and equity. A close analysis of the language will help to disclose the legislative intent. The bar of one year attaches to the action brought to recover the property sold. The action is that judicial proceeding by which the claimant on the ground ' of the invalidity of the sale ' seeks to recover it. The legislative mind had especially in view the common-law actions of ejectment, detinue, and replevin; but it must also have intended to apply the bar to a suit in chancery, where the claimant had but an equitable title."

But we cannot see the relevancy of this issue here. It is so well settled that the statute does not begin to run against a reversioner or remainderman until the termination of the life estate. In *Hoskins* v. *Ames,* 78 Miss., 986, 993, 29 South., 828, the court said: " The life tenant died in 1899, and until her death there was no right of action in the appellants.

We are of the opinion that the statute of limitations did not commence to run against appellants until the death of their mother, and they are not barred. *Gibson* v. *Jayne,* 37 Miss., 164." This was an action in ejectment brought by remainder-men under a will. The land in controversy was sold in 1853, and the suit brought after 1899. The arguments made by counsel in this case that the reversioners are barred of every sort of action by the statute of limitations were made in that case, and the court held as above shown. We consider that that decision lays this issue to rest.

Counsel quote from the decision in the case of *Jeffries* v. *Dowdle* on the subject of good faith. After quoting the court to the effect that whoever invokes the bar of the statute must prove the condition which makes it applicable, counsel says that the court " did not say that the negative must be proven." After suggesting that the deed reciting the payment of the purchase money is sufficient, counsel says that during these thirty or more years the administrator has not been called upon to account for the money which he said in that deed he received. This fact cuts both ways. He, doubtless, would have been called upon by the chancellor of his own motion to account for this money if it had not been understood by all parties that the administrator did not in fact receive any money for which to account. The fact that he did not account for it, and that he was not required by the court to account for it, is significant. He did not have the sale confirmed because the purchase money had not been paid, very likely. He was never called upon by anybody, although he had a bond binding him to account for the proceeds of sale. There were terms of court in those days every three months. The sale was made in November, and a few days thereafter an order was entered granting him time to make his report. Why there should have been any necessity for time if he had the money in his hands is difficult to understand. He did file a paper which is in the form of a report, except it is not sworn to, in February following. If he re-

ceived the money, he would have been required by the court to account for it, and his bondsmen would have had to see that it was accounted for. But that they were not called upon to make it good, and that he never did pay it into court or charge himself with it on his accounts shows that it was understood at the time by all concerned that no money had in fact been received by him. And that none was received by him, and he was not called upon to account for that which he acknowledged in the deed to have received, is explained by the fact that all the debts were barred by the statute of limitations, and it was recognized by the court and counsel that the sale was unnecessary and void, and that it was not his duty to collect the purchase money.

We have been insisting that the deed is not sufficient to show that the purchase money was paid when the payment of it is made an issue to be met by the parties invoking § 2173. But counsel says that there is a presumption of law that the transaction was in good faith. But we do not know where he finds this presumption. He says: " This presumption of law has positive evidential value. The purchaser has the right to rely on that presumption as evidence of his good faith until counter evidence is adduced to overturn it." In any case the sale must have been made in good faith, but in the face of *Jeffries* v. *Dowdle, Shannon* v. *Summers,* and other cases, he insists that nothing has to be proved by the purchaser at the chancery sale. To demonstrate what he means by this argument, he cites *Sheehan* v. *Kearney,* 82 Miss., 688, 21 South., 41, 35 L. R. A., 102. In the last named case, this court said that the probate of a will is *prima facie* evidence of its validity. From this counsel reasons that, if the record of probate of a will makes out a *prima facie* case of the validity of the will, the record of a deed makes out a *prima facie* case, under § 2173, of the good faith of the transaction and of payment of the purchase money. But he ignores altogether § 1824 of the Code of 1892, which makes the probate *prima facie* evidence of the validity of the will.

That statute is as follows: "Probate of Will *Prima Facie* Evidence. On the trial of an issue made up to determine the validity of a will which has been duly admitted to probate, such probate shall be *prima facie* evidence of the validity of the will." This is a statutory rule of evidence. There is no such statutory rule covering the case at bar. If it is true that good faith and the payment of the purchase money may be presumed from the proof of the deed itself, then the validity of a will could be proved simply by the production of the will. In other words, it would prove itself. But one propounding the will for probate may not present the document itself and say the instrument proves itself, but he must offer other affirmative testimony to show the validity of the will. Instead of the last-named argument of counsel helping his case, it is self-destructive. The rule which he is invoking in this case to show the sufficiency of the evidence offered by the defendant to prove the good faith of the transaction in the payment of the purchase money does not exist in any case, unless it is created by statute. If it is a general rule, then § 1824 of the Code is an unnecessary and meaningless enactment.

And we may add that the provision in § 2173 of the Code of 1871, requiring the purchaser to show good faith and the payment of the purchase money, is perfectly worthless, if it requires the purchaser to do nothing more than to present his deed. In fact, the unsoundness in all this argument about the instruments themselves showing good faith and the payment of the purchase money is that such argument fails to recognize the distinction between a sale under this statute and a sale where a plaintiff assumes the burden of showing that the sale was not made in good faith, and that the purchase money was not paid. Section 2173 requires these affirmative facts to be shown by him who invokes the statute, and he cannot do this simply by producing the evidence of the sale upon which he relies. In other words, the sale does not prove itself any more than a will proves itself.

And we repeat that the judgment in this case cannot be reversed, unless the court should hold that the record of these irregular and void deeds conclusively proves that the sale was made in good faith, and that the purchase money was paid. The circuit judge decided that the defendant did not meet the burden resting upon him to show good faith and the payment of the money by his introduction of records void on their face, irregular, imperfect, and unfinished. And we respectfully submit, too, that under no view of the case can § 2173 apply, even though we may be wrong on the application of the statute in general, because no sale has ever yet been made of this land. At the suggestion of one of the members of the bench, we have made search for cases in which this court held that confirmation of the sale under this statute was not necessary. We have been unable to find those cases.

*J. A. P. Campbell,* on the same side.

The facts are so fully and clearly presented and conclusion so ably argued by May, Flowers & Whitfield as to convince me that the only hesitation to affirm the judgment, if any, could arise from the claim that the plaintiffs are barred by § 2173, Code 1871. This presents a new question not before decided or affected by any decision of this court. That section is a most beneficent one designed to remedy a great evil and do much good, and is applicable to every case within its terms, but not to be applied to any case not within its purview. It is a mere statute of limitations, and not a constituent of title or one conferring a vested right, but repealable at any time before the bar is complete (and so afterwards according to United States supreme court). It allows a very short period for assertion of claim and establishes a rigid and hard rule in the interest of purchasers in good faith under decrees of court, and it should be firmly applied to all cases within its terms, but never in a case not within its terms. It is not to be stretched and extended to cases not within its terms or the contemplation of the Legis-

lature.   Wherever an action could be brought within the time
prescribed by it, and recovery had, if the sale was illegal, the
section applies; but, when no such action is maintainable, it
does not apply.   This is manifest, for it were absurd to hold a
bar to arise for not bringing an action, when none could be
brought with success, whatever the facts.   Therefore it must
be apparent that the statute has no application, except to a sale
of a present interest in possession, and that sales of future con-
tingent interests are not within the purview of the section.   It
was made for the ordinary common sales of present interest in
the possession of parties, and not for the unusual instances
where future interest might be sold, and they were not thought
of being occasional and unusual.   It were absurd to bar in a
year, when no recovery could be had because no right had
accrued.   The case of sale of future interest is not provided for
by § 2173, and it does not apply in such case, and no statute,
except the ten-year statute, does apply.   Nor does the statute
of two years in the later Codes apply, because they apply to
future sales.   Had the Code of 1871 remained unchanged until
now, the case would have been the same.   Section 2173 would
then have had no application for the reasons stated above, *i.e.*,
it does not fit the case, was not made for it, and could have no
influence on it, being applicable only to the common case of
sales of present interest in possession for which an immediate
right of action exists as soon as there was one to make defendant
to an action.

The later Codes have no influence on the question.   They
contain no saving of a right of action which did not exist under
a former Code.   They preserve the rights of action which arise
under a former Code, but have no influence where there was no
right of action, and here there was none during the life of a
former Code.   Here there was no right of action by plaintiffs
until 1904, and the only bar was ten years, because the one-
year statute did not embrace their case; it being the sale of a
future contingent interest not within the purview of § 2173,

Code 1871, and not within the terms of any other statute. The court will see that the way out of difficulties dealing with § 2173, Code 1871, is to limit it to ordinary sales of interest in possession where there are parties who might sue and recover, and therefore are required to sue in the short time prescribed, and that it has no application to the case of sale of a future interest where many years may elapse before there is a right in anybody to maintain an action. There was no saving in favor of infants or others, and many years might expire before there was any person entitled to bring an action. The only safe interpretation of the statute is that here presented. It gives the statute its beneficent operation in the great majority of sales, and in all which are embraced in its terms as well as in its spirit, as it seems to me.

The ruling that time commences whenever there is some one to sue accords with my contention that the statute has no application where there is no plaintiff entitled to sue and immediately recover if the sale was illegal. The year does not begin to run until there is a defendant. So, if there is no plaintiff when possession is taken, the statute cannot apply. The holding in *Morgan* v. *Hazlehurst Lodge,* 53 Miss., 665, that the one year did not begin until there was some one to be sued, was but the recognition of the universal rule that a statute of limitations does not begin to run until there is some one to sue, and has no bearing on the question what cases are embraced by the section. It in no manner contravenes my view of the section. It rather supports it, for, if the statute does not apply until there is one to be sued, it will not apply where there is no one to sue. The correlative is true. It does not follow that when there is no one to sue the statute applies. In the one case, there is a party entitled to sue as soon as there is a defendant; in the other, there is not, at the time of the sale, any who has the right to sue one who is in possession. In one case, a present right of action suspended for want of some one to be sued; in the other, no one entitled to sue, although there may be a defendant. My propo-

sition is that the statute applies only where there is a person in being at the time of sale entitled to bring an action for recovery of the property, and therefore the short time allowed for bringing it. To test this view, suppose the property was limited to one who would not come into being for twenty-five years. Surely the statute would not apply there, nor could it be held that the party was bound to sue in a year after coming into being. That would interpolate the statute. My view avoids all difficulties, and gives the statute full operation in all cases for which it was designed.

Another view of § 2173 of Code of 1871 seems to me equally decisive in favor of the appellees. The Code of 1871 expired November 1, 1880, and § 2173 with it; but by § 4 of the Code of 1880 (continued in subsequent Codes) rights of action and defenses created by said section were preserved, but for which the section would have been repeated, but there was no right in the plaintiffs (appellees), and therefore no defense, November 1, 1880, and nothing to which § 4 applies. The only cases provided for by § 4 (related to § 2173) were sales made (or possession taken) within one year before November 1, 1880, for as to all others the section had performed its office; there being no saving in favor of anybody. This sale was long before 1880, and not within § 4.

It seems to me § 2173 must be put out of view as not applicable. The whole object of § 4 was to prevent a change of Codes from affecting pre-existing rights of action and defense, but it was essential to their continuance that they existed under the former Code.

MAYES, J., delivered the opinion of the court.

At the May term of the circuit court of Leake county, B. B. Bobbitt *et al.*, brought an action of ejectment against J. L. Jordan to recover possession of the tract of land in controversy. This declaration was filed on the 19th day of December, 1905, and plaintiffs allege in the declaration that their right to the

possession of the land accrued to them on the 15th day of August, 1903. It will be seen from the above statement that this suit was instituted about sixteen months after the date it is alleged that the cause of action accrued. The importance of emphasizing this will be made manifest later on in the opinion. Jordan pleaded the general issue, whereupon the case went to trial on facts lying almost entirely of record.

The facts are as follows: The common source of title is A. I. Bobbitt, the ancestor of plaintiffs. Mr. Bobbitt died in October, 1861, and at the date of his death he owned the land in controversy. When he died he left a widow, Mrs. Mary E. Bobbitt, and five children. One of these children, Alfonso Bobbitt, died young without heirs, and the other four children were the plaintiffs in this case in the court below. Shortly after the death of A. I. Bobbitt, his widow was appointed administratrix, and John A. Hanson was appointed administrator of the estate. It is shown that Hanson served as administrator until March, 1873. Some two or three years after the death of A. I. Bobbitt, his widow, Mrs. Mary E. Bobbitt, married one H. A. Middleton. In 1864, Bobbitt's widow, then Mrs. Middleton, procured from the probate court of Leake county an allotment of her dower. This allotment of dower included the lands in controversy. In December, 1867, Mrs. Middleton conveyed the dower land to one W. B. Mann. In 1867, the administrator, John A. Hanson, petitioned the probate court to declare the estate of A. I. Bobbitt insolvent and to authorize him to sell the real property belonging to the estate for the purpose of paying the debts. It seems that this petition did not embrace the dower lands. On October 14, 1867, the probate court made an order directing the sale of the lands as prayed for. This order to sell was never executed. It seems that nothing more was done in this matter until the year 1871, ten years after the death of Bobbitt, when Hanson, who was still the administrator, presented another petition to the court calling attention to the fact that the court had previously de-

clared the estate insolvent, and again asking for the sale of the realty to pay the debts. In this petition he asked that he be authorized to sell all the land, including the dower. It seems that nothing was done, however, except the filing of the petition. In October, 1872, eleven years after the death of Bobbitt, still another petition was presented to the court suggesting that it had made an order at its October term, 1867, declaring the estate of Bobbitt insolvent, and this petition prayed for authority to sell all the land, including the dower, and the land in controversy for the purpose of paying the debts. At the February term, 1873, a *pro confesso* was entered against all defendants, heirs of Bobbitt, and a decree entered directing the sale of the property. This decree seems to have been entered at the February term, 1873. In August, 1873, Raymond Reid suggested the death of John A. Hanson, the former administrator, and prayed to be appointed in his stead. On the 6th day of August, in the same year, an order was entered directing Reid, administrator, to sell the land. At the February term of the chancery court in 1874, Reid, administrator, filed his report, wherein he states that he sold all the land, and the particular land in controversy was sold to W. B. Mann for cash, and he further recites "that the said several purchasers having fully complied with the terms of the sale, by paying the purchase money, for the several parcels of land, and that the deeds have been made to the purchasers by the administrator." It is not shown that there was ever any confirmation of this sale by any decree of the court. It is needless to trace the further variations in the history of this title, as it appears in this record, further than to make this statement about it: That J. L. Jordan is a remote vendee under the title of W. B. Mann. It is the sale under the decree of the court to W. B. Mann that is sought to be invalidated, and upon the validity of this sale, or its invalidity, all subsequent titles depend. This suit is an action in ejectment brought by the heirs of Bobbitt to recover as reversioners the eighty acres of land comprising the home-

stead of their father, and claimed to have been purchased by
W. B. Mann under the sale by the administrator November,
1873. W. B. Mann, the purchaser, was in possession of this
land at the time he purchased at the administrator's sale by
virtue of a deed executed to him by the widow, Mrs. Middleton,
and her husband, in 1867, about six years before the sale of the
administrator and the purchase by Mann. In other words, it
may be considered as a conceded fact in this case that Mann took
possession of this property by virtue of the deed to the dower
interest of Mrs. Middleton made in December, 1867, and not
by virtue of his purchase at the sale of the administrator in
1873, being already in possession under the deed of the dower
interest when he bought at the administrator's sale. Mrs. Mid-
dleton died in June, 1904, so .that whatever estate Mann
obtained by virtue of the conveyance of the dower interest of
Mrs. Middleton in 1867 terminated in June, 1904, and from
that time on the parties in possession were in possession under
such right as was obtained by virtue of the sale by the admin-
istrator. In other words, until the death of Mrs. Middleton,
all the vendees of Mann held possession of this property by
virtue of the conveyance by Mrs. Middleton of her dower inter-
est, and their possession was not adverse to the Bobbitt heirs up
to the date of the death of Mrs. Middleton. After that time,
which covered a period of about sixteen months from the date
of the death to the time of the institution of this suit, whatever
claim the vendees had was based upon the title obtained by Mann
at the administrator's sale, and was adverse to the heirs.

Counsel for appellee introduced no testimony impeaching
the good faith of the sale. Nowhere in this record does it
appear that any witness has taken the stand to testify that the
sale was not made in good faith, and the purchase money paid.
Appellees rely solely upon the record to prove this, and rely
upon it to impeach the good faith of this transaction and set
aside this sale, for there is no hint by any witness who has
taken the stand, or been introduced on either side, that this

sale was not made in good faith, and the purchase money paid, as is stated in the report of the administrator. It seems that they rely upon the fact that from an inspection of the record at the time of this sale it would appear that when the decree of insolvency was made, and the property ordered to be sold for the payment of the debts, the debts propounded seemed to be barred; but at the time this petition was filed the statute of limitations was not pleaded, and, even though the accounts filed with the petition might appear to be barred, the statute of limitations was not set up, and, upon the showing made by the administrator that there were debts, the decree of insolvency was made, and the property ordered to be sold, and the sale took place, so that we have the property sold by order of the probate court, and with no proof in the record that the sale was not made in good faith, and the purchase money paid, unless it can be said that the irregularities in the record leading up to the sale constitute the proof, and a suit brought to recover the property more than one year after the sale and more than one year after the time when there was no obstacle in the way to prevent a suit by the heirs. The decree of the probate court in 1873, ordering these lands to be sold, appears to be void for want of proper notice to the parties.

The rights of the parties must be determined under the law as it stood under the Code of 1871, since all the statutes prescribing the limitation period applicable to all property sold by order of the chancery court (that is to say, § 2693, Code 1880, § 2760, Code 1892, and § 3122, Code 1906) are expressly made to apply prospectively (that is, to sales hereafter made leaving unaffected the period of limitation in operation at the date of any sale ordered by the court). The sole question in this case is whether or not, under § 2173 of the Code of 1871, the statute of limitations bars the heirs from availing themselves of the invalidity of the decree of sale, when, as a matter of fact, at the date of sale they could not have instituted suit to recover this land. Section 2173 of the Code of 1871 provides as fol-

lows:  " No action shall be brought to recover any property heretofore sold by any administrator, executor, or guardian, by virtue of the order of any probate court in this state, on the ground of the invalidity of such sale, unless such action be commenced within one year after this chapter shall take effect, if such sale shall have been made in good faith, and the purchase money paid; nor shall any action be brought to recover land or other property, hereafter sold by order of a chancery court, where the sale is in good faith and the purchase money paid, unless brought within one year after such sale." It is the latter clause of this section which is involved, since this sale was made after October 1, 1871. Now, let us emphasize the fact that this sale was made in 1873, and when the sale was made the heirs could not have brought suit at law to recover the land, because Mann was in possession of the land under a deed to the dower interest of Mrs. Middleton. In other words, he was in possession by virtue of a purchase made by him of the life estate held by Mrs. Middleton, and no suit that could have been instituted by the heirs could have turned him out, nor could they, in the language of the statute, have brought any suit " to recover the land," because the only interest they had was the reversion, and this interest did not take effect until the termination of the prior life estate held by Mann under his purchase from Mrs. Middleton. The whole court concede that the heirs could not have brought suit at law to recover possession of the property at the date of sale. The question then is: If it would have been impossible for them to bring the suit within one year from the date of sale, because they did not have any right to recover the land at law, does this statute apply to them? In other words, where property is sold by order of the court, and the property sold consists of the reversion after the termination of a prior estate, either for life or years, and the parties buying the reversion have no right of entry until the termination of the prior estate, and the heirs have no right to possession at the date of sale nor within one year after, does this statute apply? Is

the statute to be destroyed in every case where there is an out-standing estate, either in curtesy, dower, or for a term of years, or must the party having the right to sue bring suit one year after the termination of the outstanding estate in a case where the purchaser of the reversion at the sale takes possession and commences to hold under the title acquired at the sale? In such a case, where the sale is made by virtue of an order of the court, is the one-year statute to be applied from the date at which the right to bring a suit accrues? If not the one-year statute, what statute of limitations is to control? It must not be forgotten that from necessity grew the statute. While it seems per-emptory and harsh, its purpose is beneficent. Before the pas-sage of this act, as the legal history of this state shows, the purchaser at a probate sale was merely the purchaser of a law-suit. This being the case, property sold at an administrator's, executor's, or guardian's sale was sold at a sacrifice. Heirs and wards were stripped of their property for a mere song, and purchasers at these sales felt no security under their purchases. It was to cure these evils, and to secure to these parties a more just return for the sale of their property when misfortune made the sale necessary, that this statute was passed. The statute is wise, wholesome, necessary. The beneficent purpose aimed at by this statute should not be destroyed. 11 Am. Dec., note on page 627; *Waln* v. *Shearman,* 8 Serg. & R. (Pa.) 357 *et seq.,* 11 Am. Dec., 624.

The question is whether or not the one year's statute of lim-itations, provided by § 2173 of the Code of 1871, has any appli-cation to the case of a remainderman. This question was settled by the case of *Morgan* v. *Hazlehurst Lodge,* 53 Miss., 665. In that case, the court says, on page 681: "It is im-possible to suppose that the statute of 1871 intended to cut off the right of the heir to the land, unless there was some person in possession against whom he might bring the action. . . . In such a case, the heir would not lose his right of action until the vendee of the administrator entered or asserted such owner-

ship as amounted to a *disseisin.* It would be meaningless, under the act of 1844, to say that the heir shall lose his right of entry in three years, when during that time, nobody was opposing his right and holding him out; no one being in possession against whom he could assert it by suit. So under the present law, it is futile to say that he must bring his action within a year, when there is no disseisor in possession against whom he could bring it. Statutes of limitation assume that the claimant has a right of action which he forbears to assert, and may lose if he does not use in time; but how sue, when no one is in adverse possession to him? . . . The statutes applies the limitation, on the assumption that the vendee, or some one under him, was in possession when the statute went into force, and intends to apply the bar within a year thereafter." The above case was decided in 1876, five years after the enactment of § 2173 of the Code of 1871, and is practically a contemporaneous construction of the statute in question. It expressly holds that when, for any reason, the person entitled to bring the action cannot do so, then the one-year statute applies only from the time when the suit could be brought, and expressly holds that this statute commences to run from the date at which the right to sue first accrues. From 1867 to June, 1904, Mann and his vendees were in possession of the property by virtue of the conveyance made by Mrs. Middleton of her dower estate. After her death in June, 1904, and about eighteen months before this suit was instituted, the parties in possession held by virtue of the administrator's deed, and the heirs, not having instituted their suit within the year, cannot now do so.

In the case of *Hall* v. *Wells,* 54 Miss., 297, the court begins its opinion by the statement that "we adhere to the views expressed in *Morgan* v. *Hazlehurst Lodge,* 53 Miss., 665." In *Morgan* v. *Hazlehurst Lodge, supra,* on page 682, Judge SIMRALL, delivering the opinion of the court, says: "The statute is remedial and curative, has its origin in that policy, and, if the words will admit it, should receive that construction which

will accomplish the end aimed at.   It was meant to cure all
defects in the sale, no matter from what cause, whether before
or after decree, unless the heir brought his action within the
time to contest and show its validity.   Though the sale be void,
he is under color and claim of title, and the statute does no more
than protect and perfect his imperfect right, after the expira-
tion of a year from the time the right to bring the suit arose."
In *Hall* v. *Wells,* 54 Miss., 297, Judge CAMPBELL, delivering
the opinion of the court, after reaffirming the views of the court
as announced in *Morgan* v. *Hazlehurst Lodge,* says:   " The
section of the Code was not intended, and does not have the
effect, to cure by express enactment illegal or defective proceed-
ings in the probate court for the sale of property by administra-
tors, executors, or guardians."   It may be readily admitted that
this statute is not a curative statute, but how can that affect the
proposition?   Neither Judge SIMRALL, in delivering the opin-
ion in the case of *Morgan* v. *Hazlehurst Lodge,* 53 Miss., 665,
nor Judge CAMPBELL, in delivering the opinion in *Hall* v. *Wells,*
54 Miss., 289, say that this statute is a curative statute intended
to reach back and validate that which was invalid; but the
statute, in its effect, operates both as a remedial and curative
statute after one year from the date of sale, and this is what is
stated by the court in *Morgan* v. *Hazlehurst Lodge* and in *Hall*
v. *Wells, supra.*   As is said in the opinion of the court in *Hall*
v. *Wells* (page 297), the statute " originated in the known fact
that a very large proportion of the sales of property by virtue
of the orders of probate courts was void, from various causes;
and, as insecurity of titles to property is a great public evil, it
was determined to provide a short statute of limitations, ap-
plicable to all cases falling within the existing evil; and the
section under review contains the provision to remedy it, not
by relating back and validating proceedings, but by requiring
all actions to recover any property before that sold by any
administrator, executor, or guardian, by virtue of the order of
any probate court, on the ground of the invalidity of such sale,

91 Miss.—6

if the sale was in good faith, and the purchase money paid, to be brought within one year after said section should take effect. This section applies to all sales of the class mentioned which are invalid, no matter on what ground.   Any sale which is included in the evil intended to be remedied is embraced."   In neither of the cases referred to does the court say that this is a curative statute, in that it has any retrospective operation, reaching back and making that valid which was invalid at the time it was done; but, in the language of Judge CAMPBELL in *Hall* v. *Wells,* the statute " is wholly prospective," doing no more, quoting the language of Judge SIMRALL in the case of *Morgan* v. *Hazlehurst Lodge,* than to " protect and perfect his imperfect right, after the expiration of a year from the time the right to bring the suit arose."   " Statutes of limitation are statutes of repose, and we should seek in construing them to give them the operation intended.   We must not defeat them by a strictness of construction it was never designed they should be subjected to." *Toll* v. *Wright,* 37 Mich., in part of the opinion to be found on page 102.   Again, in *Morgan* v. *Hazlehurst Lodge, supra,* on page 682, this court has said that this statute " should receive that construction which will accomplish the end aimed at."

Keeping in mind that this statute is a statute of repose, and that it should not be so strictly construed as to defeat the object aimed at, and we have a true key to its correct interpretation. What is the object aimed it?   It can be stated in no better language than is stated in the case of *Hall* v. *Wells:*   " It originated in the known fact that a very large proportion of the sales of property by virtue of the orders of probate courts were void, from various causes, and, as insecurity of title to property is a great public evil, it was determined to provide a short statute of limitations applicable to all cases falling within the existing evil; and the section under review contains the provision to remedy it."   The case before the court now is one of sale by order of the probate court, falls literally within " the existing evil," and the one year's statute is applicable

to it, and begins to run from the date that plaintiffs could have maintained this suit, and, since they did not institute the suit within the year, they are barred. This is expressly decided in *Morgan* v. *Hazlehurst Lodge,* reaffirmed in *Hall* v. *Wells,* and the correctness of the conclusion of the court in those cases is made more apparent on reading § 2170 of the Code of 1871, which provides that: " When any person shall be prohibited by law, or restrained or enjoined by the order, decree or process of any court in this state, from commencing or prosecuting any action or remedy, the time during which such persons shall be prohibited, enjoined or restrained, shall not be computed as any part of the period of time limited by this chapter for the commencement of such action." If the court had not already settled this question, the statute itself settles it. When the plaintiffs could not sue, this statute protected them and kept alive their right until such time as they could sue. When the right to sue accrued, the one-year statute began to run immediately, and at the end of one year from the date at which their right arose they were barred. No other statute of limitations can be applied, because the statute has made no exceptions, but includes all sales of any property sold by order of the chancery court. The statute does not say that it shall not apply to the sale of a reversion or a remainder. A reversion or remainder is property. The exact case has never before been before the court, but the same question has, and the question is expressly settled in the case of *Morgan* v. *Hazlehurst Lodge,* and, as already stated, if the court had not so decided, § 2170 of the Code of 1871 expressly provides the time when this suit shall be maintained, and expressly says that, while the person cannot bring the suit, such time shall not be computed as any part of the period of time limited by this chapter for the commencement of such action. It will be seen by this section, by its express provision, it is made to apply not to any particular section of the chapter, but to the entire chapter on the subject of limitations. Now, while there is no

express statute prohibiting the plaintiffs in this suit from maintaining this action during the incumbency of the property by the life tenant, yet it is by virtue of the law that they are prohibited from maintaining this suit, and therefore, since the statute of limitations under construction is contained in this chapter, and they are prohibited by law from suing up to the date of the termination of the life estate, they are included within the provisions of § 2170, by all sensible and reasonable construction of the statute, remembering that it is to be construed as not to defeat the end aimed at. Statutes of limitation are to be construed together, and one section is not to be excerpted from the entire statute and made to stand alone; but all the statutory provisions on the subject are to be construed, and they are to be so construed as to give effect to the purpose of its enactment. We have in this case a sale by order of the probate court, a purchaser, possession taken under the title acquired at the sale at the death of Mrs. Middleton. The statute says that no action shall be brought to recover land or other property sold by order of the probate court where the sale is in good faith and the purchase money paid, unless brought within one year after such sale. At the date of sale the parties could not sue at law. . Section 2170 provides that in such cases the statute of limitations shall begin to run only from the date when they could sue. We have the decision in *Morgan* v. *Hazlehurst Lodge* construing this statute and holding this to be the true construction. The decision was made almost contemporaneously with the statute, over thirty years ago, and by this decision a rule of property is established. To hold otherwise would mean that § 2173 should have added to it, by this court, that this section shall not apply to the sale of a reversionary interest. It would involve the overruling of the contemporaneous decision in the case of *Morgan* v. *Hazlehurst Lodge*. The construction we place upon the statute is in keeping with the spirit and purpose and end aimed at by the statute. By the construction which we place upon this statute these

plaintiffs are not narrowed in any right which they acquired. Under our construction, they are relieved from the necessity of instituting this suit at any time during the life tenancy, which was for a period of nearly thirty years, and are only required to institute the suit within one year after the date when the life estate terminated. By our construction they are given broader rights than they would have had but for the life estate, and the integrity of the statute is preserved. The rights of the heirs are not the only rights which the statute under consideration guards, but it guards the rights of the purchaser as well. The purchaser may buy at a probate sale with as much reliance upon the effectiveness of the bar created by this statute, in a proper case, as the heir may look to it as his refuge in case the sale by order of the court was void. This statute was enacted for both parties, and each had a right to rely upon it.

The case of *Clay* v. *Field,* 115 U. S., 260, 6 Sup. Ct., 36, 29 L. Ed., 375, has no sort of application to the case under consideration, for the reason that the court states in its opinion that " the court before which the case was tried expressly found that no money was ever paid on the bid, and no credit was ever entered upon the probated indebtedness." Of course, under these facts, the statute did not apply, because the condition under which it is provided by the statute that the one-year statute may create a bar to a suit to recover land sold by order of the probate court did not exist, because, as the court says, the purchase money was not paid; but that is not the case here. There is nothing in this record which goes to show that the sale was not made in good faith, and the purchase money paid. Not a witness has been put upon the stand to deny these propositions, and if it be held that this sale was not in good faith, and the purchase money was not paid, it must be so held on the face of the record. Let us see what the record shows: It shows that an application was made by the administrator to the court for the sale of this property to pay the debts. It contains

a report made to the court by the administrator, in which he recites that the receipt of the money is expressly acknowledged by him.    It shows that the administrator recites in his report that the purchasers have complied in every respect with the decree of the court, and there is not one syllable of testimony in the record to impeach the truthfulness of this report made by the administrator.    It is true that the burden of proof rested upon those who claimed under this sale to show that the sale was made in good faith, and the purchase money paid; but they make out a *prima facie* case by the production of the record of the administrator showing a sale, a purchase, and the payment of the purchase price, and they may here rest their case.    The *prima facie* case thus made may be overthrown, but it must be upon some proof of bad faith.    Fraud is not to be presumed, nor will mere irregularities and defects in the record prove fraud or bad faith, unless those defects and irregularities are such in themselves as furnish direct proof that the sale was not made in good faith, or the purchase money paid. Bad faith cannot be argued from the mere fact that the proceedings leading up to the sale were irregular, and such as to create a void sale.    If this could be done, then there would be no need for the statute.    The very object of it is to prevent these questions of irregularity, and defective proceeding, from being gone into for the purpose of vitiating the sale after the lapse of a year.    In all the cases in which sales have been declared void under this statute on the ground of bad faith, it is because the facts of the case affirmatively show that something had been done which invalidated the sale, and in which the purchaser participated as well as the administrator.    If these facts appear in the record, of course the statute has no application; but in this case there is absolutely nothing to impeach the good faith of the sale and the receipt of the purchase money, save the fact that the record shows that the case is filled with defects and irregularities, such as would render

the sale void but for the statute. There is no proof anywhere of any bad faith on the part of the purchaser.

In the case of *Shannon* v. *Summers,* 86 Miss., 619, 38 South., 345, in the opinion of the court to be found on page 629 of 86 Miss., page 347 of 38 South., the decision of the court held that this statute did not apply, and the court said: "The burden is on the purchaser to show that the sale was made in good faith. That burden was not met in this case. It is evident from the testimony of Herron, the administrator, and of Rowland, purchaser, that the latter in purchasing the land acted as agent for the former, who was to take the lands off his hands, and that while the administrator, who owed all the debts chargeable against the estate, gave the estate credit by the amount of Rowland's bid for the land, yet Rowland never paid Herron, either as administrator or otherwise, the amount of his bid." It will be seen in this case that the reason for holding that the statute did not apply was because of the proven fraud of the administrator and purchaser in collusion with each other, and the failure to pay the purchase money. Upon an examination of all the cases upon this subject, we find no case which has ever held that defects and irregularities, appearing in the record, may alone be relied upon to show the bad faith of the sale, when there is nothing else in the record to prove it, and no testimony introduced by the party assaulting the sale which would tend to impeach it. The statute was designed for the express purpose of curing these very things, and to hold that they, in themselves, could furnish the proof to impeach the sale, would be to destroy and nullify the statute. There is no contention by anybody that this sale was a valid sale; but, as repeatedly held by this court, for the statute to become effective, it is not necessary that there should have been a valid sale. Indeed, if there was a valid sale there would have been no need for the statute. The purpose of the statute is to render unassailable, after one year from the date of sale, the title to any property sold by order of the probate court. In order for

this statute to become effective and fasten itself upon the transaction, it is only necessary that the sale should take place by order of the court. It need not have been a valid sale. It extends to void sales. This whole record shows that this sale did take place under an order of the probate court. 11 Am. Dec., note on page 627.; *Richardson v. Brooks,* 52 Miss., 118; *Hall* v. *Wells,* 54 Miss., 289; *Jeffries* v. *Dowdle,* 61 Miss., 504; *Morgan* v. *Hazlehurst Lodge,* 53 Miss., 665; *Waln* v. *Sherman,* 8 Serg. & R. (Pa.), 357 *et seq.,* 11 Am. Dec., 624.

It may be conceded that the sale by the administrator was for debts barred by the statute of limitations, and that there was no proper notice served on the heirs, and that the sale was void; but all these things do not prevent the one-year statute of limitations from applying, because, however irregular and defective the proceedings leading up to the sale, still the court had jurisdiction of the administration, and the sale was made by order of the probate court. No act or irregularity of the administration can prevent the statute from running in favor of a purchaser who has paid the purchase money in good faith, unless he has participated in the wrongdoing of the administrator.

The purchaser is not required to examine the proceedings, or petition leading up to the sale. This is expressly held in the case of *Toll* v. *Wright,* 37 Mich., in part of opinion rendered by Judge COOLEY, to be found on page 100. We can do no better than quote, in support of our own views, a part of the opinion of Judge COOLEY in construing a statute similar to ours, and sustaining our view, wherein he says, on page 101: "What, then, is the meaning of the statute when it speaks of sales 'by an executor or administrator under the provisions of this chapter'? It certainly does not mean valid sales, for those need no protection. Neither can it mean sales lawfully ordered, for it makes no mention of any order, and speaks of sales only. Neither can it mean sales in which the statute has in all important particulars been followed, for the manifest

purpose is to make an undisputed possession cure defects in the proceedings. Indeed, it cannot possibly, as we conceive, mean more than this: A sale purporting to be made under the provisions of the chapter, and in pursuance of an order professedly based upon them. If the administrator with such an order has made. sale under the provisions of this chapter and given a deed under which the necessary possession has been had, we think the case is fairly within the intent of the statute. Was such the case here? We think it was. Indeed, we understand it to be conceded that the probate court in making its order must have supposed it was under this chapter. The complaint is that the application for license to sell made out no case. But there was colorable ground for judicial action, if nothing more. The existence of charges of administration would have been a valid ground for an order, and, if the court assumed that expenses for the support of the children would constitute a lawful claim against the estate, we are not prepared to say that the proceedings could be assailed collaterally for any error in that regard. But it is enough for us to conclude that here was an order for the sale of these lands made in reliance upon this statute, and a sale made in pursuance thereof. Both the judge of probate and the administrator must have supposed they had this statute for their warrant. They assumed to be acting in pursuance of its provisions, and we think nothing more is requisite to entitle the purchaser and those claiming under him to the benefits of the limitation. Statutes of limitation are statutes of repose, and we should seek in construing them to give them the operation intended. We must not defeat them by a strictness of construction it was never designed they should be subjected to. Let it be conceded that the administrator's sale was at the time void, the fact remains that the court assumed to order it under the provisions of this statute, and the administrator has followed its provisions in making the sale. It is consequently a sale ' pursuant to the provisions ' of the statute in the sense in which we understand the Legisla-

ture to have employed these terms. But it is denied by the defendant that the Legislature has power to validate a void sale. This is not what is attempted here as we think. The statute is intended as a statute of limitation in the proper sense. It is true that the section first recited provides that ' no action for the recovery of any estate,' etc., shall be maintained ' unless commenced within five years next after the sale '; and, if these words are taken literally, they would seem to cut off an action at the expiration of five years, though there had been no adverse possession. So construed, the statute would not be one of limitation, for the provision would apply equally to cases where parties were in the enjoyment of their rights and to those where they were deprived of them; but the idea of a statute of limitations is only this: That the remedy of the party is to be taken away because he is unreasonably negligent in the assertion of his rights." We also cite *Pryor* v. *Winter,* 147 Cal., 554; 82 Pac., 202; 109 Am. St. Rep., 162; *Rice* v. *Dickerman,* 47 Minn., 527; 50 N. W., 698; *Spencer* v. *Sheehan,* 19 Minn., 338 (Gil., 292).

It is contended that it was the duty of the administrator to plead the statute of limitations, and *Nutt* v. *Brandon,* 85 Miss., 702, 38 South., 104, and *Sivley* v. *Summers,* 57 Miss., 712, are cited in support of the proposition. We concede the correctness of the statement, but do not see how this can have bearing on this case, or prevent the one-year statute from applying. The administrator did not plead it, and the sale was made by order of the probate court, and the statute applies to all sales of property by order of the probate court, whether they be valid or invalid, nor does it matter under what circumstances the sale was made. As already stated, the design of the statute is to make perfect an imperfect title, acquired under a sale by the probate court, one year after the date of the sale, or one year after the date to which the parties may have instituted a suit for the recovery thereof. The case of *Kessinger* v. *Wilson,* 53 Ark., 400, 14 S. W., 96, 22 Am St.

Rep., 220, cited by counsel for appellees, while seeming to support their contention, does not receive our approval. The authorities cited in the opinion do not sustain it, nor is it sound in its reasoning. In the case of *Waln* v. *Sherman,* 8 Serg. & R. (Pa.), 357, 11 Am. Dec., 624, cited in the case of *Kessinger* v. *Wilson, supra,* on page 360 of 8 Serg. & R. (11 Am. Dec., 624), the court in construing an act which provided that " no action for the recovery of said lands shall lie, unless the same be brought within five years after the sale thereof for taxes," said, on page 362 of 8 Serg. & R. (11 Am. Dec., 624): " What is to be the commencement of the period of limitation? The best answer appears to be: The first moment when the action could have been brought." 8 Serg. & R. (Pa.), 367, 11 Am. Dec., 624. In the same case, DUNCAN, J., in delivering the opinion on the construction of this statute, on page 368 of 8 Serg. & R. (11 Am. Dec., 624), says that, though the act require the suit to be brought within five years from the date of sale, the statute only begins to run when possession is taken under the sale, and it begins to run from whatever time it is taken, making time relate to possession, and not to the date of sale. This opinion also cited several cases, among them the case of *Kearle* (*qui tam*) v. *Whitehead,* Say. Rep., 313. In a footnote to be found in 11 Am. Dec., 627, it is stated that the soundness of the doctrine laid down in the case of *Waln* v. *Sherman* has been questioned in Arkansas; but that is the only State that has ever questioned its soundness that we have been able to discover. The decision in *Waln* v. *Sherman* was followed by the court in several subsequent decisions mentioned in the footnote above referred to. All of the equity of appellee's position that the ten-year statute applies, instead of the one-year, as provided by § 2173 of the Code of 1871, applying to all sales by order of the chancery court, is based on the supposed impossibility of maintaining this suit because they were reversioners, and there was a life tenant in possession, and, of course, they could not maintain a suit to re-

cover possession of the land while the estate of the life tenant existed. This is true: They could not have maintained a suit to recover the possession of the land until the expiration of the life estate, but the sale by order of the chancery court cast a cloud on their title, and under § 975 of the Code of 1871, which provides that: "When any person, not the rightful owner of any real estate, in this state, shall have any deed or other evidence of title thereto, or shall assert any claim, or pretend to have any right or title thereto, which may cause doubt or suspicion in the title of the real owner, such real owner may file a bill in the chancery court of the county in which the real estate may be situated, to have such deed, or other evidence of title, canceled, and such cloud, doubt or suspicion, removed from said title, whether such real owner be in possession, or be threatened to be disturbed in his possession or not; and any person having the equitable title to land in this state may, in like cases, file a bill to divest the legal title out of the person in whom the same may be vested, and to vest the same in the equitable owner "— they could have maintained a suit in equity to set aside and cancel this very title immediately after the sale was made, while all the facts were fresh and obtainable, but this they did not do. On the contrary, when a full and complete remedy was open to them in the equity court, where they could have canceled and removed this cloud which has subsequently matured into perfect title, they wait thirty years or more — wait until more than one year after the expiration of the life estate — and then undertake to maintain this suit and have applied to it the ten-year statute. The ten-year statute could only apply in a case like this, where the reversioners had availed themselves of this equitable remedy under § 975 of the Code of 1871, and canceled the cloud cast on their title by the sale. Not having done so, in our judgment, by all right and reason no other statute can be applied except the one-year statute.

*Reversed and remanded.*

Calhoon, J., delivered the following concurring opinion:

If everything had been regular and complete, Mann would have had the title by his purchase under the decree of sale, and so, now appellant, who claims under him, would have it. The widow of A. I. Bobbitt died in June, 1904, and his heirs, her children, brought this action December 19, 1905, more than a year after her death. The right of appellant depends on § 2173 of the Code of 1871, which bars action against purchaser at probate or chancery sales " where the sale is in good faith and the purchase money paid, unless brought within one year after such sale." For the reason that, at the date of the sale, the vendee of the widow was in possession and owner of her dower life estate, no action could be brought at law to recover it by the heirs in remainder until she died. As soon as she died, the one-year limitation of the section began to run in favor of the purchaser of the fee at the sale and his grantees, as is fully shown in Morgan v. Hazlehurst Lodge, 53 Miss., on pages 681 and 682. It is sufficiently shown by the record that the purchase money was paid by the bidder at the chancery sale. The deed to him by the administrator, more than thirty years before the action, shows its receipt, and the report of sale to the court shows that it was paid, and the administrator charges himself with it, and it went into the estate protected by the administrator's bond. If this is not a prima facie case after thirty-two years, none could be made. There is no hint of bad faith on the part of the administrator. If there was, it could not, without collusion, affect the purchaser who was the highest bidder and paid his money. Sanders v. Sorrell, 65 Miss., 288, 3 South., 661; Summers v. Brady, 56 Miss., 11; Hiller v. Jones, 66 Miss., 636, 6 South., 465. However defective the administration proceedings may be, before or after the sale, the section cures all defects (Morgan v. Hazlehurst Lodge, 53 Miss., 665; Bradley v. Villere, 66 Miss., 399, 6 South., 208), and so the lack of a decree of confirmation is of no avail.

It cannot be that, because there is an outstanding life estate carved out by the law, this beneficent statute. of repose is emasculated to an innocent purchaser of the reversion. Code 1871, § 2170. On the other view, a purchaser of this reversion, though he may be entirely disconnected from the life estate, is without the protection of this statute. .This case is not affected by the majority opinion in *Shannon* v. *Summers,* 86 Miss., 829, 38 South., 345, which was where the purchaser bought as an agent of the administrator. Neither is it affected by the case of *Jeffries* v. *Dowdle,* 61 Miss., 508, except in favor of my view that the bad faith of the administrator, to affect the honest purchaser, must be by collusion with him. The law itself prevented action at law for recovery pending the outstanding life estate, and so the statute commenced to run as soon as the legal obstruction was removed. *Hazlehurst Lodge* case, *supra,* which is sound and ought not to be overruled. The other view sticks in the bark and is at war with the rulings on the general ten-year statute of limitations, as to which all the authorities hold that, where there is a legal outstanding life title, such as dower or tenancy by the curtesy, making impossible an action for recovery, the statute commences to run when the life estate ceases. Take the general statute, and read "one year" instead of "ten years," and we have the case before us. *Groves* v. *Groves,* 57 Miss., 658–661; *Gibson* v. *Jayne,* 37 Miss., 164–167.

It is not proper, as appellees want, to add to § 2173 the words "but this shall not apply to sales of reversionary interests." This would be rank judicial legislation. Under the statutes, there was the same power to sell reversions as present interests, and, the power existing, the statute applies, to commence as soon as the right of action accrues, free from the legal prohibition to sue. The design of the law was to encourage buyers under decrees of sale. Really the statement of the case carries with it its own irresistible argument. Suppose the

widow had never sold her dower interest, but had retained it until she died. In such case it would seem plain that the heirs of her husband, her own children, could not recover, after one year from her death, against a purchaser then taking possession, who had bought and paid for the reversion in good faith, under decree. Section 2173 has, in common acceptation, become a rule of property, and, more than twenty Legislatures having intervened without changing it, ordinary judicial conservatism should prevent the courts from lightly disturbing titles and breeding lawsuits. The position that the statute (§ 2173, Code 1871) applies only to sales of present interests in possession is, as I see it, untenable. The statute refers in terms to " any property " sold. There never was a time when a reversion was not property. It was always liable to sale by chancery decree to pay debts. When it was sold, the sale, even if void, could not be attacked after one year. If there was an outstanding term and attack not allowable until it expired, then there must be the one year after expiration. Any other construction plainly emasculates the import and purpose of the statute. It would eliminate from its scope any outstanding lease. It is useless to discuss § 4, Code 1880, and the corresponding sections in the Codes of 1892 and 1906, because the purchaser here bought under § 2173, Code 1871, and acquired a title not to be affected by subsequent enactment. It was part of his contract. *Sigman* v. *Lundy,* 66 Miss., 522–529, 6 South., 645. It was one of the statutory inducements to purchasers, but, if there could have been a repeal of § 2173, Code 1871, there was none because the corresponding sections of each subsequent Code (same as Code 1906, § 3122) refer to sales " hereafter to be made," showing there was no purpose to disturb sales previously made under § 2173, Code 1871. Note, also, that each of these sections of the subsequent Codes have the new sentence, " unless brought within two years after possession taken by the purchaser under such sale of the property."

This, in itself, effectually disposes of the idea that § 2173 refers only to sales of present interests in possession. If so, the necessity of saying it as to sales " hereafter to be made " is not perceived. It would have been just as easy to say it in § 2173. That statute was a very wise one, highly remedial, designed to correct a grave evil, and should have a liberal construction to effectuate its beneficent object. Certainly we should not restrict its plain scope by judicial interpolation of words not in it.

The case of *Kessinger* v. *Wilson,* 53 Ark., 400, 14 S. W., 96, 22 Am. St. Rep., 220, as to when the one-year statute begins to run, is too isolated and too often demolished to furnish standing ground to appellees. This will appear from the opinion in chief of Judge MAYES and its references, especially the note to *Waln* v. *Sherman,* 11 Am. Dec., 624, and its citations and the note to *Kessinger* v. *Wilson,* 22 Am. St. Rep., 228, and its citations.

WHITFIELD, C. J., delivered the following dissenting opinion.

A. I. Bobbitt died October 3, 1861. He owned the eighty acres in controversy at the time of his death. He left a widow, Mary E. Bobbitt, who, about three years later, married H. A. Middleton. He also left five children, these four plaintiffs, appellees here, and Alfonso Bobbitt, who died young without heirs. About twelve days after the death of A. I. Bobbitt, his widow was appointed administratrix, and John A. Hanson was appointed administrator of his estate. Hanson served continuously until March, 1873. In 1864, Bobbitt's widow, Mrs. Mary E. Middleton, petitioned the probate court of Leake county for an allotment of her dower. Her petition was granted, and in July of that year the final order was made by the probate judge, JAS. W. WILDER, approving the report of the commissioners and setting apart the dower of the widow which

included the lands in controversy here. On December 6, 1867, Mrs. Middleton and her husband conveyed the dower land to W. B. Mann. In 1867 John A. Hanson, administrator, presented his petition to the probate court asking that the estate of A. I. Bobbitt be declared insolvent, and that he be authorized to sell the real property belonging to the said estate for the payment of debts. This petition presented to the court did not embrace the dower lands. The final order directing the sale of the lands was made October 14, 1867. Under this order the lands were never sold. Nothing more was done until the year 1871, nearly ten years after the death of A. I. Bobbitt, when Hanson, administrator, presented his petition to the chancery court reminding the court that the probate court of the county had previously declared the estate of A. I. Bobbitt insolvent, and asking the sale of the realty to pay the debts. He asked that he be authorized to sell all the land including the dower. It seems that nothing was done further than to file the petition. In October, 1872, eleven years after the death of Bobbitt, another petition was presented to the chancery court of Leake county suggesting that the probate court of that county had at its October, 1867, term, five years previously, declared the estate of Bobbitt insolvent, and asking the court for authority to sell all the land including the dower land and including this here in controversy for the payment of the debts. At the February, 1873, term of the chancery court, a decree *pro confesso* was entered against all the defendants and heirs of A. I. Bobbitt. An undated decree in the chancery court directing the sale of the property was entered. It seems to have been entered at the February term of the court in 1873. Still the land was not sold. At the August, 1873, term of the chancery court, Raymond Reid suggested to the court that John A. Hanson was dead, and asked to be appointed administrator. On August 6, 1873, an order was entered authorizing and directing Raymond Reid, administrator, to sell the lands.

At the February, 1874, term of the chancery court, Reid filed his report of sale, showing that he had sold all the lands, and that the lands here in controversy were sold to W. B. Mann. His deed is dated November 3, 1873. This sale was never confirmed, nor was any report of it ever called to the attention of the court in any way. Indeed, the record shows the administrator asked for further time, and at last in February, 1874, the administrator filed a report which was not sworn to, but merely quietly filed with the papers in the case; the court's attention never having been called to it. Mary E. Middleton died in June, 1904. This suit was filed December 19, 1905, by the heirs of A. I. Bobbitt to recover the dower lands, claiming that it has reverted to them as heirs of A. I. Bobbitt. J. L. Jordan claims the reversion through the sale made by the administrator in 1873.

From this brief statement of the case made by this record, it will be seen that this is an action of ejectment brought by the heirs of Bobbitt to recover as reversioners the eighty acres of land comprising the homestead of their father pretended to have been sold by the administrator in November, 1873, to W. B. Mann. W. B. Mann did not go into possession of this land under the deed made by Raymond Reid, administrator, November 3, 1873. It is perfectly clear and not denied that Mann went into possession of this eighty acres on December 6, 1867, under a deed made by Bobbitt's widow, then Mrs. Middleton, and Middleton, her then husband, whereby they conveyed the dower interest in these eighty acres which had been set apart as dower to Mrs. Bobbitt, then Mrs. Middleton, to W. B. Mann. It is extremely important to keep distinctly in mind the fact that W. B. Mann went into possession under this deed conveying the dower interest, and that his possession is referable to that deed alone until the death of Mrs. Bobbitt, afterwards Mrs. Middleton, in June, 1904. Mann's possession was, of course, not adverse up to June, 1904, to the heirs of Bobbitt, the plaintiffs here. They were reversioners. They

had no interest in possession until the life estate — that is, the dower estate — terminated in June, 1904. They might have all died. Their right of " action to recover the land," in the language of § 2173 of the Code of 1871, never existed until June, 1904. Up to that time Mann was in possession as owner of the dower interest, the life estate. · From that time he was in possession adversely to these heirs, and from that time only could any statute of limitations run against these plaintiffs. It is conceded, on all hands, that the pretended decree of insolvency, and the decree in 1873 to sell all of these lands to pay debts, and the sale thereunder, were, each and all, absolutely null and void. It is to be specially noted, also, that the pretended decree of insolvency was absolutely void also for the want of notice to the parties interested. In other words, it was a decree without jurisdiction over the parties, and hence void for want of jurisdiction to render it. Not a decree void-able for irregularities, but a decree absolutely null and void for want of jurisdiction. The learned counsel for appellant concede this in ·the following language: " Had the estate never been declared insolvent, then this contention might be true " — to-wit, the contention that the decree for the sale of the lands was void. Of course, if the decree of insolvency was void for want of jurisdiction, the sale of the lands thereafter under such insolvency decree was itself void for want of jurisdiction.

The sole ground on which there can be any possible hope of reversing this judgment is that § 2173 of the Code of 1871 barred the plaintiffs. That section is in these words: " § 2173. No action shall be brought to recover any property heretofore sold by any administrator, executor, or guardian by virtue of the order of any probate court in this state on the ground of the invalidity of such sale, unless such action be commenced within one year after this chapter shall take effect, if such sale shall have been made in good faith and the purchase money paid; nor shall any action be brought to recover land or other property hereafter sold by order of

the chancery court where the sale is in good faith and the purchase money paid, unless brought within one year after such sale." It is the latter clause of this section which is here involved, since this sale was made after October 1, 1871, by the pretended decree of the chancery court. And it is this latter clause only which has been perpetuated, in changed form, in the Codes of 1880, 1892, and 1906. Let us analyze this statute. It is nothing but a statute of limitations, short, peremptory, and exceedingly harsh, in that it does not contain, as it ought to contain, a saving for minors or other persons under disability. The exact character of the statute, as being a mere statute of limitations, and not a curative act in any sense, is clearly pointed out by CAMPBELL, J., in *Hall* v. *Wells,* in 54 Miss. at page 297, where he says: " The section of the Code cited was not intended, and does not have the effect, to cure, by express enactment, illegal or defective proceedings in the probate court for the sale of property by administrators, executors, or guardians. . It has no retrospective operation, but is wholly prospective. It is founded on a view of the past, but looks to the future. It was intended to provide a short statute of limitations applicable to all cases falling within the existing evil, and the section under review contains the provision to remedy it, not by relating back and validating proceedings, but by requiring all actions to recover property before that sold by any administrator, executor, or guardian by virtue of the order of any probate court on the ground of the invalidity of such sale, if the sale was made in good faith, etc., to be brought within one year after said section should take effect." This decision squarely settles two propositions: (1) This section is a mere statute of limitations, and not a curative act in any sense; (2) that the time for the computation of the year is, so far as sales prior to October 1, 1871, were concerned, to begin from the said date October 1, 1871. The first clause of the act, which deals with past sales, expressly says, in so many words, that the action must be

brought within a year after said section should take effect.
To make it commence from any other time would be judicial
legislation pure and simple; and just so the last clause of the
section provides that no such action shall be brought to recover
land or other property sold after October 1, 1871, unless
brought within one year after such sale. The exact date
from which the one year is to be computed is expressly named
in the act, " one year after such sale," and to compute that
judicial legislation pure and simple. The reason is the same
year from any other date than the date of such sale is, also,
in both cases, as said by Judge Campbell in *Hall* v. *Wells,*
to-wit, that the provision was not to cure irregular proceed-
ings either in the past or in the future — that is to say, either
before or after October 1, 1871 — but to provide a short
statute of limitations of one year, in the one case from the
time the section took effect, and in the other case from the
date of the sale. That is the whole scheme. It was made
perfectly clear in *Hall* v. *Wells,* and any contention that this
section is a curative section is in the face of that and all other
decisions on the subject. But the monstrousness of applying
this section to this suit brought by these plaintiffs is perfectly
manifest, when it is considered that the section could not
possibly have any application to a suit by reversioners who
never had any right of action until June, 1904, the date of
the mother's death, over thirty years after the sale. Here
is a statute expressly fixing the date from which the one year
shall be computed, declaring that it shall be one year after
such sale, and yet we are asked to apply that statute, thus
expressly fixing the date from which the one year is to begin,
to a suit brought over thirty years after the sale, and brought
at the earliest time it could have been brought by the rever-
sioners who never had any right of action until the death
of the life tenant. A more monstrous injustice it would be
impossible to conceive than the application of this statute to
a suit like this.

It is further to be noted that the particular question here involved, whether this statute has any application to a suit brought by reversioners, has never before been in this court in any case whatever. It is strictly *res nova.* I am clearly of the opinion on principle, and on authority, and on the express language of the statute itself, that § 2173 of the Code of 1871 has no application whatever to this action. *Morgan* v. *Hazlehurst Lodge* does not touch the question here involved. Judge SIMRALL expressly says, at page 681 of that case: " It is impossible to suppose that the statute of 1871 intended to cut off the right of the heir to the land, unless there was some person in possession against whom he might bring the action." And, again, he points out the historical origin of the statute, and shows that, under the act of 1844 (Hutchinson's Code, p. 831), it was provided that no entry should be made, etc., unless within three years. Commenting on that very significant language, " no entry should be made," he again remarks, on the same page: " In such a case, the heir would not lose his right of action, until the vendee of the adminis-' trator entered or asserted such ownership as amounted to a disseisin. It would be meaningless, under the act of ·1844, to say that the heir should lose his right of entry in three years, when, during that time, nobody was opposing his right and holding him out; no one being in possession against whom he could assert it by suit. So, under the present law, it is futile to say that he must bring his action within a year, when there was no disseisor in possession against whom he could bring it. Statutes of limitations assume that the claimant has ·a right of action which he forbears to assert, and may lose if he does not sue in time;.but how sue, when no one is in adverse possession to him ? " This language fits in here with perfect exactness. How could these plaintiffs sue when there was no one in adverse possession until the death of their mother, the dowress, the life tenant ? In *Morgan* v. *Hazlehurst Lodge,* Thomas S. Morgan had never been in possession of the lot,

and all that Judge SIMRALL has to say, along that line, relates
to a case where there has been no disseisor in possession of
the land, claiming under the probate sale for the year pre-
scribed in § 2173.   Note specially that what Judge SIMRALL
said at page 682, to-wit, " if no one was in possession against
whom the action could be brought, then it would take effect
after possession began," is said with reference exclusively to a
case where a present right of action existed, but no defendant
was in possession to be sued, and had no reference whatever to
a case like the one at bar, where there was no present right
of action at all, when the sale was made, and none for thirty
years thereafter.

Another reason pointed out by Judge SIMRALL, page 679,
showing that this statute created a bar intended to take effect
from the time of sale, is his language, as follows: " The statute
proposed to cure the evil by applying a short limitation, where
the sale was free from fraud, and the purchaser in good faith
had paid his money, so that, if the purchaser lost his land,
he might indemnify himself in some mode or other." He
plainly means to say that the purchaser may indemnify him-
self at once, when the facts are all fresh, and the situation such
that the *status quo, ante* the sale, may be restored.   This
restoration of the *status quo, ante* the sale, could nearly always
be accomplished where the party seeking to set aside the
sale was required to sue within the year after the sale; but
it would be farcical to say that such *status quo* could be
restored more than thirty years after the sale.   The court
expressly holds that, in such case, the heir is not barred by
§ 2173; in other words, that § 2173, which provided that
the action must have been brought, as to past sales, within one
year from October 1, 1871, had no application whatever to a
suit by the heirs where the purchaser at the probate sale was
not in adverse possession so that he could be sued; and to hold
that was also to squarely hold that, as to future sales made
by the chancery court, § 2173 had no possible application to

a suit brought by the heirs where the purchaser at the chancery sale, or his vendees, had not been in adverse possession for one year from the date of sale. To decide one proposition as to the past was, of course, to decide the same proposition for the future. To show that this judicial construction by the court, through Judge SIMRALL, that some one had to be in possession who could be sued in order to make § 2173 applicable, the Legislature, in the Code of 1880, and in every Code since, has redeclared that judicial interpretation, by providing that this statute of limitations could have no application except from two years after possession taken by the purchaser. The argument made by the learned counsel for the appellant that this § 2173 does not mean an action to recover possession is wholly unsound. It is expressly overthrown by the opinion of Judge CAMPBELL in *Hall* v. *Wells, supra,* and by the opinion of Judge SIMRALL in *Morgan* v. *Hazlehurst Lodge, supra,* and by the plain and undeniable fact that these constructions, by these two judges, speaking for this court, were crystallized by legislative enactment, as shown in the subsequent statutes. It is certainly idle, now, any longer to pretend that § 2173 of the Code of 1871 related to bills to cancel clouds, as it is plainly said it related alone to actions to recover the land or the property; that is, to recover possession of it, of course. And it is certainly settled by too many decisions of this court to require any citation that reversioners and remaindermen cannot bring an action in ejectment until the estate of the life tenant falls in, and that any statute of limitations passed to bar a present right of action cannot, in reason or right, have any application whatever to such reversioners or remaindermen. See *Hoskins* v. *Ames,* 78 Miss., 986, 29 South., 828, where this very § 2173 was invoked and disallowed. But there is another striking thing about *Morgan* v. *Hazlehurst Lodge,* going much further in support of the contention of these appellees than is necessary to be claimed here, and that is that that case

expressly held that § 2173 could not be invoked to bar the plaintiff within the year from the date of the sale, even where the plaintiff had a present right of action, if it also appeared that there was no defendant in possession who could be sued within the year.    In other words, this court very properly refused to apply this harsh and peremptory statute to the case of a plaintiff, even with a present right of action, unless there was some defendant in possession to be sued; and so the court proceeded to say, what has absolutely nothing on earth to do with this case, that suit might be brought by such party with a present right of action within one year from the date when there was some defendant in possession to be sued, and that is absolutely all that was held on that point in that case.    Here are reversioners with no present right of action, and yet the court applies to them this § 2173, although they had no cause of action at the time of the sale, and none until their mother's death in 1904.

What was the purpose and object of this § 2173?    It was a statute intended to give repose to titles acquired at the sales named in it, by compelling all persons who had a right of action, when the sale took place, to challenge the validity of such sale within one year from the date of such sale, and not afterwards.    So harsh and peremptory was the time limited that it was immediately changed in the next Code to two years, two years from possession taken by the purchaser, and the law is that to-day.    But notwithstanding its harshness, as against persons under disability — minors and lunatics — who nevertheless did have a present right of action, and could have sued within the year, the minor by his next friend or guardian, and the lunatic by his guardian or committee, that, as much as infants and lunatics might justly have complained of the extreme rigor of this statute as to them, they certainly could not complain on the ground that reversioners can complain, that they did not have a present right of action at the date of the sale.    Section 2173, as interpreted by this court,

did give them (lunatics and infants) the one year from the date of sale, and under *Morgan* v. *Hazlehurst Lodge* extended that year from one year from possession taken by the purchaser so that he could be sued. In direct contrast with the liberality of construction by this court of this section, as applied in favor of those who even had a present right of action, in that it extended the time to them to one year from the time when some defendant who could be sued took possession, this court now absolutely holds this section to bar reversioners who never had any right to bring their suit to recover the land until thirty years after the date of the sale, and when, too, no one was in possession of this land holding adversely to them one hour until the mother's death. In other words, the court held, in *Morgan* v. *Hazlehurst Lodge,* and the Legislature subsequently so enacted, that even those who had a present right of action at the date of the sale might not only sue within one year from the date of such sale, but they should have that time extended to one year from the date when some defendant who could be sued took possession, because of the gross injustice of applying the statute to one who could not sue because there was nobody to be sued.

This court now feels no hesitancy, on the contrary, in applying this section to bar reversioners, who not only had no right of action when the sale was made, but none as against those claiming under W. B. Mann, who never held one hour's adverse possession since possession taken under the widow's deed conveying her dower, until the death of the mother in 1904. Under the present interpretation of this statute, neither the fact that reversioners had no right to bring a suit to recover the land, nor the added fact that there was no person in possession of this land holding adversely to them in direct subordination to their right, can avail these unfortunate reversioners; whereas, in bright contrast to this, the court held, in *Morgan* v. *Hazlehurst Lodge,* that, notwithstanding the statute said the suit should be brought within one year from

the date of such sale, the Legislature never meant, and the
court should never hold, that it could be applied to plaintiffs
who had a present right of action even where there was no
defendant in possession to be sued. The contrast is painful,
but it stands. What, now, was the purpose and object of
the statute? The purpose of the statute, as said, was plainly
to give repose to titles, but as against those who had a present
right of action. The Legislature never dreamed that anybody
would suppose this section applicable to those who had no
present right of action. One year was, in one view, a very
short time; yet, because of the great evil to be corrected, it
was a reasonable time as applied against those who had, at
the time of the sale, the right to sue, whether adults, or minors
through their next friends, or lunatics through their guardians.
If these persons wished to challenge the sale, they should chal-
lenge it within such twelve months. They could only challenge
it by showing that there was no legal sale, or that the purchase
money was not paid, or that the sale was not made in good
faith, and the purchaser had the burden of establishing such
good faith or such payment on the trial. Persons who had a
present right to sue could hunt the country over for witnesses,
who knew that the purchase money had not been paid, or that
the sale had not been made in good faith. They could examine
every person who had any knowledge of the sale and how it
was conducted. They could gather all that evidence within
one year; and it was also easy for the purchaser, if he should
lose in the trial of such a suit, to get the witnesses within
that year to show the value of any improvements, or charges,
or taxes which he had paid, so that the *status quo, ante* the
sale, might be healingly restored. These were the reasons
behind the statute, even as applied to those who had a right
to sue at the date of the sale, and it took these reasons, and it
took the present right to sue at the time of the sale, to justify
such a statute; but how, in the name of reason, can any of these
considerations which stood behind the enactment of this statute

find any place whatever, as against reversioners who never had the right to sue at all to recover the land in ejectment, for thirty years after the date of such sale?

It is idle to talk about *Fox* v. *Coon,* 64 Miss., 465, 1 South., 629, having any pertinency here. In truth, the only thing held in *Fox* v. *Coon* was that, inasmuch as the tax deed purported to convey the whole fee, when the interest conveyed should have been limited to the interest that might rightfully pass by the conveyance, the deed should be reformed to that extent. In other words, that under that bill the deeds might be reformed so as not to remain a cloud upon the title of the reversioners. Whether that bill, in that case resulting in a decree to that precise extent, and no more, might have been filed by reversioners before the falling in of the life estate, is utterly immaterial in this case, since this is no bill in equity, but an action, by the heirs, in ejectment to recover the land. This court expressly said, in *Morgan* v. *Hazlehurst Lodge, supra,* that the kind of action referred to in § 2173 was an action of ejectment for land, or detinue or replevin for personal property. That is the express and emphatic declaration of Judge SIMRALL. How idle is it now, then, to talk about the suit mentioned in § 2173 being a bill to cancel clouds? Section 2173 had nothing in the world to do with bills filed to cancel clouds. Those suits were governed by another statute of limitations thoroughly familiar. But if the reversioners might, within the year limited by that statute, file a bill to cancel clouds, what on earth has that to do with the inquiry here, as to whether this section, relating alone to ejectment, or detinue or replevin, or like possessory actions, to recover the possession of the land, or personal property, can be applied in an ejectment suit against reversioners who never had a cause of action until thirty years after the sale?

It is further to be noted that in *Morgan* v. *Hazlehurst Lodge* the sale was confirmed. Here the sale never was confirmed. The administrator, instead of reporting the sale at once to

the November term of the probate court in 1873, got leave
for further time to report. Why, it is inconceivable, unless
the purchase money had not been paid; or, unless, as he
well knew, there was not a valid debt in existence against the
estate. An unconfirmed sale is, in the eye of the law, abso-
lutely no sale at all. To invoke this § 2173 in the case of a sale
absolutely null and void because there were no debts for which
the land could be sold, and because there was no notice to
the parties, and because there was no confirmation of the sale,
is exactly the same thing as if it were invoked to support a
sale by the chancery court where there had never been any
process served on the parties affected, and never had even
existed any debt whatever, much less a debt barred by the
statute of limitations. In such state of case, no court, in my
judgment, could ever apply § 2173 in support of such a
pretended sale as that. To do so is to deprive of property
without due process of law, in direct violation of the state and
the federal Constitutions. In *Morgan* v. *Hazlehurst Lodge*
there was no dispute about the facts, and the purchaser bought
in good faith, and actually paid cash for the lot. Both these
propositions are earnestly denied in this case. To show that
*Morgan* v. *Hazlehurst Lodge* meant that the time must be com-
puted as to furture sales from the date of sale, Judge SIMRALL
cites *Jones* v. *Billstein,* 28 Wis., 221, as construing a statute
like ours. In that case the plaintiff waited until eleven years,
after he was twenty-one years of age, before he began his action,
and his contention was that he had no right of action until
the administrators had been discharged and five years there-
after. The statute construed in that case provided as follows:
" No action for the recovery of any estate sold by an executor
or administrator," etc., " shall be maintained by any heir,"
etc., " unless it be commenced within five years next after the
sale "— precisely as § 2173 says, " within one year after
such sale," and the Wisconsin court said, at page 229 of 28
Wis., speaking of the statute: " By its terms the heir is barred

unless he commences his action within five years next after the sale. Now, if the statute does not commence to run against the heir until the estate shall have been settled, or until delivered over to him by order of the court, then in but very few cases would its operation commence at the time of the sale." In that case there was no action by reversioners, but an action just as in *Morgan* v. *Hazlehurst Lodge.* Here, then, is a Wisconsin decision upon a precisely similar statute, with identical words fixing the time for the statute to begin running, at the date of the sale, which squarely holds that the time must be computed from the date of sale. But there is another recent decision upon the identical statute, squarely decisive of the very point here involved. It is the case of *Kessinger* v. *Wilson,* 53 Ark., 400, 14 S. W., 96, to be found also in 22 Am. St. Rep., 221. The plaintiffs in that case sued in ejectment; the right of action accruing, as admitted in the case, when the youngest of the plaintiffs attained his majority. The land was sold January 2, 1872. The youngest of the plaintiffs became of age, and the homestead right expired, and the right of action accrued on December 10, 1882. The suit was brought February 5, 1888, sixteen years after the sale, and more than five years after the action accrued. A short statute of limitations, identical with the one here, was invoked to bar the suit. That statute was in these words: "All actions for lands sold at judicial sales shall be brought within five years after the date of such sale, and not thereafter." The court after an exhaustive review of the authorities construing similar statutes in Arkansas, Pennsylvania, Iowa, Alabama, Wisconsin, Kansas, and Missouri, said: "From the foregoing view of authorities, it appears that courts are nearly agreed in construing statutes like the five years' statute pleaded in this case, as to the time they commence running. They hold that statutes of limitation, clear and unambiguous, like the five years' statute of this state, begin to run, according to their words, from the date of sale, record, or other day, as the time may be thereby

fixed. They differ, however, as to the necessity for possession for the full statutory period on the part of the party pleading the limitation, or, if he had possession, as to the effect of it. But no question of that sort is presented for our consideration. The only questions presented, as to the five years' statute, are, when does it begin to run, and is it applicable to this case? The words of the statute are. ' All actions  .  .  .  shall be brought within five years after the date of such sale, and not thereafter.' It is clear that it commences to run from the date of sale, and not thereafter, as it declares. As it begins to run at the date of the sale, it is difficult to understand how it can bar an action when the cause of it did not arise until more than ten years after the sale had elapsed. The sustainment of a contention to that effect would lead to the absurd conclusion that all rights of action against the purchaser of land sold at a judicial sale, arising after the lapse of five years from the date of sale, are barred at the very instant the right of action accrues. This would be equivalent to a denial of the right to be heard at all in the vindication of such rights. It is manifest that the statute was never intended to be applied in such cases, but that its object was to require all parties to bring suits against purchasers at judicial sales within five years after the date of sale, for the enforcement of only such rights to recover the land sold as can be enforced in an action brought within that time, and to bar the recovery of such rights in any suit brought thereafter. It has no application in this action. The only statute · of limitations applicable to this case is the seven years' statute."

It is not possible for the human mind to conceive of a decision more directly in point, and more conclusive and decisive of the controversy in this case. The Legislature did not have to say, in § 2173, " except as against reversioners," as intimated in the concurring opinion in this case. The Legislature knew that reversioners had no present right of action, and they were not dreamed of as embraced within this

§ 2173.   The very inherent nature of their estate, as rever-
sioners, the universal principle of law that they can never
bring ejectment to recover the land they hold in reversion
until the expiration of the life estate, the utter impossibility
of such reversioners, thirty years after a sale, getting up the
evidence as to how the sale was conducted, whether the purchase
money was paid, whether it was in good faith, what improve-
ments, and charges, and taxes the purchaser had been at the
expense of paying or making, are absolutely conclusive of the
utter incongruity of applying this section to such reversioners.
The Legislature did not say " except reversioners, etc.," there-
fore, for this plain and obvious reason; but the Legislature
did say expressly and emphatically that the suit to set aside
the sale and recover the land should be brought within one
year from the date of such sale, and what the majority of
the court do is to interpolate these words into the statute, to-wit,
that " the suit shall be brought within one year from the date
of such sale, except where reversioners are involved, and then
it shall be brought within one year from the expiration of the
particular precedent estate, life estate, or otherwise."   Where
did this court get the authority to substitute, for the words,
" within one year from the date of such sale," the words I have
indicated, or equivalent words, providing that the action need
not be brought within one year from the date of such sale in the
case of reversioners, but might be brought within one year from
a different time, the death of the life tenant, etc?   The court
cannot escape the irrefragable logic of this position by saying
the statute ought not run against these reversioners until the
expiration of the life estate, and that therefore the court is
authorized to say the Legislature meant, in their case, not
one year from the date of such sale, but one year from the
date their right accrued, the death of the life tenant.   The
court has no power to blot out the words " within one year
from the date of such sale," and substitute other words — to
expunge from the statute the point of time fixed expressly

by it, from which the statute is to run, and write into the
statute another point of time, from which the statute is to
run as against reversioners.   There is no need for any such
judicial legislation.   The plain and simple reason why the
Legislature did not refer to reversioners is that reversioners,
and no other persons who did not have any present right
of action when the law was made, were ever dreamed of as
being embraced within this statute, for so to have held would
have been in the face of every decision that can be found
in any of the books in respect to statutes of limitation, the
universal rule as to which is that they never run against
parties who have no cause of action at the period of time to
which the statute refers for the starting of the statute.   If
one had asked the Legislature which passed this act, " Do you
mean to embrace reversioners?" the answer would have been,
"Why, of course not."   If it had, then, been said, "Had
you better not expressly say you do not mean reversioners?"
the answer would have been just as prompt, " Universal law
prevents the application of this statute, or any other statute
of limitations, to those who have no right to sue when the sale
was made."

It is wholly unnecessary, legislatively, to declare what the
courts must know.   It is a curious feature of the case of
*Kessinger* v. *Wilson,* 53 Ark., 400, 14 S. W., 96, 22 Am. St.
Rep., 220, that it shows that the supreme court of Pennsyl-
vania held, just as this court held in *Morgan* v. *Hazlehurst
Lodge,* that this sort of statute would not be applied against
one even who had a present right of action, in an action of
ejectment, unless there was some defendant in possession to
be sued, and that in such case the Legislature meant to extend
the time to one who might presently have sued, so as to give him
one year from possession taken by a defendant who could
be sued.   In other words, the Pennsylvania supreme court
follow the liberal view announced by Judge SIMRALL for this
court, even in the case of those who had a present right of

action when the sale was made. These reversioners had no such present right of action. We deem it useless to pursue the subject. Unless this court is to take the place of the Legislature, and overthrow all decisions to the contrary, the section must be given the meaning it plainly declares, to-wit, that the time must be computed from the date of such sale, and this section must be held applicable alone to those cases in which a right of action existed, came into being coetaneously with the sale. It had no sort of application, by its very terms, to any other action than an action, the right to begin which commenced on the day of the sale, and to apply it to an action brought by reversioners thirty years after the sale, which action could not possibly have been brought until the death of the life tenant, is a monstrous perversion of the whole spirit and object of the statute, and would impute to the Legislature a patent absurdity. Let me add one other most significant fact in this case: That neither the great learning of the learned counsel for the appellant, nor that of my Brethren, has sufficed to produce one single solitary authority, in this state or elsewhere, holding that a statute like this can be applied, possibly, to reversioners or remaindermen. The decisions referred to by my Brethren in Wisconsin and elsewhere are simply decisions like *Fox* v. *Coon* in 64 Miss., and have no earthly application to an action of ejectment to recover possession of the land.

But if this statute were applicable, the same result must necessarily follow, since the proof that the purchase money was paid is utterly inadequate as expressly adjudicated in *Clay* v. *Field,* 115 U. S., 261, 262, 6 Sup. Ct., 36, 29 L. Ed., 375. In that case the administrator gave a deed, which recited the payment of the consideration money, and there was also a receipt given for the amount of the bid; but there was no credit entered upon the probated indebtedness. There must manifestly have been, in that case, a report of the sale reciting the payment of the consideration money, and yet that great

court held, unanimously, that all that fell far short of being sufficient evidence to show that the purchase money was paid. It said: "But it protects no one who is not proved to have purchased the land in good faith, and to have actually paid the purchase money. In the case at bar, Mrs. Clay (the daughter and sole heir of the brother and partner of the intestate, who had probated against the estate a debt due to him from the partnership) bid off the land at the administrator's sale, and received a deed thereof from the administrator. But the court, before which the case was tried (a jury having been waived in writing by the parties), has expressly found that 'no money was ever paid on the bid,' and 'no credit was ever entered upon the probated indebtedness.' It is indeed found that 'a receipt was given to the administrator for the amount' of the bid, and, although by whom that receipt was given does not appear, it may be presumed to have been given by some one authorized to represent her father's estate and herself. But a mere receipt, acknowledging payment of money, is not conclusive evidence against the person giving it. It is not shown that any release of the probated debt was ever executed, or that the administrator ever accounted in the probate court for the amount of the bid. Mrs. Clay could not have been compelled to pay the amount, and, if she bought without notice of the invalidity of the sale, could have had the sale set aside in equity. *Miller* v. *Palmer,* 55 Miss., 323. In short, no act appears to have been done by herself, by the administrator, or by the probate court, which, on the one hand, changed her condition, or estopped her, or any representative of her father, to deny that the debt probated by him had been paid or discharged, or to assert any right which existed before the sale; or, on the other hand, estopped the administrator to deny that the purchase money for the land had been paid to him. Under such circumstances, to hold that the purchase money is proved to have been paid would be to disregard both the words and the intent of the statute. The case of

*Summers* v. *Brady,* above cited, on which the defendants relied, is quite distinguishable. The facts of that case, as assumed in the opinion, and more fully brought out in *Sivley* v. *Summers,* 57 Miss., 712, were as follows: The land was sold by order of the probate court for the payment of several debts probated by Silvey, the administrator, by one Drone, and by various other persons, and was bought by and conveyed to Drone in his own name, but in fact for himself and Sivley jointly. Drone immediately conveyed two-thirds of the land to Sivley, and the two afterwards conveyed the whole to a third person, under whom the defendants claimed title. The administrator settled his final account, charging himself with the whole of the purchase money as in his hands. The court ordered that money to be divided *pro rata* on all the probated debts, and all the creditors but Drone and Sivley were estopped to deny that their debts had been extinguished by the sale and conveyance of the land, but had conveyed it away, and Sivley, as administrator, was estopped to deny that he had been paid the whole purchase money upon the original sale, because he had charged himself with it in his final account allowed by the probate court. In the other case, cited for the defendants, of *Calicott* v. *Parks,* 58 Miss., 528, the report does not show that any question of the mode of payment was presented or considered."

The two cases are identical so far as the payment of the purchase money is concerned, except that in the *Field Case* the sale was confirmed, and in this case there never was any confirmation of the sale. In the *Field Case,* the precise point, held in the court below and affirmed by the United States supreme court, was that the recital in the deed of the administrator and in his report of sale, in a case, too, where the sale was confirmed, that the purchase money had been paid, is not sufficient evidence to meet the burden on the part of the purchaser that the purchase money had been paid; and the supreme court of the United States expressly added that to hold that

such recitals in the deed and in the report were sufficient would be to " destroy both the letter and the spirit " of said § 2173. This court now holds the precise contrary, to-wit, that, where there is not a shred of evidence that the purchase money was paid, except these very same identical recitals in the deed and in the report of sale, they were sufficient to meet the burden on the purchaser, and that, too, when the sale had never been confirmed. The report was never called to the attention of the court in any way whatever. No credit was entered on any of the probated indebtedness; not a trace of the purchase money is anywhere disclosed by the record. Indeed, it is perfectly manifest that all the debts in this case were barred by the statute of limitations long before the decree for the sale of the lands was made in November, 1873. There had been negligence of the grossest character on the part of the administrator Hanson, who died before any sale was made, and no decree for the sale of these lands was entered for more than twelve years after the administration of the estate was begun. It was the duty of the administrator to plead the statute of limitations, and, as held in *Nutt* v. *Brandon,* 85 Miss., 702, 38 South., 104, and *Sivley* v. *Summers,* 57 Mass., 712, and in *Huntington* v. *Bobbitt's Heirs,* 46 Miss., 528, all the debts were barred long before the decree was made.

The learned counsel representing the appellant in the oral argument devoted a large part of that argument to the contention that although, as he conceded, all debts appeared to be barred on the face of this record, and there was no other evidence than the record, yet that it had been decided in the case of *Byrd* v. *Wells,* 40 Miss., 711, that the administrator could revive and keep alive debts of a decedent not barred at the time of decedent's death; and that case did so hold; but the learned counsel seem to have overlooked the case of *Huntington* v. *Bobbitt's Heirs,* 46 Miss., 528, decided by this court at the April term, 1872, which overrules *Byrd* v. *Wells* and establishes the direct contrary of that case, and establishes it

most wholesomely and properly.   The court said, at page 536:
" Prolonged administrations of estates of deceased persons
seldom benefit any others than the administrators of such
estates.    As a general rule, the sooner an estate is adminis-
tered and settled up the better for all parties interested therein.
Speedy administrations leave but little inducement to the
personal representative to enter into speculation with the funds
of the estate, which should be applied to the payment of the
debts.    The law gives six months to the administrator to
collect the effects and ascertain the condition of the estate,
during which time he is protected from suits .by creditors.
It is his duty to pay the debts of the estate as soon as prac-
ticable, and thereby save the costs of litigation, and stop the
interest accruing against the estate, and, when the debts are
paid, the estate should be distributed as soon as possible, among
those who are, by law, entitled to it.    And the case of *Byrd*
v. *Wells* may be cited as one of the best illustrations of the
correctness of these views.    Wells, the testator, died in Feb-
ruary, 1844, and in the month of March following Stewart
proved his will and qualified as executor.    And in June, 1860,
more than sixteen years afterward, Byrd, as administrator
*de bonis non* of said executor, filed in the probate court the
final account of the executor.    No inventory or report of the
personal estate or credits of Wells appears ever to have been
made by the executor, Stewart; nor did he, so far as appears,
ever return an annual or partial account.    What the executor
was doing with the estate during all this time, whether liti-
gating with the creditors or not, we are not informed; but
certain it is that as soon as Byrd filed the final account
of the executor, litigation was commenced with the heirs and
legatees of the testator.    It is certainly difficult to conceive
how the heirs and creditors could be benefited by the long
procrastination of the administration of that estate.    The law,
justice, and policy conspire in requiring a speedy adminis-
tration of the estates of decedents."

Let me stress one or two facts about this last case. The A. I. Bobbitt involved in the 46 Miss. case is the same identical A. I. Bobbitt, the father of these appellees. It was the administration of his estate which was involved in that case and is involved in this, and the identical question in that administration, involved in both cases, was whether the administrator had the right to revive these barred debts. More than that, Raymond Reid, the very administrator who secured this order of insolvency and this sale, appeared as counsel in that case, denying the authority of the administrator so to keep alive these debts, and induced the court by his very correct argument to overrule *Byrd* v. *Wells.* What resulted from this? Why, that this very identical administrator, Raymond Reid, was bound to have had actual knowledge from the case of *Huntington* v. *Bobbitt's Heirs,* in 46 Miss., 528, that neither Hanson, his predecessor as administrator, nor himself, had a scintilla of authority to keep alive these debts; and yet, in the face of this knowledge, we find this same administrator Raymond Reid filing this petition to sell this land to pay these debts in November, 1873, although the decision of *Huntington* v. *Bobbitt's Heirs* was rendered by this court just the year before, April, 1872, and the law on the subject was therefore fresh in his mind. Is it possible that any court can justly hold that a sale by this administrator, the counsel for this estate in *Huntington* v. *Bobbitt's Heirs,* himself having the law declared that the administrator in this very estate had no power to revive these debts, such sale being presumed to pay debts that had no existence on earth, could have acted otherwise than in bad faith? It is an absolutely unthinkable thing that any sale to pay debts, where no debts existed, could be other than in bad faith. There is not a shred of evidence that any creditor ever received a dime of this purchase money, and all the implications point to the fact that it was never paid at all. At all events, the burden of proof that the purchase money was paid is upon the purchaser, as held in

*Jeffries* v. *Dowdle,* 61 Miss., 508; and we have heretofore held that this proof must be clear and convincing. *Gibson* v. *Currier,* 83 Miss., 255, 35 South., 315, 102 Am. St. Rep., 442. The proof that the purchase money was paid is an absolute condition precedent to the application of the statute at all.

But, again, there is not a particle of evidence offered in this case by appellants to show that the sale was made in good faith. On the contrary, the facts of record show, to my mind, a clear case of bad faith. There were three petitions filed to sell this land by the first administrator, Hanson, under none of which was it ever sold, and this action on Hanson's part extended over a period of eleven years. It was finally sold by the second administrator, Reid, on a petition — the fourth — filed by him, over twelve years after the appointment of the first administrator when he knew from the *Huntington* v. *Bobbitt's Heirs Case,* in 46th Miss., that the debts were all barred. It certainly needs no citation of authority to show that an estate, if it is to be declared insolvent at all, 'should be so declared within some reasonably short time, eighteen months to two years at the furthest in ordinary cases, and it would be absurd to insist that a period of twelve years from the date of the appointment of the administrator, unexplained, was not a period so long as to charge the administrator with criminal negligence and gross fraud in the administration of the estate. Every debt was barred long before the sale, and yet the administrator unblushingly files a petition to sell the land for the payment of debts, when he knew no debts existed, and when it was his duty to have pleaded the statute of limitations, instead of getting up a fraudulent sale of the land to pay debts that did not exist. It is said in *Morgan* v. *Hazlehurst Lodge,* at page 683, that: "The purchaser must bid on the property and pay his money on the faith and confidence that the sale will pass the title which the decedent had. If he knows that the judicial proceedings are fatally defective, or that the administrator has not conformed to the

law and the directions of the decree, then the sale has not been made *bona fide.*" This is the express language of the opinion on which the majority so much rely. Does any one doubt for one instant from this record that the administrator and the purchaser at this sale knew these debts were barred, and that, if the debts were barred, the court was without power to order a sale? The administrator recites, in his deed, that the purchase money was paid, but there is nothing in the record to show any application of the money to the indebtedness of the estate. The United States supreme court in the case of *Clay* v. *Field,* expressly said " that a receipt was given to the administrator for the amount of the bid, but that a mere receipt acknowledging payment of money was not conclusive evidence against the person giving it, and that it was not shown that any release of the property was ever executed, or that the administrator ever accounted to the probate court for the amount of the bid." Every one of these statements is strictly true of the administrator's proceedings in this record; and yet the majority ignore these declarations of the United States supreme court construing this statute, while boldly asserting that this case has no application whatever to the case at bar. It is simply on all fours with the case at bar, so far as the payment of the purchase money is concerned, and I am now again referring to it to show that the purchaser must, undoubtedly, have known the bad faith with which the administrator was acting throughout.

Let us summarize, once for all, the facts showing that this sale was fraudulently made, and remember that this proof was made by the purchaser himself, and that it is all the evidence the record shows on the subject. First, these proceedings show that there never was a valid decree of insolvency, for two reasons: First, because there was no notice given to the heirs; and, second, there were no debts in existence to pay; that the final order for the sale of the land was made about twelve years after the death of the intestate; that this order

was procured by Raymond Reid, administrator, who had himself, as counsel, secured from this court in *Huntington* v. *Bobbitt's Heirs,* 46 Miss., 528, a decision never questioned or overruled since, that there were no debts of this estate in .existence, and neither Hanson nor he had authority to waive the statute of limitations; that the law required such proceedings to be instituted as speedily as practicable after the administration had begun; that the parties were not properly in court when the order of sale was taken; that all the debts which the land was sold to pay were at the time barred by the statute of limitations; that a sale was made but never reported to the court in proper form, nor called to the attention of the court, nor confirmed by the court. This, and this only, is the proof offered by the purchaser to show the good faith of the sale. I submit with perfect confidence that it conclusively demonstrates its utter bad faith, and that the court below was fully warranted in so finding. The universal maxim is that every presumption will be indulged in support of the judgment of the court below, and that, wherever it is reasonably possible to refer that judgment to evidence which warranted the finding, it will be so referred, and the judgment sustained. Now, it is too plain for argument that on this testimony the circuit judge would have been abundantly warranted in finding, as a fact, that the sale was not made in good faith, and, if that be true, the judgment will be referred to that finding, and upheld according to universal authority on this point. The court, on the other hand, refers the judgment, not to some evidence which could have supported the finding, but to something by reason of which to overthrow the judgment. This, I submit, is a reversal of the uniform maxim on the subject: " *Omnia esse rite acta præsumuntur.*" What the court here is limited. to, strictly, as I understand appellate power, is to say that, on this testimony, the judgment below was clearly and manifestly wrong in finding that the sale was not made in good faith. And the same observation may be made with

respect to the finding entirely proper on the evidence, that the purchase money had not been paid. Indeed, with respect to the payment of the purchase money I propound this query: If the mere recital in the deed and report of the administrator, without another scintilla of evidence, be enough to satisfy the burden on the purchaser of showing, by affirmative testimony, that the purchase money was paid, is there any conceivable quantum of proof less than this which can be imagined? And yet the rule is laid down by this court, repeatedly, that the quantum of proof which the purchaser must produce to show that the purchase money was paid must be clear and convincing. If, I say without the slightest hesitation, this proof furnished by the purchaser shows, or tends to show, anything on these two points, it is a demonstration that neither was the purchase money paid, nor was the sale made in good faith; and what this court now holds, let it be precisely noted, is that this identical proof which I have set forth above, and on which the judgment below might well have found that the sale was not in good faith, and that the purchase money was not paid, was such as to compel this court now to reverse that judgment of the ground that the verdict was manifestly wrong. In other words, the court holds that this evidence does not even tend to show bad faith, or that the purchase money was not paid, but that it conclusively shows the opposite. The effort seems to have been, not to discover, in accordance with the maxim quoted above, whether the evidence established, or tended to establish, that the purchase money was not paid, and the sale not made in good faith, but how possibly inconclusive and meager the evidence might be on which this court could safely overturn the judgment of the court below. Look, now, by way of summary, to the evidence that the purchaser introduced to show that he had paid the purchase money: First, he introduced a deed by the administrator, made out of time, before any sort of report was pretended to have been made. The deed was

made long before the report was filed at the February term,
1874; indeed, in a few days after the sale. Second, this
report was not sworn to, as required by § 1151 of the Code
of 1871. Third, the report was never presented to the chan-
cellor. Fourth, there is. nothing in the record to show that
the chancellor's attention was ever called to the report at all.
Fifth, the administrator never charged himself with this money
in his accounts. Sixth, it is not shown that he ever paid a
dime of these alleged debts with the money. Seventh, there
is nothing in this record to furnish any explanation of what
disposition the administrator made of the money he alleges
he received. Now, mark the point, these records are intro-
duced by the purchaser himself. He stands on these records,
and on these records alone, and it is shown that the records
are complete; that nothing has been lost out of the papers
in this administration. If the administrator had received
the money, would he not most manifestly have charged himself
with it in his account as administrator? The very fact that
the sale was never confirmed is strong evidence that the pur-
chase money never was paid. The administrator could never
have secured a confirmation of the sale, unless he had paid
the money into court; and that is doubtless the reason that
the sale never was confirmed. Most manifestly the chancery
court had no power, under any circumstances whatever, to sell
the lands of this decedent to pay debts, if in fact none existed
to be paid. How can anything be plainer than that a pro-
ceeding, which could not under any circumstances be valid,
cannot be made valid by the mere lapse of time? We have
repeatedly held, recently, that none of the short statutes of
limitations which protect tax sales can possibly have any
application if there existed no power to sell the land for taxes,
whether the want of power was due to one cause or another;
that, in every such case, these statutes of limitation had no
sort of application. And yet the court is now holding that
this statute of limitations, if it had any application at all,

can be invoked to destroy the rights of these reversioners, in a case where a sale has been ordered by a chancery court to pay debts, when in truth not a single debt existed to be paid, and there was consequently an utter want of jurisdiction or power to make such an order. I say, without the least fear of successful answer, on logic or on authority, that it is simply an unthinkable thing that a court can order a sale to pay barred debts in good faith; or that such a sale, if effectuated, can possibly be made in good faith. Suppose a suit had been brought against this administrator himself to require him to account for the money which he says he received in this deed. Is it possible that any court for one moment would hold that the recitation in the deed would be conclusive, and not open to contradiction by him? It has been, time out of mind, settled law that, unless the sale is confirmed by the court, the title of the heirs is not divested, and the purchaser acquires no title. No deed should ever be made to a purchaser until after confirmation, and confirmation never should be had until the purchase money has been paid. The most reasonable inference to draw from the proof in this record is that both the administrator and the purchaser knew that this money had not been paid, and hence wanted three months for a report to be made of this simple transaction, and hence further never dared to ask the court to confirm it. That confirmation is essential to divest the title of the heirs. See 2 Tiffany on the Modern Law on Real Property, § 462; 18 Cyc. pp. 787, 788; 24 Cyc. p. 33. And this is the declared rule in this state. *Leonard* v. *Matthews,* 40 Miss., 210, 228.

I have read, with great care, the supplemental brief of learned counsel who presented this case orally to the court for the appellants. More than half of the argument of that counsel, than whom there is no greater lawyer in this country, was devoted to an effort to show that these debts were not barred under the authority of *Byrd* v. *Wells;* but after the production of *Huntington* v. *Bobbitt's Heirs,* in 46 Miss., 528,

*supra,* he has had the candor, which does him honor, not to refer to that proposition in his supplementary brief. He was far too sound a lawyer to persist in that contention in the face of *Huntington* v. *Bobbitt's Heirs,* in 46 Miss., 528. His reliance, as I understand his very able and ingenious argument, is not on the proposition, thoroughly exploded by the case of *Huntington* v. *Bobbitt's Heirs,* that the debts were not barred, but that these plaintiffs were barred under the authority of the case of *Fox* v. *Coon,* 64 Miss., 465, 1 South., 629. But the answers to that contention are many and obvious: First, no chancery sale was involved in *Fox* v. *Coon.* Second, that was no suit to recover "the possession of the land," and the court said, in *Morgan* v. *Hazlehurst Lodge,* as I have pointed out, that § 2173 refers exclusively to suits to recover possession of the property, real or personal, actually and expressly naming the suits, to-wit, ejectment for land, and detinue or replevin for personal property. A bill in equity, such as filed in *Fox* v. *Coon,* has nothing to do with a suit to recover the possession of the land. Third, the bill in *Fox* v. *Coon* was filed on the theory that one tenant in common could not acquire at a tax sale title to the property, but would hold it as trustee for his co-tenants, and the bill was retained for the single purpose, stated in this opinion, of having the deeds reformed so as to limit the conveyance to such interest as they ought to have passed. And, finally, no statute of limitations whatever was referred to, discussed, or involved in that case. It is too plain, it seems to me, for serious contention, that a bill in equity to cancel clouds has no sort of application to a statute of limitations applied to suits in ejectment to recover possession of the land.

Some sort of reference is made to § 2174 of the Code of 1871 as having application here. The bare reading of the section dispels any such pretension utterly. That section applies the same statute of limitations to equity and law actions brought for the "same cause." Neither in equity, nor at law, could

these reversioners have brought any suit to recover the posses-
sion of this land until their right accrued upon the death of
their mother, and only then, an action at law.   *Hoskins* v.
*Ames,* 78 Miss., 993, 29 South., 828, is conclusive of this
proposition.   The argument made by the learned counsel that
there is a presumption of law, having positive evidential value,
that the purchase money was paid, and the sale made in good
faith, is wholly fanciful.   It will not bear the test of exam-
ination.   Counsel says that that would be the same sort of
presumption which this court in *Sheehan* v. *Kearney,* 82 Miss.,
688, 21 South., 41, 35 L. R. A., 102, said was sufficient to
establish, unless rebutted, the presumption of sanity, and the
same sort of presumption that would establish, *prima facie,*
by the probate of a will, the evidence of its validity.   As to
the last point, § 1824 of the Code of 1892 is a perfect answer,
since, by that section, the statute law is what gives the probate
of a will *prima facie* validity.   There is no such statute that,
in a suit of this kind, there is any legal presumption, either
that the purchase money was paid, or that the sale was made
in good faith to arise, or be created by the mere recital in
the administrator's deed or report of sale.   This needs no
further notice.   As to the first branch of the proposition, the
answer is equally perfect: That there is, in universal law,
a presumption that all men are sane.   Where has there ever
been found any such presumption, under this statute putting
the burden on the purchaser, that a mere recital in a deed, or
in a report, had the effect of establishing, *prima facie,* that the
purchase money was paid, or that the sale was made in good
faith?   If these unfortunate reversioners are to lose their
inheritance, in Heaven's name let it not be upon presumptions
— presumptions, too, which find no footing anywhere in the
law.   If the transcendently gifted counsel, who presented this
cause for the appellants, in the oral argument, can find no
better footing to support his cause than these illusory observa-
tions, as to some fanciful presumption of payment, and of good

faith, to be derived from a mere recital in a deed or in a report, it is because there is no law supporting such notions; else he certainly would have found it. It is equally idle to attempt any confusion here by talking about the general jurisdiction of the probate court to order sales of land to pay debts That is a thousand miles from the mark. The point here precisely is that, granted such general jurisdiction, it has no power to exercise that jurisdiction, in a case where no debts existed to be paid, just exactly as the state has no power to order the sale of land for taxes where there are no taxes due.

I propose now to notice briefly some of the remarkable propositions set out in the opinion of the majority in this case. There are some things which the majority opinion concedes: (1) That the sale was absolutely null and void; (2) that it was so void for the want of notice to the parties; void, in other words, for want of jurisdiction; and (3) that there is nothing in the letter of the statute applying this bar to a case of this sort. Let us now notice some of its statements. It is said, in the course of the opinion of the majority, that: " Counsel for appellee introduce no testimony impeaching the good faith of the sale. Nowhere in this record does it appear that any witness has taken the stand to testify that the sale was not made in good faith, and the purchase money paid." Expressions similar to this on these particular points are scattered, indifferently, through the opinion from time to time. The whole argument of the opinion proceeds upon the assumption that the appellees, the owners of the land, had upon them the burden of proof that the sale was made in bad faith, and that the purchase money was not paid. That is the plain and obvious deduction from the whole course of reasoning in the opinion on this subject. The theory seems to be that the purchaser can fold his hands, and remain passive, and claim the benefit of this statute, simply because the heirs do not put a witness on the stand after the lapse of thirty years to prove that the sale was not made in good faith, and that

the purchase money was not paid. The direct converse of
this has been, over and over, declared by our court. It is the
heirs who can remain passive, not the purchaser. It is the
purchaser who must show by affirmative testimony that the
sale was made in good faith, and that the purchase money
was paid, and not the heirs, who are required to show that the
sale was not in good faith, and the purchase money not paid.
It is true that the opinion seems to admit, in one part of it,
the legal proposition that the burden is on the purchaser; but
the admission is worth nothing in the face of the plain and
obvious claim of the opinion, its manifest reasoning that that
burden is, in fact, on the heirs, and not the purchaser, and that
it is the heirs who must put witnesses on the stand to prove
a negative. It certainly needs no further comment, when
I cite the opinion of the supreme court of the United States
in *Clay* v. *Field,* declaring expressly that the mere recital in
the deed of the administrator that the purchase money was
paid, and in the report of it to the court, that it was paid, even
in a case where there was a confirmation of the sale is utterly
insufficient, in the absence of a showing further than that, that
the money was accounted for as applied on the debts of the
estate, and declaring, in respect to that sort of proof, that
" under such circumstances, to hold that the purchase money
is proved to have been paid would be to disregard both the
words and the intent of the statute," and then find my Brethren
answering that square decision of the point by the light remark
that it has no application to the case at bar. It is on all fours
in respect with the *Clay-Field case,* except that it is stronger
than that case against the application of the statute. It is
idle to appeal to reason any further on this line. I pass from
this proposition.

The next proposition I refer to, in the opinion of the ma-
jority, is this: They say that, " when a decree of insolvency
was made, and the property ordered to be sold for the payment
of the debts, the debts propounded seemed to be barred, but, at

the time this petition was filed, the statute of limitations was not pleaded, and, even though the accounts filed with the petition might appear to be barred, the statute of limitations was not set up, and, upon the showing made by the administrator that there were debts, the decree of insolvency was made, and the property ordered to be sold, and the sale took place, so that we have the property sold by order of the probate court," etc. Was ever such a *non sequitur* heard of? It is admitted that the debts on their face show they were barred, and yet it is insisted that that made no difference, because the administrator did not plead the statute. My learning has always been, on this subject, that it was the duty of the administrator to protect the estate, for which he was the fiduciary, and that it was his special duty to plead the statute of limitations against all debts which were barred, as held in this very estate in the *Bobbitt's Heirs case* in 46 Miss., 528, *supra.* I understand the power of the probate court to sell land to pay debts to depend on the fact that there were debts due to be paid, not on the statement of the administrator the one way or the other, and surely not on his failure to plead the statute the law made it his sworn duty to plead. The showing made by the administrator! He could have made no showing that would not have manifested on the very face of every debt the fact that it was barred.

But we come now to a still more remarkable attitude of the court on this subject. The court gravely asks this question in the course of its opinion: " Is the statute to be destroyed in every case where there is an outstanding estate, either in curtesy, dower, or for a term of years, or must the party having the right to sue bring suit within one year after the termination of the outstanding estate in a case where the purchaser of the reversion at the sale takes possession and commences to hold under the title acquired at the sale? In such a case, where the sale is made by virtue of an order of the court, is the one-year statute to be applied from the date at which the right to bring a suit accrues?" And, again, further on, the court says: " The

statute does not say that it was not applied to the sale of a reversion or a remainder." And still again the court says: " To follow out the opposite conclusion would mean that § 2173 should have added to it, by this court, that this section shall not apply to the sale of a reversionary interest, and would involve additional judicial legislation." This is so extraordinary an announcement that it is difficult to understand how the court could fail to see the utter fallacy involved in the declaration. It is I, and not the majority of the court, who insist upon standing squarely by this statute as written. It is the majority of the court, and not myself, who do the judicial legislation. It is they, not I, who interpolate into this statute what was never written there, and was never intended to be written there. It is gravely said that the statute does not say that it shall not apply to the sale of a reversion or remainder. The statute expressly declares what it does apply to, and it does not apply to anything which is not expressly stated it applies to. The majority write into the statute these words, " except that as to reversioners this statute shall take effect within one year from the termination of the life estate." That is exactly what is done, and that, I say, is emphatically judicial legislation pure and simple. I stand by the statute; the majority repudiate it, and add to its already unwarranted harshness, by ingrafting exceptions not contained in the statute itself. I have heretofore pointed out the harshness of this statute. My Brethren speak in great praise of its " beneficent operation," its " wholesomeness," etc. The codifiers of the Code of 1880, 1892, and the Code of 1906, and the Legislature which adopted them, did not seem to think it so beneficent. They changed one year to two years and made the two years' period begin from possession taken by the purchaser, crystallizing into law the announcement on that point in *Morgan* v. *Hazlehurst Lodge.* Suppose a suit brought by a minor, after he became of age, more than one year after the date of sale; what would be the result ? He would be clearly barred, and why ? Because

the statute most unreasonably contains no exception in favor of minors. The majority stand on the statute when it destroys the rights of those under disability — minors, lunatics, etc.— if the suit be brought within one year after the sale, but they repudiate the statute, as written, when they apply it to an action brought by reversioners whose right to sue never accrued until thirty years after such sale. They say Judge SIMRALL held that this statute began to operate from the date of the death of the life tenant. I deny emphatically that the court held any such thing in that case. Every opinion must be limited to the case made by its facts, and the case made by the facts in *Morgan* v. *Hazlehurst Lodge* was not a case where reversioners sued, and the remarks of Judge SIMRALL were made as applicable alone to persons having a present right to sue for the land. He had not the remotest reference to a suit brought by reversioners. It certainly is hard enough to have the case wrested from its moorings by applying a statute intended to bar persons having a present right to sue within a year from the sale, but what shall be said when the majority turn upon the unfortunate dissenter and charge him with doing what they themselves have done, to-wit, interpolate into the statute words that are not there. Of course, the statute does not say that it does not apply to reversioners. It was wholly unnecessary to say that. The nature and character of their estate established their want of any present right to sue. It defined to whom it applied. It applied alone to all persons who had a present right of action beginning from the date of the sale, and to no person who did not have a present right of action at the date of the sale. I have referred to the reasons given by Judge SIMRALL that there might be some remedy where a purchaser was about to lose his money because of the invalidity of a sale set aside within a year. I have further shown that the reason thus given shows the inapplicability of this statute to an attack made thirty years later. It is incomprehensible to me how my Brethren can fail to see that they are

directly and squarely adding to this section, and stand not only not within its letter, but, as just shown, not within its spirit.

I pass from this to another proposition, and that is this: The absolute impossibility of determining whether the majority of the court mean to hold that § 2173 is a curative statute or not. In one case it is pronounced a mere statute of limitations; in another it is called both a remedial and a curative statute, and quotations are made indiscriminately from *Hall* v. *Wells,* 54 Miss., 289, and *Morgan* v. *Hazlehurst Lodge.* I confess myself unable to comprehend which view the majority opinion is intended to announce on this subject; but, whatever it is intended to announce, there is no uncertainty as to what this court intended to announce in *Hall* v. *Wells,* to-wit, that it is a statute of limitations pure and simple.

Another most astounding proposition to my mind is the citation of the case of *Bradley* v. *Villere,* 66 Miss., 399, 6 South., 208, which held that § 2173 of the Code of 1871 applied as well to sales made in disregard of the Constitution as to those in violation of statutes. This doctrine has been repudiated in a dozen cases within the last ten years. It certainly needs no argument to show, since the decision of *Hawkins* v. *Mangum,* where by Brother CALHOUN said, in 78 Miss., 97, 28 South., 872 (and in at least a dozen other decisions to the same effect), that no sale which violated the Constitution could ever be protected by any statute of limitations, that no statute of limitations was ever intended to apply to a sale void for unconstitutional reasons.

But the most remarkable and incomprehensible announcement of the majority is contained in this quotation: They say that their position " is made more apparent on reading § 2170 of the Code of 1871, which provides that: ' When any person shall be prohibited by law or restrained or enjoined by the order, decree, or process of any court in this state from commencing or prosecuting any action or remedy, the time during which such person shall be prohibited, enjoined, or restrained

shall not be computed as any part of the period of time limited
by this chapter for the commencement of such action.' " " If,"
say the majority, " the court had not already settled this ques-
tion, the statute itself settles it. When the plaintiffs could
not sue, this statute protected them and kept alive their right
until such time as they could sue." I confess my utter ina-
bility to appreciate this reasoning. It is beyond me. The
profession will certainly be startled when they hear this con-
struction of this familiar § 2170. I do not think it ever oc-
curred to any one that this section ever had any reference to
anything else except the order, decree, or process of some court,
or some positive prohibition of statute law. No one pretends
there was any positive statute provision of law preventing these
reversioners from suing, or any order, decree, or process of
any court preventing them from suing. The very thought of
this § 2170 is that the persons prohibited from suing, by posi-
tive statute law, or by process or by decree of a court, are
those who had a present right of action, and who were kept
from exercising that right of action by the positive statute law,
or by order, process, or decree of some court. In other words,
the statute was intended to protect those who had a present
right of action from having the statute of limitations run
against that present right of action, during some period within
which the positive statute law or some order, decree, or process
of a court kept them from exercising their right; in other words,
from suing. It would have been very hard, if one having a
present right of action was prevented from suing by reason of
some positive statute law, or by the order of some court, and in
the meanwhile to allow the statute of limitations to run against
his right of action, so as to finally bar him. That was the evil
intended to be cured by § 2170. It never had the remotest
reference to a right of action that did not presently exist, when
the order of the court, or the positive statute law, was made or
enacted. The resort to such a desperate strait as the invocation
of § 2170 to bolster up the case of the majority is conclusive

evidence that they were hard bestead. It is too plain for discussion that these appellees, reversioners, never had any present right of action to be prohibited by any court, or by any positive statute law. They could not have sued until their mother died, because of the nature of their estate as reversioners; not because any court had prohibited them from suing, or because there was any statute law prohibiting them from suing. There was no need for any order of the court or for any statute. They were prohibited by the very nature of the estate they held, a reversion, and as reversioners they had no present right of action to be prohibited or restrained by any positive statute, or by order of the court.

I pass to another proposition: The court actually say that the proposition in this case whether this section has any application to the right of reversioners to sue is not *res nova.* I assert that it is emphatically *res nova. Morgan* v. *Hazlehurst Lodge* has nothing in the world to do with this proposition, and nothing in that case had the remotest reference to an action by reversioners under this § 2173. I do not overrule *Morgan* v. *Hazlehurst Lodge,* as the court says my view would do. I put *Morgan* v. *Hazlehurst Lodge* on the facts of that case, while the court wrest language used in *Morgan* v. *Hazlehurst Lodge,* and apply that language in a way never dreamed of by the writer of that opinion, as shown by his own language in the construction of § 2173 and of the act of 1844 out of which it grew.

Again, the court say: " It is true that the burden of proof rested upon those who claimed under this sale to show that the sale was made in good faith, and the purchase money paid; but they make out a *prima facie case* by the production of the record of the administrator showing a sale, a purchase, and the payment of the purchase price." Now, there are three things here said to be shown which I respectfully submit are not shown at all. I insist that it is not shown that there was any sale. There was a sale without power to make it, because there were no debts, and there was no notice; just as if there had been no

sale at all. There was no purchase, because there was no sufficient proof of the payment of the purchase price, and there is no proof of the payment of the purchase price except the recital by the administrator in his deed, which is a mere contradictable receipt as any other receipt is, and his report was never called to the attention of the court now acted on by it.

Again, the court say: " Bad faith cannot be argued from the mere fact that proceedings leading up to the sale were irregular, and such as to create a void sale." Here, again, the court is wobbling, and again talks about the irregularity of the sale and the creation of a void sale. If the sale was void, let us have. it void, and quit talking about this irregularity, and especially let us recognize the plain fact that it was a sale void, as the majority admit, because the decree was without notice, and therefore without jurisdiction; and most especially let us remember that it was void also because the probate court had no power to order a sale to pay debts, when there were no debts to be paid.

Again, the court say: " It may be conceded that the sale by the administrator was void, but all these things did not prevent the one-year statute of limitations from applying, because however irregular and defective the proceedings leading up to the sale, still the court had jurisdiction of the administration, and the sale was made by order of the probate court." Here, at last, we have the court boldly declaring its position that, although a sale was decreed to pay debts when all the debts were absolutely barred, and there were no debts therefore to be paid, and although the decree was made without jurisdiction of the parties in the particular case, for the want of notice, nevertheless this statute applies to cut out the rightful owners of the land. " Jurisdiction of the administration," say the majority. What on earth has " jurisdiction of the administration " to do with jurisdiction to make a decree in the particular case, in which it is conceded no notice was served on the parties to be affected? My Brethren distinguish between the general

jurisdiction which a probate court had to order land sold for the payment of debts, and the utter want of jurisdiction that same court would have to decree any sale, where there had been no notice served upon the parties defendant; and can they not also see that, whilst the probate court has a general jurisdiction to order the sale of lands to pay debts, it cannot exercise that jurisdiction, it has no power to exercise that jurisdiction, by ordering a sale to pay debts, where, concededly, all debts were barred long before the decree? The confusion into which they have fallen is palpable. They are manifestly confounding and confusing together two wholly different things, to-wit, the general jurisdiction which a probate court has to order land sold to pay debts and to administer estates, and the absence of the right to exercise that jurisdiction, in a particular case, where it was lost either because there was no notice served on the parties to be affected, or because there was no power to sell, since there were no debts to be paid. I confess my amazement at the inability of the court to apprehend this palpable distinction.

I will pursue the subject no further. I regard this decision as a most lamentable one. The result of it no man can foresee. Reversioner and remaindermen will have no rights left under the construction of § 2173 given by the majority to this section.

This case is of such great importance, and has been so ably argued, that the reporter is directed hereby to set out all the briefs in full.

For all the reasons above indicated, I most emphatically dissent *in toto* from the opinion of the majority, and the judgment following it.